**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff*, | |
| *v.* | Case No.: 2:26-cv-00156 |
| KRIS WARNER, in his Official Capacity as WEST VIRGINIA SECRETARY OF STATE, | |
| *Defendant*. | |

**<u>MEMORANDUM OF LAW IN SUPPORT OF WEST VIRGINIA ALLIANCE FOR RETIRED AMERICANS' MOTION TO INTERVENE AS DEFENDANT</u>**

Pursuant to Federal Rule of Civil Procedure 24, the West Virginia Alliance for Retired Americans (the "Alliance" or "Proposed Intervenor") moves to intervene as defendant. Proposed Intervenor meets all of Rule 24(a)'s requirements and thus intervention should be granted as of right. Alternatively, the Court should grant permissive intervention under Rule 24(b).

## INTRODUCTION

The U.S. Department of Justice ("DOJ") pursues an unprecedented campaign to compile sensitive personal information on voters nationwide in a centralized federal database. As part of this effort, DOJ sued the West Virginia Secretary of State on February 26, 2026, seeking to compel him to turn over the State's unredacted voter registration list, which contains sensitive and private information about every voter in the state. This unlawful demand intrudes not only upon West Virginia's constitutional prerogative to maintain and protect its own voter registration list and the explicit guarantees it has made to voters that their private data will not be shared, but also on the privacy rights of West Virginia voters whose data will be disclosed if DOJ prevails.

West Virginia law explicitly protects from disclosure the personal information that DOJ seeks. It precludes the release of any voter registration records which contain "the registrant's telephone number, email address, Social Security number or driver's license number or nonoperator's identification number issued by the Division of Motor Vehicles." W. Va. Code Ann. § 3-2-30(b); *see also id*. § 3-2-30(a) (precluding the "examin[ation]" of voter registration records containing the same identifying information); *see also* W. Va. Code Ann. § 5A-8-22 (precluding the state executive branch from disclosing "[a]n individual's Social Security number" because it amounts to "an unreasonable invasion of privacy" under West Virginia law). DOJ's requested relief runs roughshod over these privacy protections, which Proposed Intervenor seeks to preserve.

Proposed Intervenor—which has over 51,000 members in West Virginia—moves to intervene to represent and protect its members' interests in preventing improper disclosure of their

1

sensitive personal information, as well as its own organizational interests threatened by this action. Although Secretary Warner has thus far reportedly refused to provide the requested information, as a governmental defendant, he must consider the "broader public-policy implications" of the issues presented in this suit, unlike Proposed Intervenor, which is solely concerned with protecting its members' and constituents' privacy, "full stop." *Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179, 196 (2022) (citing *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538–39 (1972)). As a result, Proposed Intervenor's interests are not adequately protected by the existing parties.

DOJ has filed nearly identical lawsuits against dozens of states and courts across the country have repeatedly granted intervention to state Alliance chapters seeking to defend their members' privacy rights and their own organizational interests in these cases. *See United States v. Benson*, No. 1:25-CV-01148, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026); Order, *United States v. Simon*, No. 0:25-cv-03761 (D. Minn. Jan. 6, 2026); Order, *United States v. Pennsylvania*, No. 2:25-cv-01481 (W.D. Pa. Jan. 16, 2026); *United States v. DeMarinis*, No. 1:25-cv-03934 (D. Md. Feb. 2, 2026); Min. Order, *United States v. Oliver*, No. 1:25-cv-01193 (D.N.M. Dec. 12, 2025); Min. Order, *United States v. Amore,* No. 1:25-cv-00639 (D.R.I. Jan. 6, 2026), Min. Order, *United States v. Copeland Hanzas*, No. 2:25-cv-00903 (D. Vt., Jan. 16, 2026); Min. Order, *United States v. Galvin*, No. 1:25-cv-13816 (D. Mass. Jan. 6, 2026); Order, *United States v. Wis. Elections Comm'n*, No. 3:25-cv-01036 (W.D. Wis. Jan. 21, 2026); Min. Order, *United States v. Thomas*, No. 3:26-cv-00021 (D. Conn. Jan. 13, 2026); Text Order, *United States v. Matthews*, 3:25-cv-03398-CRL-DJQ (C.D. Ill. Mar. 2, 2026).[1] The Alliance has not been denied intervention in any of these

---

[1] Other motions to intervene from state Alliance chapters in similar DOJ cases are pending. *See* Kentucky Alliance Mot. Intervene, *United States v. Adams et al*, 3:26-cv-00019 (E.D. Ky Mar. 2,

cases in which it has sought intervention. This makes sense. Ultimately, it is the *voters'* personal data that is at stake here. Thus, not only should the Court allow participation by a party that directly represents those interests (and, in the West Virginia Alliance's case, it represents *over 51,000 of those voters' interests*), allowing intervention will ensure that the Court hears from the people who will be directly harmed should DOJ prevail.

Proposed Intervenor is entitled to intervention as of right under Rule 24(a). But in the alternative, it should be granted permissive intervention under Rule 24(b) to ensure that West Virginia voters—whose sensitive and personal information is the target of DOJ's request for relief—have a say in these proceedings. Proposed Intervenor's presence will also help to develop the issues and ensure vigorous presentation of arguments that are most pertinent to the voters who are threatened by this suit and that the Secretary may be limited in presenting. Among other things, Proposed Intervenor is uniquely situated to offer insight into the parallel proceedings, many of which involve sister state Alliance chapters. Indeed, one court has already relied on the Alliance's arguments in dismissing DOJ's claims. *See Benson*, 2026 WL 362789, at *11.

## **BACKGROUND**

**I.    Federal law has long made voter list maintenance a state responsibility, consistent with the constitutional principles of federalism.**

The U.S. Constitution "invests the States with responsibility for the mechanics" of federal elections, though Congress may "preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997); *see also* U.S. Const. art. I, § 4, cl. 1. That said, the Supreme Court has been clear that

---

2026) (pending); Arizona Alliance Mot. Intervene, *United States v. Fontes,* 2:26-cv-00066 (D. Ariz. Jan. 8, 2026) (pending); Colorado Alliance Mot. Intervene, *United States v. Griswold,* 1:25-cv-03967 (D. Colo. Dec. 17, 2025) (pending); Nevada Alliance Mot. Intervene, *United States v. Aguilar*, 3:25-cv-00728 (D. Nev. Dec. 16, 2025) (pending); MD/DC Alliance Mot. Intervene, *United States v. Evans et al*, 1:25-cv-04403 (D.D.C. Dec. 21, 2025) (pending).

Congress's power to preempt such laws goes only "so far as it is exercised, and no farther." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013). And while Congress has enacted certain laws governing voter registration, these laws augment existing "state voter-registration systems," *id.* at 5, and confirm that *states* are the custodians of voter registration data.

The relevant federal laws are the National Voter Registration Act ("NVRA") and the Help America Vote Act ("HAVA"). NVRA, which was enacted in 1993, charges *states*—not the federal government—with the "administration of voter registration for elections for Federal office," 52 U.S.C. § 20507(a), including maintaining voter lists (subject to strict procedural safeguards), *id.* § 20507(c)–(g). It similarly makes *states* the custodians of those lists. *See Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018).

HAVA was enacted following the 2000 elections "to improve voting systems and voter access." *RNC v. N.C. State Bd. of Elections*, 120 F.4th 390, 394 (4th Cir. 2024). It requires states to create a "computerized statewide voter registration list," 52 U.S.C. § 21083(a)(1), and to "perform list maintenance" consistent with the NVRA's highly deferential provisions. *Id.* § 21083(a)(2)(A). HAVA is also abundantly clear that this list is to be "defined, maintained, and administered at the State level." *Id.* § 21083(a)(1)(A). Its legislative history stressed that "[h]istorically, elections in this country have been administered at the state and local level. This system has many benefits that must be preserved," including that "[t]he dispersal of responsibility for election administration has made it impossible for a single centrally controlled authority to dictate how elections will be run, and thereby be able to control the outcome." H.R. Rep. No. 107-329, pt. 1, at 31–32 (2001). Accordingly, neither NVRA nor HAVA tasks the federal government with duties related to voter lists, *by design*. Congress has intentionally "left it up to the States to maintain accurate lists of those eligible to vote in federal elections." *Husted*, 584 U.S. at 761.

4

II.    **DOJ has embarked on an unprecedented nationwide campaign to collect personal voter registration data held by the states.**

In the spring of 2025, DOJ launched a campaign to demand broad and unprecedented access to state voter files, including personal information about each voter. It has reportedly sent demands to at least 48 states, with plans to make similar demands on all 50.[2] The vast majority have declined to turn over sensitive personal information that is typically protected by state law. *See supra* note 1.

DOJ has now filed lawsuits against 29 states and the District of Columbia to compel production of that data. While DOJ has repeatedly claimed that it need not offer any justification for its demands, it reportedly seeks to use the data to create a national voter database to attempt to substantiate unfounded accusations that millions of non-citizens have voted illegally in recent elections.[3] In recent public statements, moreover, Assistant Attorney General Harmeet Dhillon made clear that DOJ also intends to use the information to attempt to compel removal of *hundreds of thousands* of voters from the rolls.[4] And, as detailed in a brief filed by several states in several of these other parallel cases, DOJ has often demanded not simply read-only access, but "materials that define or explain how" the voter information is coded into the registration database, "potentially because additional information about the database coding would assist in transferring

---

[2] *See* Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (Dec. 5, 2025), https://perma.cc/ED4Z-AWB4; Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times (Sep. 9, 2025), https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html.

[3] *See* AAG Harmeet Dhillon (@AAGHarmeetDhillon), X (Dec. 18, 2025, at 9:24 AM ET), https://x.com/AAGDhillon/status/2001659823335616795 (stating in video discussing these lawsuits: "You're going to see hundreds of thousands of people in some states being removed from the voter rolls.").

[4] *See id.*

data . . . into other federal databases." *See, e.g.*, Br. of Amici Curiae Md. et al. in Supp. of Mot. to Dismiss at 6, *United States v. Bd. of Elections of N.Y.*, No. 1:25-cv-01338 (N.D.N.Y. Jan. 6, 2026),. Indeed, in recent months the federal government has repeatedly sought to transfer and utilize sensitive information given to or possessed by it for other uses that threaten the citizenry in a number of ways. This includes, for example, collecting state data on Supplemental Nutrition Assistance Programs and using state-compiled Medicaid data for immigration enforcement purposes. *Id.* at 2–5. These concerns are similarly present here.

DOJ allegedly sent Secretary Warner a letter on September 8, 2025, seeking West Virginia's statewide voter registration list with "all fields" that DOJ claimed were "required under HAVA to register individuals for federal elections." Compl. ¶¶ 20–23. According to the complaint, on September 22, 2025, "Defendant[] refus[ed] to provide the requested [state voter registration list] for all fields." *Id.* ¶ 24. DOJ allegedly emailed Defendants on December 10 and December 19, 2025, and on January 13, 2026, again requesting West Virginia's state voter registration list with all fields. *Id.* ¶ 25. According to the complaint, on February 11, 2026, Defendant sent a letter to the Attorney General explaining that he would not provide the requested information. *Id.* ¶ 26.[5]

### III.    DOJ sues to compel West Virginia's complete voter list.

DOJ filed this suit on February 26, 2026, seeking to compel the Secretary to provide West Virginia's full statewide voter registration list. *See* Compl. Although the Complaint alleges that DOJ seeks this data to ensure that West Virginia is complying with the NVRA and HAVA, it does not assert *any* claims under those laws. Instead, DOJ brings only one claim under the Civil Rights Act of 1960, 52 U.S.C. § 20703 ("Section 303"), a statute that permits DOJ to review certain voting

---

[5] DOJ references this correspondence in its complaint, but it does not attach any of it.

records and papers for the purpose of enabling investigations "concerning infringement or denial of . . . constitutional voting rights." *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962).

Section 303 does not support DOJ's sweeping demands. *See United States v. Weber*, No. 2:25-cv-09149-DOC-ADS, 2026 WL 118807, at *8 (C.D. Cal. Jan. 15, 2026) (granting motions to dismiss DOJ's parallel CRA claim in California). Congress enacted that provision to preserve "the right of all qualified citizens to vote without discrimination," and specifically to facilitate "investigation[s]" authorized under the Civil Rights Act of 1957, which recalcitrant local officials had frustrated through the destruction of records. H.R. Rep. No. 86-956, at 1944 (1959). This history "leaves no doubt but that [Section 303] is designed to secure a more effective protection of the right to vote." *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Att'y Gen. of U.S.*, 285 F.2d 430 (5th Cir. 1961); *see also Weber*, 2026 WL 118807, at *8 ("The purpose of Title III is to detect voting-related racial discrimination."). Yet DOJ admits that it is *not* seeking to enforce the Civil Rights Acts or investigate the denial of the right to vote. Instead, it claims to be evaluating West Virginia's list maintenance efforts under NVRA and HAVA. *See generally* Compl. Section 303 of the Civil Rights Act has no application here. And, even if it did apply, it does not prohibit states from redacting sensitive voter information that has nothing to do with investigating the denial of the right to vote, just as they may in disclosing information under NVRA. *See Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068, 1083 n.14 (10th Cir. 2025); *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024).

It is also notable that, in the first few waves of its otherwise nearly identical lawsuits against other states, DOJ *did* assert NVRA and HAVA claims.[6] However, it has abandoned those claims

---

[6] DOJ filed numerous cases in September 2025, alleging claims under the NVRA, HAVA, and Section 303. *See* Compl., *United States v. Bellows*, No. 1:25-cv-00468 (D. Me. Sep. 16, 2025);

in more recent waves of these lawsuits, including here against West Virginia.[7] DOJ's change of

tactic is an implicit admission that it does not have a basis to pursue these actions under HAVA or

NVRA, and in that regard at least, DOJ is correct.

## IV.    Proposed Intervenor and its members are threatened by DOJ's demands.

Proposed Intervenor West Virginia Alliance for Retired Americans represents over 51,000

members in West Virginia—most of whom are registered to vote and whose sensitive personal

information will accordingly be disclosed to DOJ if it prevails here. Ex. B, Decl. of John Case

("Case Decl.") ¶ 4. West Virginia law guarantees to all these voters that the sensitive information

they disclose when registering to vote will be kept confidential and secure. *See* W. Va. Code Ann.

§ 3-2-30(a), (b); *see also* W. Va. Code Ann. § 5A-8-22(a).

The Alliance is a nonprofit, nonpartisan organization whose membership includes more

than 51,000 retired workers that live throughout West Virginia. Case Decl. ¶¶ 3–4. Its mission is

---

Compl., *United States v. Oregon*, No. 6:25-cv-01666 (D. Or. Sep. 16, 2025); Compl., *United States v. Weber*, No. 2:25-cv-09149 (C.D. Cal. Sep. 25, 2025); Compl., *United States v. Bd. of Elections of N.Y.*, No. 1:25-cv-01338 (N.D.N.Y. Sep. 25, 2025); Compl., *United States v. Benson*, No. 1:25-cv-01148 (W.D. Mich. Sep. 25, 2025); Compl., *United States v. Simon*, No. 0:25-cv-03761 (D. Minn. Sep. 25, 2025); Compl., *United States v. Scanlan*, No. 1:25-cv-00371 (D.N.H. Sep. 25, 2025); Compl., *United States v. Pennsylvania*, No. 2:25-cv-01481 (W.D. Pa. Sep. 25, 2025).

[7] None of the DOJ's later-filed cases allege NVRA or HAVA claims—each alleges only a single claim under Section 303. *See* Compl., *United States v. Copeland Hanzas*, No. 2:25-cv-00903 (D. Vt. Dec. 1, 2025); Compl., *United States v. DeMarinis*, No. 1:25-cv-03934 (D. Md. Dec. 1, 2025); Compl., *United States v. Albence*, No. 1:25-cv-01453 (D. Del. Dec. 2, 2025); Compl., *United States v. Amore*, No. 1:25-cv-00629 (D.R.I. Dec. 2, 2025); Compl., *United States v. Hobbs*, No. 3:25-cv-06078 (W.D. Wash. Dec. 2, 2025); Compl., *United States v. Toulouse Oliver*, No. 1:25-cv-01193 (D.N.M. Dec. 2, 2025); Compl., *United States v. Griswold*, No. 1:25-cv-03967 (D. Colo. Dec. 11, 2025); Compl., *United States v. Nago*, No. 1:25-cv-00522 (D. Haw. Dec. 11, 2025); Compl., *United States v. Galvin*, No. 1:25-cv-13816 (D. Mass. Dec. 11, 2025), Compl., *United States. v. Aguilar*, No. 3:25-cv-00728 (D. Nev. Dec. 11, 2025); Compl., *United States v. Evans*, No. 1:25-cv-04403 (D.D.C. Dec. 18, 2025); Compl., *United States v. Raffensperger*, No. 5:25-cv-00548 (M.D. Ga. Dec. 18, 2025); Compl., *United States v. Matthews*, No. 3:25-cv-03398 (C.D. Ill. Dec. 19, 2025); Compl., *United States v. Wis. Elections Comm'n*, No. 3:25-cv-01036 (W.D. Wis. Dec. 18, 2025); Compl., *United States v. Thomas*, No. 3:26-cv-00021 (D. Conn. Jan. 6, 2026); Compl., *United States v. Fontes,* No. 2:26-cv-00066 (D. Ariz. Jan 6, 2026).

to ensure the social and economic justice and full civil rights of retirees, including by working to safeguard the right to vote. *Id.* ¶¶ 5–6. To that end, the Alliance encourages its members to register to vote, engages in registration drives, and educates voters. *Id*. These activities are central to achieving the Alliance's core mission—by turning out members to vote, the Alliance builds its constituency's political power and ability to achieve its legislative goals. *Id.* ¶ 6. The Alliance has long been concerned with protecting the privacy rights of its members, and it regularly discusses with its members the risks of identity-fraud scams and how they need to vigilantly protect their confidential, personally identifying information to avoid such scams, which are disproportionately targeted at older Americans. *Id*. ¶¶ 9–11. Given the current Administration's carelessness regarding personal data—as shown, for example, by the Department of Government Efficiency's ("DOGE") poor track record of preventing data breaches—many of the Alliance's members fear that the federal government will not take diligent care and commit to safeguard the confidentiality of their personal data.[8] *Id.* ¶¶ 13–15. Given the risks of identity theft and other forms of exploitation that accompany disclosures of such information, the Alliance has a direct and acute interest in protecting the fundamental privacy rights of its individual members. *Id.* ¶ 11.

## **LEGAL STANDARD**

The governing Rules require intervention be granted to any movant who "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that

---

[8] For example, public reports have indicated that DOGE placed the security of millions of Social Security numbers at risk of disclosure. *See* Nicholas Nehamas, *DOGE Put Critical Social Security Data at Risk, Whistle-Blower Says*, N.Y. Times (Aug. 26, 2025), https://www.nytimes.com/2025/08/26/us/politics/doge-social-security-data.html. And DOJ recently admitted that DOGE employees sought to share social security data with private organizations seeking to undermine the results of prior elections. *See* Notice of Corrections to the Record, *Am. Fed. of State, Cnty., & Mun. Emps. v. Social Sec. Admin.*, No. 1:25-cv-00596 (D. Md. Jan. 16, 2026).

disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2). The motion to intervene must be timely, *Alt v. E.P.A.*, 758 F.3d 588, 591 (4th Cir. 2014), and show: "(1) an interest in the subject matter of the action; (2) that the protection of this interest would be impaired because of the action; and (3) that the applicant's interest is not adequately represented by existing parties to the litigation." *Stuart v. Huff*, 706 F.3d 345, 349 (4th Cir. 2013) (citation omitted); *see also* Fed. R. Civ. P. 24(a). Courts also have discretion to grant permissive intervention when a proposed intervenor "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). "The Fourth Circuit favors 'liberal intervention . . . to dispose of as much of a controversy' as possible." *Aziz v. Trump*, 231 F. Supp. 3d 23, 28–29 (E.D. Va. 2017) (quoting *Feller v. Brock*, 802 F.2d 722, 729 (4th Cir. 1986)).[9]

## **ARGUMENT**

### I.    **Proposed Intervenor is entitled to intervene as of right.**

The Court should grant Proposed Intervenor's motion to intervene as of right under Rule 24(a)(2) because its motion is timely, the disposition of this case could impair its ability to protect significant interests—the privacy rights of its members and constituents, and its mission-critical work—and no existing party adequately represents those interests.

### A.    **The motion to intervene is timely and will not prejudice the parties.**

Proposed Intervenor's motion to intervene is indisputably timely. DOJ brought this suit on February 26, 2026, *see* Compl., and this motion follows only eight days later—before any

---

[9] Rule 24 requires a motion to intervene to "be accompanied by a pleading that sets out the claim or defense for which intervention is sought." Fed. R. Civ. P. 24(c). Proposed Intervenor thus attaches a proposed Answer to this motion. *See* Ex. A. However, should it be granted intervention, Proposed Intervenor respectfully reserves the right to file a Rule 12(b) motion.

responsive pleadings or dispositive motions have been filed. No case schedule has been set, and no deadlines would need to be altered if intervention were granted. Proposed Intervenor will abide by any future deadlines set by the Court, so there is no prejudice to any party if intervention is granted. *See Women's Health Ctr. of W.Va. v. Sheth*, No. 2:23-cv-000789, 2023 WL 2146255, at *1 (S.D. W. Va. Feb. 21, 2023) (granting motion to intervene where intervenor indicated it was prepared to comply with previously established deadlines); *see also Ohio Valley Env't Coal., Inc. v. McCarthy*, 313 F.R.D. 10, 17–18 (S.D. W. Va. 2015) (motion to intervene was timely brought when the only action that had taken place was filing of a complaint and answer).

### B. Proposed Intervenor's ability to protect its interests will be impaired absent intervention, as other courts have recognized in parallel litigation.

Proposed Intervenor satisfies the closely related second and third requirements for intervention because it has significant protectible interests in this lawsuit, and the relief DOJ seeks threatens to impair those interests. A party satisfies the "protectible interest" standard so long as it "stand[s] to gain or lose by the direct legal operation of the district court's judgment" in the underlying action. *Teague v. Bakker*, 931 F.2d 259, 261 (4th Cir. 1991); *see also Francis v. Chamber of Com. of U.S.*, 481 F.2d 192, 195 n.8 (4th Cir. 1973) (noting that the current version of Rule 24(a) was "designed to liberalize the right to intervene in federal actions").

Proposed Intervenor more than satisfies Rule 24(a)(2)'s standards. It staunchly opposes the disclosure of its members' sensitive personal information to DOJ. *See supra* Background § IV. Courts regularly find that precisely these types of concerns support intervention. *See, e.g.*, *Kalbers v. U.S. Dep't of Just.*, 22 F.4th 816, 827 (9th Cir. 2021) (recognizing "straightforward" significantly protectible interest in confidentiality of non-public documents); *In re Sealed Case*, 237 F.3d 657, 663–64 (D.C. Cir. 2001) (holding intervenors had "legally cognizable interest in maintaining the confidentiality" of records). Proposed Intervenor's members have relied upon

West Virginia law's protections against disclosure of their social security numbers. *See* W. Va. Code Ann. § 5A-8-22(a). Yet DOJ seeks to override those protections, and Proposed Intervenor is credibly concerned about the consequences of the disclosure of its members' sensitive information to DOJ, including because of the risk of data breaches that could expose them to identity-theft scams, and based on their members' fears of retaliation. Case Decl. ¶¶ 9–15.

That said, and as another court in this Circuit correctly found in granting intervention to a sister Alliance chapter in DOJ's parallel case against Michigan, Proposed Intervenor and its members have "an interest in keeping their information private from the DOJ, whether or not disclosure to the DOJ produces any additional harm." *Benson*, 2025 WL 3520406, at *3. This is because individuals have an intrinsic right to the sanctity of information that is deeply personal and sensitive, and once that information is disclosed, "the cat is out of the bag." *In re Sealed Case*, 237 F.3d at 664 (citation omitted) (finding impairment when intervenor's confidential information was at risk of disclosure); *see also Newport News Shipbuilding & Drydock Co.*, 646 F.2d 117, 121 (4th Cir. 1981) (noting the question of impairment includes whether proposed intervenors would suffer a "practical disadvantage or impediment"); *Kalbers*, 22 F.4th at 828 (holding intervenor's "interest in keeping its documents confidential would obviously be impaired by an order to disclose" those documents). DOJ, in asking Defendants to disregard West Virginia law by turning over such sensitive information, threatens to irreparably harm Proposed Intervenor's members.

This is particularly important to the Alliance's membership, which consists almost entirely of seniors who are deeply concerned about the risks of social security fraud, identity theft, and other types of financial fraud, which are very often targeted at seniors. Case Decl. ¶¶ 9–11. The Alliance's members are wary of engaging in activities that will increase the chance that their private data will be turned over to third parties without knowledge or authorization. *Id.* In view of

the current administration's carelessness regarding personal data, Alliance members may reasonably be particularly hesitant to engage in the political process if it means inviting opportunities to have their private personal information released. *Id*. ¶¶ 11, 13, 15.

Proposed Intervenor's voter engagement and turnout work will also be harmed if DOJ's requested relief is granted. The fear and distrust sown by DOJ's aggressive demands for personal information directly frustrates Proposed Intervenor's mission-critical organizational work. *Id*. ¶¶ 6, 8. And courts have long recognized that organizations have a significant protectible interest in preserving and pursuing their own mission-critical organizational work, particularly when it comes to ensuring members' ability to vote. *See, e.g.*, *Jud. Watch, Inc. v. Ill. State Bd. of Elections*, No. 24 C 1867, 2024 WL 3454706, at *3 (N.D. Ill. July 18, 2024); *Paher v. Cegavske*, No. 3:20-cv-00243-MMD-WGC, 2020 WL 2042365, at *2 (D. Nev. Apr. 28, 2020); *Issa v. Newsom*, No. 2:20-CV-01044-MCE-CKD, 2020 WL 3074351, at *3 (E.D. Cal. June 10, 2020); *cf. La Union del Pueblo Entero v. Abbott*, 29 F.4th 299, 306 (5th Cir. 2022) (recognizing political party had a "legally protectable interest" because it "expend[s] significant resources in the recruiting and training of volunteers and poll watchers who participate in the election process"); *League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*, 659 F.3d 421, 434–35 (5th Cir. 2011) (reversing denial of intervention and concluding voting rights interest was sufficient to satisfy Rule 24(a)(2)).

Given these significant interests, Proposed Intervenor easily satisfies Rule 24(a)(2)'s requirements. Courts have accordingly granted intervention as of right to many similarly situated parties in parallel cases, including the Alliance, as well as other organizations that asserted organizational and membership interests akin to Proposed Intervenor's here. *See supra* at 2–3 (collecting cases); *see also Benson*, 2025 WL 3520406, at *6 (granting intervention as of right to the Alliance in DOJ's parallel Michigan lawsuit); *United States v. Oregon*, No. 6:25-CV-01666-

MTK, 2025 WL 3496571, at *2 (D. Or. Dec. 5, 2025) (granting intervention as of right to advocacy organization and individual voters); Text Order, *Amore*, No. 1:25-cv-00639 (D.R.I. Jan. 6, 2026) (granting intervention as of right to membership organization, labor union, and individual voters); Order, *Wis. Elections Comm'n*, No. 3:25-cv-01036 (W.D. Wis. Jan. 22, 2026), (granting intervention as of right, and alternatively by permission, to organizations and voters).

### C.   Proposed Intervenor's interests are not adequately represented by existing parties.

The "burden of showing an inadequacy of representation is minimal." *Virginia v. Westinghouse Elec. Corp.*, 542 F.2d 214, 216 (4th Cir. 1976); *accord Trbovich*, 404 U.S. at 538 n.10 (explaining this requirement "should be treated as minimal"). While the Fourth Circuit has suggested that a presumption of adequacy may arise "[w]hen the party seeking intervention has the same ultimate objective as a party to the suit," *Westinghouse Elec. Corp.*, 542 F.2d at 216, a proposed intervenor need only show that "that representation of his interest 'may be' inadequate." *JLS, Inc. v. Pub. Serv. Comm'n of W. Va.*, 321 F. App'x 286, 289 (4th Cir. 2009) (unpublished) (citation omitted). Courts are "liberal in finding" this requirement met because "there is good reason in most cases to suppose that the applicant is the best judge of the representation of the applicant's own interests." 7C Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1909 (3d ed. 2024). Here, Proposed Intervenor has distinct interests from the existing parties, who are governmental actors bound by federal and state laws governing voter list maintenance activities. No existing party adequately represents Proposed Intervenor's distinct interests.

DOJ plainly does not, as it seeks to forcibly compel production of West Virginia's unredacted state voter registration list—including the sensitive data of Alliance members. And, while the existing Defendant has, to date, resisted the DOJ's demand, he too does not adequately

represent Proposed Intervenor's specific interests. Federal courts have "often concluded that governmental entities do not adequately represent the interests of aspiring intervenors." *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 736 (D.C. Cir. 2003). This is because a government-official defendant's interests are "defined by the public interest, [not simply] the interests of a particular group of citizens." *JLS, Inc.*, 321 F. App'x at 290 (citation modified); *see also Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 972 (3d Cir. 1998). Simply put, "the government's representation of the public interest may not be 'identical to the individual parochial interest' of a particular group just because 'both entities occupy the same posture in the litigation.'" *Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 899 (9th Cir. 2011) (quoting *WildEarth Guardians v. U.S. Forest Serv.*, 573 F.3d 992, 996 (10th Cir. 2009)); *see also Conservation L. Found. of New Eng., Inc. v. Mosbacher*, 966 F.2d 39, 44 (1st Cir. 1992) (explaining "a governmental entity charged by law with representing the public interest of its citizens" will not necessarily "advance the narrower interest of a private entity").

The Supreme Court recently emphasized this point, explaining that public officials must "bear in mind broader public-policy implications," whereas a private litigant—like Proposed Intervenor—seeks to vindicate its own rights "full stop." *Berger*, 597 U.S. at 195–96 (citing *Trbovich*, 404 U.S. at 538–39). Thus, the Court cautioned that courts should not conduct the adequacy of representation analysis at too "high [a] level of abstraction," and reaffirmed that, even where the parties' interests "seem[] closely aligned," the burden to demonstrate inadequate representation remains "minimal" unless the parties' interests are "identical." *Id.* at 196 (citation omitted). In other words, even if the Secretary continues to oppose the ultimate relief that DOJ seeks, it does not follow that he shares "identical" interests to a civic membership organization committed to protecting its members and encouraging political participation. *See id.*

Here, the Defendant and Proposed Intervenor do not share "identical" interests. For one, the Secretary is required to enforce the requirements of the NVRA and HAVA, in addition to state laws governing maintenance of the voter registration list. Thus, by definition, the Secretary has an obligation to weigh and carry out public duties that Proposed Intervenor does not share. *See, e.g.*, *Bellitto v. Snipes*, No. 16-cv-61474, 2016 WL 5118568, at *2 (S.D. Fla. Sep. 21, 2016) (concluding adequate representation was not guaranteed where existing defendant was "an elected official" whose interpretation of the NVRA might not be aligned with intervenors' interests). Indeed, the NVRA specifically requires state election officials to "balance competing objectives"— maintaining accurate and current voter rolls while promoting access to the ballot box—that are not necessarily aligned with Proposed Intervenor's interests. *Bellitto v. Snipes*, 935 F.3d 1192, 1201 (11th Cir. 2019). In view of those circumstances, adequate representation of Proposed Intervenor and its members' interests is hardly "assured." *Brennan v. N.Y.C. Bd. of Educ.*, 260 F.3d 123, 132– 33 (2d Cir. 2001) (explaining this factor is met where parties' interests are not "so similar" as to assure adequacy of representation).

These considerations may require Defendant to "negotiate[] a settlement that would [be] contrary to the interest of the prospective intervenors," itself reason to find Proposed Intervenor's interests not adequately represented. *Fiandaca v. Cunningham*, 827 F.2d 825, 833 (1st Cir. 1987); *see also Kane Cnty. v. United States*, 928 F.3d 877, 895–96 (10th Cir. 2019) (recognizing "administration of . . . litigation resources" and "inclin[ation] to settle" may further establish inadequate representation). Indeed, DOJ told a federal court earlier this week that one of the states it recently sued is already in the process of negotiating a deal to release the relevant data. *See* Tr. of Mot. Dismiss Hr'g at 33:1–11, *United States v. Simon*, No. 0:25-cv-03761 (D. Minn. Mar. 3, 2026). The DOJ did not identify which state, but the fact that any of the states that DOJ has sued

on the same theory and seeking the same information are actively negotiating deals to turn over this sensitive data provides further reason to grant Proposed Intervenor's intervention here.

In addition, the Secretary is advised by a bipartisan State Election Commission with competing views among its various members. *See* W. Va. Code Ann. § 3-1A-5. Although the State Election Commission is not named as a party, the Secretary works in conjunction with the Commission in administering the state's elections and must balance his own views with those of the Commission. *See Kleissler*, 157 F.3d at 973 (finding inadequate representation when government had "numerous complex and conflicting interests"). The Secretary not only faces pressure from other governmental actors within the State, but also from the federal government; the state is reliant on federal dollars to administer elections, supporting a potential "interest in bringing [this] litigation to an end by settlement[]" with DOJ. *Brennan*, 260 F.3d at 133. Indeed, the U.S. Attorney General recently stepped up DOJ's attempts to coerce state governments to turn over this data, when she demanded access to Minnesota's voter roles as a condition to ending ICE activity in Minneapolis. *See supra* note 6.

Proposed Intervenor, however, is not burdened with the Secretary's public duties and obligations to enforce NVRA and HAVA. Instead, Proposed Intervenor is focused entirely on maintaining the privacy of its members' sensitive personal information and promoting its own organizational objectives. As a result, it is well-positioned to press legal arguments that cannot be "equally asserted" by the Secretary given his public duties. *Does 1 Through 7 v. The Taliban*, No. 6:22-cv-990, 2023 WL 4532763, at *5 (N.D.N.Y. July 12, 2023). Other courts have recognized this and granted intervention to other similar organizations and Alliance chapters in parallel cases. *See, e.g.*, Text Order, *Amore,* No. 1:25-cv-00639 (D.R.I. Jan. 6, 2026); *Benson*, 2025 WL 3520406, at *5–6; *Oregon*, 2025 WL 3496571, at *4–5; *see also* Order, *Galvin*, No. 1:25-cv-13816 (D. Mass.

Jan. 6, 2026); Order, *Pennsylvania*, No. 2:25-cv-01481 (W.D. Pa. Jan. 16, 2026); Order, *Simon*,

No. 0:25-cv-03761 (D. Minn. Jan. 6, 2026); *DeMarinis*, 1:25-cv-03934 (D. Md. Feb. 2, 2026);

Min. Order, *Oliver*, 1:25-cv-01193 (D.N.M. Dec. 12, 2025); Min. Order, *Amore,* 1:25-cv-00639

(D.R.I. Jan. 6, 2026), Min. Order, *Copeland Hanzas*, 2:25-cv-00903 (D. Vt, Jan. 16, 2026); Min.

Order, *Galvin*, 1:25-cv-13816 (D. Mass. Jan. 6, 2026); Order, *Wis. Elections Comm'n*, 3:25-cv-

01036 (W.D. Wis. Jan. 21, 2026); Min. Order, *Thomas*, 3:26-cv-00021 (D. Conn. Jan. 13, 2026).

This is not speculation; it has already been borne out in these cases. For example, in a

recent decision granting the motions to dismiss DOJ's complaint seeking the same data from

Michigan, the court credited several arguments that the Michigan Alliance, as intervenor, made

that the state defendants did not make. *See Benson*, 2026 WL 362789, at *8 ("[T]he Court rejects

Michigan's arguments but finds persuasive Defendant-Intervenors' argument as to the scope of

documents requestable under the CRA."). Thus, the participation of the Michigan Alliance in that

action was essential to the protection of its members' privacy interests. The Court should grant

Proposed Intervenor intervention for the same reason here.

## II.    Alternatively, the Court should grant permissive intervention.

In the alternative, the Court should grant Proposed Intervenor permissive intervention,

which only requires that it have a claim that "shares with the main action a common question of

law or fact" and a determination that "intervention will not 'unduly delay or prejudice the

adjudication of the original parties' rights.'" *Johnson v. Corr. Corp. of Am.*, No. 3:12-CV-00246-

H, 2014 WL 3970115, at *1 (W.D. Ky. Aug. 13, 2014) (quoting Fed. R. Civ. P. 24(b)). Both

requirements are met here. Proposed Intervenor clearly has defenses that share common questions

of law and fact with those already at issue in this action, and its motion is timely. Further, Proposed

Intervenor commits to adhering to any case schedule the Court imposes, so there is no risk of

prejudice to existing parties. *See supra* Argument § I.A.

Courts routinely grant permissive intervention to ensure that voters (or organizations representing voters' interests) have a say in litigation concerning their rights.[10] That rationale applies with force here. Proposed Intervenor's members indisputably have "confidentiality and/or privacy interest[s]" at stake, which alone "warrants an opportunity to permissively intervene to protect that interest." *In re Exch. Union Co.*, No. 24-MC-91645-ADB, 2025 WL 894652, at *3 (D. Mass. Mar. 24, 2025). And because Proposed Intervenor would be the *only* party that represents voters "whose personal information would be distributed to [DOJ] were the United States to prevail in this action," their "presence would assist the court in deciding the issues before it." Ex. C at 5, Order, *Scanlan*, No. 1:25-cv-00371 (D.N.H. Jan. 5, 2026), (granting permissive intervention to individual voters to defend against DOJ's claim). This perspective, unencumbered by the Secretary's duties as an election official, will indisputably contribute to the just and equitable adjudication of this lawsuit. *Id.* at 6 ("Even assuming that the proposed intervenors' interest is adequately represented by defendants, their presence in this suit will assist the court in the just and equitable adjudication of this matter.").

Courts also routinely grant permissive intervention to civic organizations to ensure their voices and the voices of their members are heard when litigation implicates the rights and privacy of all voters, notwithstanding the presence of governmental defendants ostensibly charged with upholding broader conceptions of the public interest. *See, e.g.*, *1789 Found. Inc. v. Fontes*, No.

---

[10] *See, e.g.*, *League of Women Voters of N.C. v. North Carolina*, No. 1:13CV660, 2014 WL 12770081, at *3 (M.D.N.C. Jan 27, 2014) (permitting individual voters to intervene); *Moore v. Circosta*, No. 1:20CV911, 2020 WL 6597291, at *2 (M.D.N.C. Oct. 8, 2020) (permitting civic organization to intervene in voting rights litigation); *cf. Am. Humanist Ass'n v. Md.-Nat'l Cap. Park & Plan. Comm'n*, 303 F.R.D. 266, 270 (D. Md. 2014) (permitting veteran organization to intervene in litigation challenging the constitutionality of a local World War I memorial); *Ariz. All. for Retired Ams. v. Hobbs*, No. CV-22-01374, 2022 WL 4448320, at *2 (D. Ariz. Sep. 23, 2022); *Pub. Int. Legal Found., Inc. v. Winfrey*, 463 F. Supp. 3d 795, 802 (E.D. Mich. 2020).

CV-24-02987-PHX-SPL, 2025 WL 834919, at *4 (D. Ariz. Mar. 17, 2025) (permitting membership organization and other advocacy organizations to intervene as defendants); *Winfrey*, 463 F. Supp. 3d at 802 (permitting voting rights organizations to intervene as defendants). Thus, in keeping with the "liberal" standard in favor of intervention, *Feller v. Brock*, 802 F.2d 722, 729 (4th Cir. 1986), which ensures that all interested parties have the opportunity to protect their rights and interests, the Court should follow several other courts in granting permissive intervention to Proposed Intervenor.[11] *See* Mins. of Mot. Hr'g, *Weber*, No. 2:25-cv-09149, (C.D. Cal. Nov. 21, 2025); Min. Order, *Nago*, No. 1:25-cv-00522; *see also* Order, *Galvin*, No. 1:25-cv-13816 (granting intervention without stating if it was by right or by permission); Order, *Pennsylvania*, No. 2:25-cv-01481, (same).

## CONCLUSION

Proposed Intervenor respectfully requests that the Court grant its motion to intervene.

---

[11] In addition to all previously cited cases, courts have further granted permissive intervention, or intervention without indicating whether it is permissive or by right, to similarly situated organizations in five more parallel cases. *See* Order, *Bellows*, No. 1:25-cv-00468 (D. Me. Dec. 12, 2025), (granting permissive intervention to individual voters); Order, *Simon*, No. 0:25-cv-03761 (D. Minn. Jan. 6, 2026), (granting permissive intervention to membership organization); Order, *Oliver*, No. 1:25-cv-01193 (D.N.M. Dec. 15, 2025), (granting intervention to membership organization); Order, *Albence*, No. 1:25-cv-01453 (D. Del. Jan. 15, 2026), (granting intervention to individual voters); Order, *Copeland Hanzas*, No. 2:25-cv-00903 (D. Vt. Jan. 16, 2026), (granting intervention to membership organization and individual voters); Text Order, *Matthews*, No. 3:25-cv-03398-CRL-DJQ (C.D. Ill. Mar. 2, 2026) (granting intervention to Illinois Alliance for Retired Americans).

Dated: March 6, 2026,

Respectfully submitted,

**POWELL & MAJESTRO PLLC**

/s/  *Christina L. Smith*
Christina L. Smith (WVSB 7509)
Graham B. Platz (WVSB 14093)
405 Capitol Street, Suite 807
Charleston, WV 25301
304-346-2889 / 304-346-2895 (f)
csmith@powellmajestro.com
gplatz@powellmajestro.com

**ELIAS LAW GROUP LLP**

Elisabeth Frost (DC Bar No. 1007632)*
Lucas Lallinger (DC Bar No. 1046778)*
Julianna Astarita (DC Bar No. 6340483)*
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4490
F: (202) 312-5904
efrost@elias.law
llallinger@elias.law
jastarita@elias.law

* Statement of Visiting Attorney filed concurrently with motion

*Counsel for Proposed Intervenor*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served this 6th day of March, 2026, with a copy of this document via the Court's CM/ECF system. All other counsel will be served in accordance with Federal Rule of Civil Procedure 5(a).

 /s/ *Christina L. Smith*
Christina L. Smith (WVSB 7509)
405 Capitol Street, Suite 807
Charleston, WV 25301
304-346-2889 / 304-346-2895 (f)
csmith@powellmajestro.com

*Counsel for Proposed Intervenor*