**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

UNITED STATES OF AMERICA,

*Plaintiff*,

v.

Case No. 2:26-cv-00156

KRIS WARNER, in his Official Capacity as
WEST VIRGINIA SECRETARY OF STATE,

*Defendant*.

## WEST VIRGINIA CITIZEN ACTION GROUP'S MEMORANDUM IN OPPOSITION TO THE MOTION TO COMPEL PRODUCTION OF RECORDS PURSUANT TO 52 U.S.C. § 20701, *et seq.*

### INTRODUCTION

Plaintiff, the United States, has undertaken a widespread effort to amass voters' sensitive data from almost every state in the country. West Virginia is one of 30 states, plus the District of Columbia, that Plaintiff has sued over their refusals to produce unredacted voter rolls, including driver's license numbers and social security numbers. Plaintiff's motion to compel, ECF No. 14, is an attempt to circumvent the traditional requirements of litigation and the Federal Rules of Civil Procedure (FRCP or Federal Rules) to obtain information about West Virginia voters. Plaintiff uses the motion to compel as a vehicle to obtain the only relief it seeks in this case: access to West Virginia's unredacted voter registration list. Plaintiff makes this attempted end-run around judicial review because its demand under the CRA is plainly deficient insofar as it fails to state the basis and the purpose for obtaining the unredacted voter list.

To date, all courts to rule on these cases have dismissed Plaintiff's parallel attempts to obtain unredacted voter rolls in other states. *See United States v. Weber*, No. 2:25-cv-09149- DOC-ADS, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026); *United States v. Oregon*, No. 6:25-cv-01666-

1

MTK, 2026 WL 318402 (D. Or. Feb. 5, 2026); *United States v. Benson*, No. 1:25-cv-01148-HYJ-PJG, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026); *United States v. Galvin*, No. 1:25-cv-13816-LTS, 2026 WL 972129 (D. Mass. Apr. 9, 2026); Ex. A, *United States v. Amore*, No. 1:25-cv-00639-MSM-PAS, (D.R.I. Apr. 17, 2026), ECF No. 51 (*Amore*); *see also United States v. Raffensperger*, No. 5:25-cv-00548-CAR, 2026 WL 184233 (M.D. Ga. Jan. 23, 2026) (dismissing complaint without prejudice for lack of subject matter jurisdiction based on where demanded records were located). Because Plaintiff's case in West Virginia suffers from the same legal flaws, its functionally dispositive motion to compel should be denied.

## BACKGROUND AND PROCEDURAL HISTORY

In the summer of 2025, Plaintiff sent letters to election officials in dozens of states, including West Virginia, demanding production of their statewide voter registration lists, including sensitive information that is not part of the public voter file. The United States Department of Justice (DOJ) wrote to Secretary of State Warner on September 8, 2025, demanding an electronic copy of West Virginia's statewide voter registration list containing "all fields, which . . . must include the registrant's full name, date of birth, residential address, his or her state driver's license number, or the last four digits of the registrant's social security number[.]" ECF No. 14-2, Sept. 8, 2025 Letter; *see also* ECF No. 1, Compl. ¶¶ 21-24. On September 22, 2025, Secretary Warner wrote back to DOJ explaining that "thorough review of" the sources that DOJ cited "reveals no authority compelling compliance with such a broad request." *See* ECF No. 14-3, Sept. 22, 2025 Letter. Secretary Warner also explained West Virginia's list maintenance practices. *Id.* On December 10 and 19, 2025, and on January 13, 2026, DOJ "sent follow-up emails renewing the request for a copy of West Virginia's" voter registration list with "all fields." ECF No. 1, Compl. ¶ 25. On February 11, 2026, Secretary Warner sent DOJ "a letter explaining that [his office] would

not provide West Virginia's" voter registration list "with all fields." *Id.* ¶ 26; *see also* ECF No. 11-6, Feb. 11, 2026 Letter. Secretary Warner stated that "the alleged purpose of the DOJ's request is to run West Virginia's entire voter list through the Systematic Alien Verification Entitlements ("SAVE") database," but "as we discussed, the WVSOS is a registered and recently approved user of the SAVE database." *See* ECF No. 11-6, Feb. 11, 2026 Letter. Secretary Warner also explained that "West Virginia law protects the sensitive personally identifiable information of its voters, and the Secretary of State takes seriously his responsibility to safeguard such information from unauthorized disclosure." *Id.* Secretary Warner offered to work with DOJ to "reach an amicable resolution within the limits of state and federal law" and "to provide a detailed narrative of [West Virginia's] voter list maintenance procedures upon request." *Id.* Secretary Warner also explained that "West Virginia has 1,195,305 registered voters. Since 2017, 408,397 voter registration records have been lawfully cancelled, 62,756 of which were cancelled under Secretary of State Kris Warner's administration." *Id.*

Plaintiff filed suit on February 26, 2026, alleging only one claim: that Defendant has violated the Civil Rights Act of 1960 (CRA). ECF No. 1. Weeks later, Plaintiff moved to compel West Virginia to provide its full statewide voter registration list pursuant to the same statute. *See* ECF No. 15, Mem. in Supp. of Mot. to Compel (Br.).

**ARGUMENT**

Plaintiff's motion to compel suffers from two major flaws. First, it attempts to bypass the normal rules of civil procedure and escape this Court's judicial review. The Court should reject that attempt. Second, the substance of Plaintiff's motion—and the nature of its demand for West Virginia's records—fails and the motion should be denied.

### I.    Plaintiff's motion is a procedurally improper dispositive motion.

Plaintiff attempts to shoehorn a dispositive motion into a motion to compel—a mechanism normally reserved for discovery disputes, not addressing the merits of the case—without affording either the Court or the parties the opportunity to develop the legal and factual issues in this case. Plaintiff's motion asks the Court to forgo judicial review under the Federal Rules and merely rubber-stamp its request. The CRA does not authorize this motion to compel, but rather requires "appropriate process," which includes judicial review and application of the Federal Rules.

### A.  The CRA does not authorize a procedurally deficient motion to compel.

The CRA does not permit a rushed motion to compel outside the bounds of judicial review and the Federal Rules. The CRA provides that a district court "shall have jurisdiction by *appropriate process* to compel the production of such record or paper." 52 U.S.C. § 20705 (emphasis added). "Appropriate process" does not include bypassing the normal process of civil litigation through a motion to compel. *See Weber*, 2026 WL 118807, at *8 (finding that "[n]othing in the text of Title III requires a special statutory proceeding or any abbreviated procedures"); *Oregon*, 2026 WL 318402, at *8 ("There is no current or binding authority for the proposition that Title III precludes the Court from evaluating the sufficiency of Plaintiff's allegations"); *Amore*, at *8 (agreeing that "the Federal Rules of Civil Procedure govern this case, and that DOJ is not entitled to any sort of summary or abbreviated procedures for the obtaining the information it seeks.").

### B.  The CRA requires judicial review and application of the Federal Rules.

"Appropriate process" under the CRA requires meaningful judicial review and application of the FRCP. *See Weber*, 2026 WL 118807, at *7-8 ("appropriate process" requires application of the FRCP to determine whether Plaintiff has met the CRA's statutory requirements). Only four

years after Congress enacted the CRA, the Supreme Court held that a statute using the same phrase—"appropriate process"—required application of the Federal Rules. *United States v. Powell*, 379 U.S. 48, 58 n.18 (1964) ("Because § 7604(a) contains no provision specifying the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply"). Assessing a statutory scheme analogous to Title III of the CRA, the Supreme Court in *Powell* held that "appropriate process" required courts to apply standard civil procedure and to ensure the relevant agency satisfied statutory prerequisites to compel the production of records.[1] *Id.* at 57-58 & n.18. Courts in this Circuit have applied *Powell* to other federal agency's demands for records. *See, e.g.*, *United States v. Newport News Shipbuilding & Dry Dock Co.*, 837 F.2d 162, 165-66 (4th Cir. 1988); *E.E.O.C. v. Md. Cup Corp.*, 785 F.2d 471, 475-76 (4th Cir. 1986); *see also United States v. Markwood*, 48 F.3d 969, 977-78 (6th Cir. 1995). Applying the same meaning to the identical text of the CRA accords with how courts generally interpret federal statutes. *See Azar v. Allina Health Servs.*, 587 U.S. 566, 574 (2019) ("This Court does not lightly assume that Congress silently attaches different meanings to the same term in the same or related statutes.").

The Federal Rules "govern the procedure in *all civil actions* and proceedings in the United States district courts." Fed. R. Civ. P. 1 (emphasis added); *see also* 28 U.S.C. § 2072(b) (authorizing FRCP and providing that "[a]ll laws in conflict with such rules shall be of no further force or effect after such rules have taken effect"). The FRCP were promulgated to "secure the just, speedy, and inexpensive determination of *every action*," Fed. R. Civ. P. 1 (emphasis added), "consistent with fairness to the parties." *United Mine Workers v. Gibbs*, 383 U.S. 715, 724 (1966).

---

[1] The statute at issue in *Powell* provided the IRS with authority to issue administrative summonses and demand records as part of its prelitigation investigatory powers. It provided that federal courts had jurisdiction "*by appropriate process* to compel such attendance, testimony, or production of books, papers, or other data." 379 U.S. at 52 n.10 (emphasis added).

5

Plaintiff chose to initiate this civil action, subject itself to this Court's procedures, and file a motion to compel—a discovery motion governed by the FRCP. *See* Fed. R. Civ. P. 37(a). The FRCP should therefore apply to Plaintiff's civil suit. *See Weber*, 2026 WL 118807, at *7-8; *Oregon*, 2026 WL 318402, at *8; *Amore*, at *8.

At a minimum, Plaintiff's demand under the CRA must satisfy the basic administrative requirements outlined in the statute to obtain records by stating the basis and the purpose of its demand. Plaintiff has not met the statutory prerequisites under the CRA, because it has not provided the statement of basis and purpose for its demand, *see infra* Section II, and should not be allowed to abuse this procedural device to circumvent judicial analysis of that failure.

## C.  In analogous situations, courts engage in meaningful judicial review.

As the Supreme Court has made clear, "[t]o protect against mistaken or arbitrary orders" by administrative officials, "judicial review is provided." *United States v. Morton Salt Co.*, 338 U.S. 632, 640 (1950). The same should be true here. Following the established principle that judicial review applies to protect against arbitrary orders, courts have extended *Powell* to other prelitigation agency requests for data, regardless of the issuing agency. *See, e.g.*, *United States v. Am. Target Advert., Inc.*, 257 F.3d 348, 351 (4th Cir. 2001); *Newport News Shipbuilding & Dry Dock Co.*, 837 F.2d at 165-66; *Maryland Cup Corp.*, 785 F.2d at 475.

Plaintiff's attempts to put daylight between *Powell* and its own demands are unavailing. It claims that *Powell* is distinguishable because the statute at issue in the case explicitly "prohibited the Government from subjecting a taxpayer to unnecessary examination," and the CRA contains no such prohibition. Br. at 6-7 (quotations omitted). First, this is not the statutory language that the Supreme Court relied upon to conclude that the Federal Rules apply and judicial review attaches. Rather, the Court relied upon the "appropriate process" language common to both the CRA and

6

the Internal Revenue Code. *Powell*, 379 U.S. at 58 n.18. Second, Plaintiff's suggestion—that the absence of a limiting statement implies that Congress meant to give the Department of Justice unbounded power to collect sensitive data from states with no review by a court—is absurd on its face and flies in the face of ordinary judicial review.

To the contrary, in various contexts, courts engage in meaningful review of federal agency records demands, assessing whether the government has established a "legitimate purpose," that the investigation is "relevant to that purpose," and that the government followed the requisite process in seeking to access records. *See, e.g.*, *Equity Inv. Assocs., LLC v. United States*, 40 F.4th 156, 161-62 (4th Cir. 2022) (quoting *United States v. Powell*, 379 U.S. 48, 57 (1964)). Such judicial review is consistent with other federal statutes allowing federal agencies to obtain records in service of investigations, where courts have found that the test of judicial enforcement of such subpoenas includes an evaluation of whether the investigation is "conducted pursuant to a legitimate purpose," *Id.*

### D. Plaintiff's reliance on *Lynd* and *Donaldson* is unavailing.

Plaintiff asks the Court to overlook the case law requiring application of the FRCP and judicial review primarily based on its reading of *Kennedy v. Lynd*, a Fifth Circuit opinion from 1962 that is not binding on this Court, *see* Br. at 1-8, but Plaintiff's argument is unavailing. Plaintiff hangs its hat on a single line from *Lynd* suggesting that the CRA authorizes a special statutory proceeding "*comparable to* the form of a traditional order to show cause, or to produce in aid of an order of an administrative agency." 306 F.2d 222, 225 (5th Cir. 1962) (emphasis added). But *Lynd* does not suggest that even such a "comparable" proceeding is warranted in all CRA cases, including where there is no administrative order. *See id.* And *Lynd* was the product of a different era, shortly after the enactment of the CRA, during which "some southern officials, in order to

hamper investigations by the Department of Justice and the Civil Rights Commission, had been destroying or impounding voting and registration records."[2] In the intervening 60 years, the Supreme Court has clarified that typical procedure attaches when a federal agency seeks to compel the production of records. *See Becker v. United States*, 451 U.S. 1306, 1307-08 (1981); *Powell*, 379 U.S. at 57-58; *see also, e.g.*, *United States v. Will*, 671 F.2d 963, 966 (6th Cir. 1982) (allowing summons recipient opportunity to rebut government's prima facie case).

Plaintiff's discussion of *Lynd* is tellingly selective. For example, Plaintiff never addresses the Court's statement that "Title III provides 'an effective means whereby preliminary investigations of registration practices can be made to determine whether or not such practices conform to *constitutional* principles.'" *Lynd*, 306 F.2d at 225 (emphasis added) (internal citation omitted). Plaintiff does not argue that it is attempting to use *Lynd*'s process to effectuate the Constitution's guarantee of voting rights but, rather, that it needs the documents to engage in list maintenance required by federal statute.

Plaintiff's reliance on *Donaldson v. United States*, 400 U.S. 517 (1971), is also misplaced. In *Donaldson*, the central issue was whether a third party could mandatorily intervene in a proceeding to enforce an IRS summons. The third party conceded that there were no constitutional issues at play and that the requests were not directed at his records. *Id.* at 522-23. Thus no right of the third party who sought mandatory intervention was at issue. The court in *Donaldson* simply held that an unharmed third party had no role in the proceeding. That is not the case here, where this Court is not considering a motion to intervene, but rather *Plaintiff*'s motion to compel. The motion raises the exact concern as in *Powell*; the process necessary to protect those subject to

---

[2] Daniel M. Berman, *A Bill Becomes a Law: Congress Enacts Civil Rights Legislation* 9 (2d ed. 1966); *see also* Report of U.S. Comm'n on Civil Rights 1963, at 16; *see also Amore*, at *8 (describing *Lynd* as "steeped in the context of 1960s racial discrimination in voter registration").

prelitigation information requests. *Powell*, 379 U.S. at 58 ("It is the court's process which is invoked to enforce the administrative summons and a court may not permit its process to be abused.").

Even if the Court were inclined to treat this matter differently than other civil cases, it should exercise its judicial authority to ensure the demand is proper and legally supported. *Lynd* recognized that under the CRA, a court "exercises judicial judgment. It does not confer or withhold a favor.'" 306 F.2d at 225 (quoting *Tutun v. United States*, 270 U.S. 568, 578 (1926)). That judgment includes an analysis of whether the agency made the request for an improper purpose or in bad faith. *See Matter of Does*, 688 F.2d 144, 147-48 (2d Cir. 1982) (In the IRS summons context, Government must establish "legitimate purpose," "relevan[ce] to that purpose," and that the Government followed the requisite process) (citation modified); *see also Sugarloaf Funding, LLC v. U.S. Dep't of the Treasury*, 584 F.3d 340, 345 (1st Cir. 2009) (court's role is to ensure the government is using its authority "in good faith and in compliance with the law") (internal citation omitted); *United States v. Westinghouse Elec. Corp.*, 788 F.2d 164, 166-67 (3d Cir. 1986) ("[I]f a subpoena is issued for an improper purpose . . . its enforcement constitutes an abuse of the court's process."). Given the extraordinary nature and breadth of Plaintiff's demands in this case and across the country, the Court should exercise its judgment to ensure that Plaintiff is complying with the law and that its requests are made in good faith.[3]

---

[3] *Lynd* also directs that "if the respondent-custodian opposes the grant of such relief," the Court should set a "suitable hearing" on the matter. 306 F.2d at 226. Thus, at minimum, this Court should decline Plaintiff's request to decide this matter based on Plaintiff's motion to compel, without the benefit of discovery, and set an evidentiary hearing for the motion. The Court should not wholly dispense with the process otherwise applicable under the Federal Rules. *See* Fed. R. Civ. P. 1.

**II.      Plaintiff has failed to meet its statutory requirements under the CRA.**

The basis and purpose requirements of the CRA are essential procedural safeguards that Plaintiff has failed to satisfy. The *Weber*, *Oregon*, *Galvin*, and *Amore* courts have uniformly agreed that failing to satisfy one or both of these safeguards is fatal to Plaintiff's case.[4]

A federal agency's power to enforce demands for records "is created solely by statute." *Peters v. United States*, 853 F.2d 692, 696 (9th Cir. 1988). Therefore, to enforce such a demand, the agency must comply with the terms of the applicable law. *See Consumer Fin. Prot. Bureau v. Accrediting Council for Indep. Colleges & Schs.*, 854 F.3d 683, 690 (D.C. Cir. 2017) (requiring compliance with the statute that controls the CFPB's investigative demands). Section 303 of the CRA requires the Attorney General to provide "a statement of the basis and the purpose" for records she demands. 52 U.S.C. § 20703; *see also Weber*, 2026 WL 118807, at *8. The "basis" required by statute is the statement describing the factual underpinning for the Attorney General's belief that federal civil rights law has been violated, and the "purpose" is the statement that explains how the requested record would help determine if a violation occurred. *See Basis*, Black's Law Dictionary (4th ed. 1951) ("foundation"); *Purpose*, *Black's Law Dictionary* 161 (4th ed. 1968) ("end, intention, or aim"). At a minimum, the "basis" requirement compels the Attorney General to describe facts in his possession that tends to show the law has been violated. *See Kennedy v. Bruce*, 298 F.2d 860, 861 (5th Cir. 1962); *United States v. Lynd*, 301 F.2d 818, 821-23 (5th Cir. 1962) (requiring sufficient allegations that "there are reasonable grounds for belief that

---

[4] The *Benson* Court dismissed Plaintiff's complaint on the grounds that the CRA allows the Attorney General to inspect or copy records relating to acts requisite to voting only if those records "come into the possession" of election officials in the course of carrying out those acts, and voter registration lists are not among such records. *Benson*, 2026 WL 362789, at *9. The Court need not reach this issue if it finds that Plaintiff failed to abide by the appropriate process under the CRA and did not state a sufficient basis and purpose.

certain voters are being discriminatorily denied their voting rights in a given county"); *see also Weber*, 2026 WL 118807, at \*8 ("In the past, the DOJ has routinely stated both a purpose and basis related to alleged civil rights violations and how their requested records would specifically assist in their investigation."); *Galvin*, 2026 WL 972129, at \*3 ("Put simply, the statute requires a statement of <u>why</u> the Attorney General demands production of the requested records—and, as conveyed by the statute's use of the definite article, the statement must be 'the' factual basis, not just a conceivable or possible basis."); *Amore*, at \*11 ("the 'basis' contemplated by Title III is a factual, not legal basis").

The basis and purpose requirements of the CRA ensure that the statute cannot be used as a tool to obtain records for reasons unrelated to the statute, or for no reason at all. *See Weber*, 2026 WL 118807, at \*9 ("The requirement that the Attorney General state their purpose and basis is not merely perfunctory—it is a critical safeguard that ensures the request is legitimately related to the purpose of the statute."). For example, the United States could not use the CRA to obtain voting records because it wanted to verify taxpayer addresses. *Cf. In re Gordon*, 218 F. Supp. 826, 827 (S.D. Miss. 1963) ("[T]his Act merely provides for a limited exploration and discovery as to the validity of the election processes employed and pursued in such Federal elections after May 6, 1960."). Plaintiff's complaint and motion to compel demonstrate that Plaintiff has not complied with these requirements.

### A. Plaintiff has failed to state the basis.

Plaintiff's September 8, 2025 demand for West Virginia's state voter list contained no description of the basis for its request, merely a bare citation to the CRA. ECF No. 14-2. In *Lynd*, the Attorney General's letter made a "statement of the basis" when he stated that the demand was "based upon information in the possession of the Attorney General tending to show that

11

distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction." 306 F.2d at 229 n.6.

In contrast, Plaintiff's September 8 letter demanded West Virginia's sensitive voter data "[p]ursuant to the foregoing authorities [of the NVRA and HAVA], including the CRA." ECF No. 14-2, at 2. Plaintiff argues that such a reference to the statutory basis for making the demand, namely the CRA, suffices. Br. at 9-10. Plaintiff cites nothing to support this proposition, because it cannot possibly be accurate. The CRA requires that the Attorney General provide both the basis *and* the purpose alongside any CRA demand, but Plaintiff's argument collapses these two distinct requirements, which would eliminate a requirement Congress imposed. *See Oregon*, 2026 WL 318402, at *9 ("If the purpose is to investigate violations of a statute, the basis must be something else; the statute underlying the investigation is nothing more than a component of the purpose."); *Galvin*, 2026 WL 972129, at *6 (dismissing case for failing to state basis); *Amore*, at *12 (rejecting this argument and finding "Congress could not have intended Title III to be interpreted in this redundant and circular manner."). In order to give meaning to both terms, "the basis" must "mean a factual basis for investigating a violation of a federal statute." *Oregon*, 2026 WL 318402, at *9; *see also Galvin*, 2026 WL 972129, at *6; *Amore*, at **12-13. Because Plaintiff provided no factual predicate for its September 2025 demand, the motion fails.

Nor can Plaintiff belatedly supply a post-hoc justification for its demands as it attempts to do through the declaration of Eric Neff. The CRA requires that the written demand itself contains the statement of basis and purpose. *See Galvin*, 2026 WL 972129, at *5. And even if this Court could consider Plaintiff's post-hoc rationale, the Neff Declaration would still fail to satisfy the CRA's requirements. In the singular paragraph when the Declaration specifically mentions West Virginia, it provides only discussions of prior matters related to the NVRA, HAVA, and the CRA,

but no basis to argue that West Virginia has currently violated federal voting laws. *See* ECF No. 14-1. Plaintiff's failure to provide a basis for its request that is specific to West Virginia becomes clearer within the broader context: It has demanded unredacted voter rolls from almost every state and sued 30 states and the District of Columbia without providing individualized reasons showing a good-faith belief that every one of these states is violating federal voting law.

### B.  Plaintiff has failed to state the purpose.

Plaintiff has likewise failed to identify the legitimate purpose for its demand. Although it is nowhere in their written demands, Plaintiff now claims that the nonpublic information it seeks "is necessary to identify duplicate registration records, registrants who have moved, registrants who have died, and those who are not eligible to vote in federal elections." ECF No. 14-1 at 2. But the Constitution, and relevant statutes Plaintiff invokes, establish that the states, not the federal government, are in charge of maintaining voter rolls, and the process of removing and adding individual voters. *See* 52 U.S.C. § 20507(a)(4); 52 U.S.C. § 21083(a)(1)(A); 52 U.S.C. § 21085 (delegating expressly to the states the methods of complying with HAVA's substantive list-maintenance provisions); *see also Amore*, at *2. Plaintiff's new purported purpose would supplant West Virginia's role in list maintenance by substituting its own judgment and process, which violates the constitutional and statutory assignments of election administration duties.[5] Usurpation of these duties cannot serve as a legitimate purpose for Plaintiff's demands. *See Weber*, 2026 WL 118807, at *2 ("The DOJ cannot go beyond the boundaries provided by Congress and use these legislative tools in a manner that wholly disregards the separation of powers provided for in the Constitution.").

---

[5] The proposed Memorandum of Understanding (MOU) that the United States has offered Colorado and other states confirms that this is precisely what the United States intends to do. *See infra* Section II(D).

Plaintiff cites only two instances from the last fifty years in which the DOJ used the CRA to seek states' unredacted voter files. *See* ECF Nos. 14-4, 14-5.[6] Neither of these 20-year-old agreements helps its case. Most importantly, the parties in both cases negotiated consent decrees with no legal reasoning by the court, so neither is helpful in determining the scope of the Attorney General's authority under the CRA or whether DOJ followed proper procedure. *See*, *e.g.*, *JTH Tax, Inc. v. H & R Block Eastern Tax Serv., Inc.*, 359 F.3d 699, 707 (4th Cir. 2004); *Lazaro v. Liberty Car Serv., Inc.*, No. 19-CV-7314, 2021 WL 5508071, at *4 n.3 (E.D.N.Y. Mar. 23, 2021), *report and recommendation adopted*, No. 19-CV-7314, 2021 WL 4487874 (E.D.N.Y. Sep. 30, 2021) ("Counsel's own motion seeking settlement approval in another matter is far from persuasive authority.").

Moreover, both agreements provide much greater protection for the data than Plaintiff has indicated would occur here. For example, in its Memorandum of Understanding with Texas, DOJ agreed to give the state notice before disclosing any of the information received outside of DOJ, and to destroy the information after its use. ECF No. 14-7 at 2. Similarly, in the Georgia consent decree, the court limited DOJ's use of the data received and similarly prohibited its disclosure except to Congress, a court, or grand jury, and required DOJ to eventually destroy the records. ECF No. 14-6 at 3-4. Plaintiff provides no such assurances, and its recent public statements indicate that it will not abide by such limitations. *See infra* Section II(D). That Plaintiff is only able to cite the Texas and Georgia examples demonstrates that Plaintiff's current use of the CRA to sweep up sensitive data from across the country is far outside normal bounds.

---

[6] *United States v. North Carolina State Board of Elections* was not brought under the CRA. ECF No. 14-3.

Plaintiff's arguments related to purpose are also insufficient because an unredacted voter file is not necessary for the United States to assess West Virginia's compliance with its statutory responsibilities under the NVRA or HAVA. *See Weber*, 2026 WL 118807, at \*8-9; *but see* Br. at 1. The NVRA requires states to implement "a *general program* that makes a *reasonable effort* to remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(a)(4) (emphasis added); *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 787 (2018) (Thomas, J., concurring). The Supreme Court has "recognized that 'States take a variety of approaches' in complying with the NVRA's requirements." *Common Cause/New York v. Brehm*, 432 F. Supp. 3d 285, 317 (S.D.N.Y. 2020) (citing *Husted*, 584 U.S. at 762).

"Congress did not give any further guidance on what a 'reasonable effort' must look like. Congress did not, for example, enumerate what steps a state should take to come into compliance with this standard." *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 624 (6th Cir. 2025). The phrase "reasonable effort" represents "some middle ground" in delineating the state's obligations under the NVRA. *United States v. Missouri*, 535 F.3d 844, 850-851 (8th Cir. 2008). "In other words, the NVRA sets the floor for how states conduct list maintenance; states have discretion to choose how precisely to follow its requirements." *Common Cause/New York*, 432 F. Supp. 3d at 317.

Here, the Attorney General failed to state the purpose for his request because he failed to explain why he needs access to driver's license numbers and social security numbers to evaluate whether West Virginia's general list-maintenance programs meet the standard of "reasonable effort." Plaintiff argues that it needs this list to ensure "that matches to identify voters are more accurate and complete." *See* Br. at 10. Such a level of specificity does not fall under the federal government's duty to evaluate a state's general list-maintenance procedures. It is an attempt to

15

usurp the State's role of deciding how to implement its general program—which cannot be a valid purpose under the CRA. Moreover, a static, unredacted copy of West Virginia's voter registration list is not necessary to determine whether West Virginia is complying with HAVA's and the NVRA's list maintenance requirements because a static list does not explain the procedures by which West Virginia maintains the list. Therefore, Plaintiff's stated purpose—to conduct its own list maintenance under the NVRA and HAVA—is not sufficient under the CRA.

**D. Plaintiff's stated basis and purpose are pretextual.**

Critically, the CRA mandates that DOJ provide in writing a statement of "*the* basis and *the* purpose" of a records request. 52 U.S.C. § 20703 (emphases added); *see also Galvin*, 2026 WL 972129, at *3 ("[T]he Attorney General must <u>have</u> a basis, and must articulate that basis, in order to demand a state or local election official produce election records.") (citing *Weber*, 2026 WL 118807, at *9). By twice using the definite article, the statute requires not just a conceivable or possible basis or a purpose, but *the* complete basis and *the* complete purpose underlying the request. *See Niz-Chavez v. Garland*, 593 U.S. 155, 165-66 (2021). The question of pretext goes directly to whether the requirements of the statute were met—whether the DOJ stated *the* purpose for its demand, as required by the statute. The pleadings and public record compel the conclusion that it did not.

Plaintiff's failure to provide the required basis and purpose is unsurprising, because its purpose is plainly not to evaluate compliance with the general list maintenance provisions of the NVRA or HAVA, but to sweep up sensitive data of tens of millions of voters that can be used for any number of undisclosed and opaque purposes including interfering with West Virginia's statutory and constitutionally mandated role in elections. *See Weber*, 2026 WL 118807, at *10. In stark contrast to previous, targeted demands under the CRA, DOJ has made the same request for

16

sensitive voter data to at least 48 states and Washington, D.C., and thus far sued 30 of those states and Washington, D.C. DOJ has not attempted to show that there is any reason to think that all of these jurisdictions may be violating the NVRA's and HAVA's list maintenance provisions. The widespread lack of justification demonstrates again that DOJ seeks to misuse the CRA as an unlimited tool to compile and consolidate voter data, and to interfere with the states' rights to administer their own elections, rather than to protect the right to vote. *See Weber*, 2026 WL 118807, at \*12 ("If the DOJ wants to instead use these statutes for more than their stated purpose, circumventing the authority granted to them by Congress, it cannot do so under the guise of a pretextual investigative purpose."); *In re Gordon*, 218 F. Supp. at 826-27 ("[T]his Act merely provides for a limited exploration and discovery as to the validity of the election processes employed and pursued in such Federal elections after May 6, 1960.").

Plaintiff's plans for this sensitive data appear nowhere in the Complaint, but have emerged from other sources, including the MOU DOJ has signed with at least two states and President Trump's most recent Executive Order.[7] The MOU describes DOJ's attempted takeover of states' exclusive authority to maintain their voter rolls and determine who should be removed from the rolls due to ineligibility. It provides that DOJ will conduct an "analysis and assessment" of the

---

[7] *See "Confidential Memorandum of Understanding" executed with Texas*, https://www.brennancenter.org/media/15082/download/texas_12.09.2025_executed-mou.pdf?inline=1; *"Confidential Memorandum of Understanding" executed with Alaska*, https://www.brennancenter.org/media/15064/download/alaska_12.22.2025_executed-mou.pdf?inline=1. DOJ has apparently asked other states to sign the same MOU. *See Proposed "Confidential Memorandum of Understanding" sent to Colorado*, https://www.documentcloud.org/documents/26330926-vrldata-sharing-agreement-doj-co/; *see also* Jonathan Shorman, *Trumps's DOJ Offers States Confidential Deal to Remove Voters Flagged by Feds*, Stateline (Dec. 18, 2025), https://stateline.org/2025/12/18/trumps-doj-offers-states-confidential-deal-to-wipe-voters-flagged-by-feds-as-ineligible/.

state's voter rolls and instruct the state to remove voters DOJ identifies.[8] On March 31, 2026, President Trump issued Executive Order 14399, titled "Ensuring Citizenship Verification and Integrity in Federal Elections." The Order purports to enforce federal laws "prohibit[ing] non-citizens from registering to vote or voting in Federal elections," and to "enhance election integrity via the United States Mail." The Order directs the creation of a "State Citizenship List," which would require using Social Security records and other sensitive voter data—i.e., the data that DOJ seeks through its unprecedented data-collection effort in West Virginia.

DOJ recently confirmed its goal was not to review list maintenance procedures, but to expand federal control over elections and target voters for removal, stating: "At this Department of Justice, we will not permit states to jeopardize the integrity and effectiveness of elections by refusing to abide by our federal elections laws. If states will not fulfill their duty to protect the integrity of the ballot, we will."[9] This federal takeover of list maintenance would run contrary to the constitutional and the statutory frameworks for elections, which provide that Congress and the states make the law, and state and local governments run elections, including registering voters and maintaining voter rolls. 52 U.S.C. § 20507(a)(4); 52 U.S.C. § 21083(a)(1)(A); 52 U.S.C. § 21085.[10]

---

[8] The MOU provides that removals must take place within 45 days of notification from DOJ, which—for any voters flagged for removal based on having moved—would violate Section 8(d) of the NVRA. 52 U.S.C. § 20507(d).

[9] Press Release, Off. of Pub. Affs., U.S. Dep't of Just., *Justice Department Sues Four Additional States and One Locality for Failure to Comply with Federal Elections Laws* (Dec. 12, 2025), https://perma.cc/2N9T-YASF.

[10] Further, the proposed MOU does not limit DOJ's ability to use states' data and expressly permits DOJ to provide the data to contractors. MOU at 6-7; *but see* 52 U.S.C. § 20704.

**E. The federal statutes on which Plaintiff relies do not preempt West Virginia law.**

West Virginia law protects voters' sensitive data, expressly prohibiting disclosure of sensitive voter information. W. Va. Code §3-2-30(a) (2013). In his correspondence with DOJ, Secretary Warner explained he was bound by West Virginia law restricting his ability to disclose confidential information about voters. ECF No. 14-3, at 2. Secretary Warner offered to work with DOJ to "reach an amicable resolution within the limits of state and federal law" and "to provide a detailed narrative of our voter list maintenance procedures upon request." *Id.* Rather than confirm that the requested sensitive voter information would not be used for these prohibited purposes, Plaintiff filed this lawsuit.

Plaintiff now argues that state law cannot apply here because it is preempted by HAVA and the NVRA, but this argument fails. HAVA lacks a public disclosure provision, and courts have recognized that the NVRA and state privacy laws operate together where such state privacy laws require minimal redaction of sensitive personal identifiers, while still requiring disclosure of the underlying records. *See Weber*, 2026 WL 118807, at *13-14; *see also Project Vote/Voting for America, Inc. v. Long*, 682 F.3d 331, 339-40 (4th Cir. 2012); *Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 265-66 (4th Cir. 2021). State laws operate in concert with the NVRA as a "single procedural scheme," ensuring that the Attorney General and private litigants have the data required to enforce the Act, while simultaneously protecting voters' privacy interests. *See Gonzalez v. Arizona*, 677 F.3d 383, 394 (9th Cir. 2012). West Virginia laws preventing disclosure of sensitive information do not frustrate the NVRA's purpose. Instead, those privacy laws reinforce the boundaries of public inspection articulated by the courts and the Attorney General. *See id.*; Brief for the United States as Amicus Curiae, *Public Interest Legal Foundation, Inc. v. Bellows*, No. 23-1361, 2023 WL4882397, at *28 (1st Cir. 2023) (arguing that state law

limits on voter information are not preempted when they affect uses that "would not further the NVRA's purposes," including "bans on disseminating personal data."). As West Virginia law is not preempted, Secretary Warner had no choice but to protect the information of West Virginia voters.

## CONCLUSION

For the foregoing reasons, Defendant-Intervenor CAG requests that the Court deny Plaintiff's motion to compel.

April 17, 2026                                    Respectfully submitted,

                                                 */s/*Aubrey Sparks

20

Aubrey Sparks (WV Bar No. 13469)
Robb Livingood (WV Bar No. 11974)
American Civil Liberties Union of
West Virginia Foundation
P. O. Box 3952
Charleston, WV 25339-3952
asparks@acluwv.org
rlivingood@acluwv.org

Adriel I. Cepeda Derieux**
American Civil Liberties Union Foundation
915 15th Street NW
Washington, DC 20005
(202) 457-0800
acepedaderieux@aclu.org

Theresa J. Lee**
Sophia Lin Lakin
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
tlee@aclu.org
slakin@aclu.org

Brent Ferguson
Daniel S. Lenz*
Sejal Jhaveri
Renata O'Donnell*
Kate Hamilton
Alexis Grady
Campaign Legal Center
1101 14th St. NW, Suite 400
Washington, DC 20005
Tel: (202) 736-2200
Fax: (202) 736-2222
bferguson@campaignlegalcenter.org
dlenz@campaignlegalcenter.org
sjhaveri@campaignlegalcenter.org
rodonnell@campaignlegalcenter.org
khamilton@campaignlegalcenter.org
agrady@campaignlegalcenter.org

Maura Eileen O'Connor *
Justin Lam*
Brennan Center for Justice
at NYU School of Law
777 6th St. NW, Ste. 1100
Washington, DC 20001
Tel: (202) 249-7190
oconnore@brennan.law.nyu.edu
lamju@brennan.law.nyu.edu

*Pro Hac Vice Applications Pending*
**Pro Hac Vice Applications Forthcoming*

Counsel for Proposed Intervenor-Defendant West Virginia Citizen Action Group