# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### AT CHARLESTON

**THE UNITED STATES OF AMERICA,**

    *Plaintiff*,

    **v.**

**KRIS WARNER, in his Official Capacity
as WEST VIRGINIA SECRETARY OF
STATE,**

    *Defendant*.

**Civil Action No. 2:26-cv-00156
Hon. Thomas E. Johnston**

## DEFENDANT KRIS WARNER'S MEMORANDUM OF LAW
## <u>IN SUPPORT OF MOTION TO DISMISS</u>

Michael R. Williams (WV Bar # 14148)
 *Solicitor General*
Caleb A. Seckman (WV Bar # 13964)
 *Assistant Solicitor General*
West Virginia Attorney General's Office
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25305
Michael.R.Williams@wvago.gov
Caleb.A.Seckman@wvago.gov
Telephone: (304) 558-2021
Fax: (304) 558-0140

*Counsel for Defendant Kris Warner*

**INTRODUCTION**

The United States seeks unredacted access to West Virginia's voter registration list. Secretary Warner cooperated as much as West Virginia law would allow him to, but he has explained that state law does not allow him to release the list without redactions. The Secretary thus asked the Government to accept a redacted list. Instead, the Government sued.

This same story is playing out in dozens of States across the country. The United States asks a State to turn over unredacted voter lists; the State refuses; the Government sues. But the Government's suits have not been successful. At least five federal courts have dismissed complaints nearly identical to this one.

These decisions come as no surprise. The Government's demand exceeds the agency's statutory authority in multiple ways. For one, it has provided no basis in fact for its request, instead pointing only to Title III generally. The demand also lacks a proper purpose under Title III—and the purpose given here warrants close scrutiny given the circumstances surrounding the demand. Finally, the documents the Government seeks fall outside the statute's scope.

Beyond its lack of statutory authority, the Government's demand comes with other problems. For one, it violates at least three federal privacy laws. For another, it interprets Title III in a way that would make the statute itself constitutionally suspect. And at bottom, the Government's authority is largely a moot point, as West Virginia's redaction law isn't preempted.

Because the Government demands more than what federal or state law allows, the Court should dismiss the Complaint.

**STATEMENT**

**I.      Federal law puts States in charge of elections.**

The Constitution gives States primary responsibility over elections. The Elections Clause directs States to prescribe the time, place, and manner of congressional elections. U.S. CONST. art.

I, § 4, cl. 1. This constitutional prescription creates a "default" rule that States carry out all election "mechanics." *Foster v. Love*, 522 U.S. 67, 69 (1997). Congress must speak with clarity to change this default. *United States v. Gradwell*, 243 U.S. 476, 485 (1917).

Congress has largely left the election arena to the States. Only a few relevant federal statutes speak to the issue.

First, Title III of the Civil Rights Act of 1960 directs States to retain certain voting records. 52 U.S.C. § 20701. As with the other provisions of the Civil Rights Act, Title III sought to eliminate racial discrimination in voting. *See United States v. Mayton*, 335 F.2d 153, 159 (5th Cir. 1964). Under Title III, state election officials must "retain and preserve" "all records and papers … relating to any application, registration, payment of poll tax, or other act requisite to voting in such election" for a "period of twenty-two months" after any federal election. 52 U.S.C. § 20701. The Act imposes criminal penalties for altering documents subject to the "retention and preservation" requirement. *Id.* §§ 20701-02. The Attorney General may inspect, reproduce, or copy these records if he first provides an adequate "basis and purpose" for the request. *Id.* § 20703. Federal courts retain "jurisdiction by appropriate process to compel" production of those records if the request was properly made. *Id.* § 20705.

Second, the National Voter Registration Act (NVRA) of 1993 mandates States maintain accurate voter rolls. *See* 52 U.S.C. § 20507.

Third, the Help America Vote Act (HAVA) of 2002 requires States to keep a centralized voter registration database. *See* 52 U.S.C. § 21083(a)(1)(A).

## II. State law empowers West Virginia to administer elections.

West Virginia law dictates most everything else about federal elections. As relevant here, it requires the State establish a permanent voter registration system, W. VA. CODE §§ 3-2-1–44. State law also allows people to examine voter registration records. *See id.* § 3-2-30(a). But that

latter provision prohibits disclosure of sensitive voter information, like Social Security or driver's license numbers.  *See id.*

### III.    The federal government seeks comprehensive, unredacted voter information.

In March 2025, President Trump issued an executive order instructing the federal government to obtain and review States' voter information.  *Preserving and Protecting the Integrity of American Elections*, Exec. Order 14,248, 90 Fed. Reg. 14005, 14006-07 (Mar. 25, 2025).  The order directed the Department of Homeland Security to cross-check States' "publicly available voter registration list" and NVRA records of voter list maintenance activities against federal immigration databases and other state records.  *Id.* (emphasis added).

Six months later, the Department of Justice began demanding comprehensive voter information nationwide.  *See* Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. TIMES (Sept. 9, 2025), https://tinyurl.com/mpd97sc3.  On September 8, 2025, DOJ sent one such demand to Secretary Warner.  The agency "demanded … [he] provide an electronic, unredacted copy of [the State's] statewide voter registration list," including a registrant's full name, date of birth, residential address, and driver's license number or the last four digits of their Social Security number.  February 11, 2026 Letter, at 1[*].  DOJ cited Title III of the Civil Rights Act, the NVRA, and HAVA as the statutory bases for its request.

### IV.    Secretary Warner responds.

The Secretary quickly replied to DOJ's demand, denying it for two reasons.  First, the request was inadequate under federal law.  September 22, 2025 Letter, ECF No. 14-3, at 2.  The

---

[*] In considering a motion to dismiss, courts can consider "documents that are explicitly incorporated into the complaint by reference."  *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016).  The Complaint incorporates by reference the February 11, 2026 Letter.  *See* Compl. ¶¶ 26, 31.  So the Court can consider the letter, which is attached as Exhibit A.

demand letter did not establish how the "proposed review of West Virginia's voter registration list maintenance procedures [fell] within" Title III's statutory purpose. *Id.* (cleaned up). Second, state law also barred disclosure of that information. *Id.* (citing W. VA. CODE § 3-2-30(a)).

DOJ reached out a second time, but the Secretary maintained the same view. February 11, 2026 Letter, at 1-2. He reiterated that DOJ's demand "included only a vague explanation of the basis and specific purpose of the request," which was insufficient under Title III. *Id.* at 1. And recent "verbal communications" with DOJ made this general explanation more dubious, as they revealed that the "alleged purpose of the request [was] to run [the State's] entire voter list" through DHS's alien verification database. *Id.* at 2.

**V. The United States brings lawsuits nationwide; courts dismiss them.**

Nearly every State that has denied DOJ's request has been met with swift legal action. *See Tracker: DOJ Lawsuits Seeking States' Sensitive Voter Data*, STATE DEMOCRACY RSCH. INITIATIVE, https://tinyurl.com/34eyy98d (last updated Apr. 20, 2026) (twenty-nine pending lawsuits). West Virginia was no exception. The Government filed this action demanding voter information on February 26, 2026. *See* Compl. The Government continues to assert that Title III authorizes its request. *See generally id.* Alongside its complaint, the United States filed a motion to compel production of the voter list. ECF No. 14. The accompanying memorandum makes the same general arguments set forth in the complaint. *See* ECF No. 15.

Every court to have ruled so far has dismissed the Government's complaints. *United States v. Weber*, No. 25-cv-09149, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026) (dismissing because the Government lacked a proper basis and purpose), *appeal docketed*, No. 26-1232 (9th Cir. Mar. 3, 2026); *United States v. Oregon*, No. 25-cv-01666, 2026 WL 318402 (D. Or. Feb. 5, 2026) (dismissing because the Government lacked a proper basis and purpose, and because no federal statute entitled it to unredacted voter information), *appeal docketed*, No. 26-1231 (9th Cir. Mar. 3,

4

2026); *United States v. Benson*, No. 25-cv-1148, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026) (dismissing because voter registration lists were not "records" under Title III), *appeal docketed*, No. 26-1225 (6th Cir. Feb. 27, 2026); *United States v. Galvin*, No. 25-13816, 2026 WL 972129 (D. Mass. Apr. 9, 2026) (dismissing because the Government lacked a proper "basis"); *United States v. Amore*, No. 25-CV-00639-MSM-PAS, 2026 WL 1040637 (D.R.I. Apr. 17, 2026) (dismissing because the Government lacked a proper basis or purpose); *United States v. Fontes*, No. CV-26-00066-PHX-SMB, slip op. (D. Ariz. Apr. 28, 2026) (dismissing because a voter list is not "a § 20701 document").

## SUMMARY OF THE ARGUMENT

**A.** The Government's demand is not valid under Title III. It has not provided an adequate statement of the demand's basis and purpose. It lacks a factual basis because the demand only superficially references the statute itself, and it lacks a proper purpose because the purpose alleged falls outside Title III's scope. The statute's text is enough to decide the issue, but the circumstances surrounding the demand warrant even closer scrutiny of the Government's explanations. The demand also seeks information not covered by Title III. The voter registration list is not a "paper" or "record" that the Secretary "comes into possession of." It is an internally created database. Thus, Title III cannot compel its production.

**B.** The demand also violates at least three federal privacy laws. The United States failed to comply with the requirements of the Privacy Act, the E-Government Act, and the Driver's Privacy Protection Act. So even if the demand were valid under Title III, the Government would still need to make its request in compliance with federal laws.

**C.** West Virginia law also prohibits the unredacted disclosure sought here. The Constitution positions States as the default entities responsible for election regulations. Here, state law permits only the redacted voter registration list to be released. And no federal law—including

5

Title III, the NVRA, and HAVA—preempts this redaction requirement. So even if the demand was otherwise proper, the Government would still only be entitled to a redacted list.

The Court should dismiss the complaint.

## STANDARD OF REVIEW

A Rule 12(b)(6) motion to dismiss tests the "legal sufficiency of a complaint." *Francis v. Giacomelli*, 588 F.3d 186, 189 (4th Cir. 2009). Under this standard, the Court must "accept as true all well-pleaded facts … and construe them in the light most favorable to the plaintiff." *Matherly v. Andrews*, 859 F.3d 264, 274 (4th Cir. 2017). But the Court need not "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Mkts. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000). Additionally, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rather, to survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In other words, this "plausibility standard requires a plaintiff to demonstrate more than 'a sheer possibility that a defendant has acted unlawfully.'" *Francis*, 588 F.3d at 193 (quoting *Iqbal*, 556 U.S. at 678).

## ARGUMENT

### I.     The Civil Rights Act does not authorize the Government's demand.

The Government premises its request on the authority of the Department of Justice. As with all agencies, DOJ is a "creature[] of Congress." *City of Arlington v. FCC*, 569 U.S. 290, 317 (2013) (Roberts, C.J., dissenting). It "literally has no power to act … unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). So DOJ's demand may only be enforced if it "is within the authority of the agency" under Title III. *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950).

6

"The interpretation of the meaning of statutes … is exclusively a judicial function." *United States v. Am. Trucking Ass'ns, Inc.*, 310 U.S. 534, 544 (1940). And "[i]n ascertaining the plain meaning" of a statute, the Court "must look to the particular statutory language at issue." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988). Laws also can't be interpreted "in a vacuum, but with reference to the statutory context, structure, history, and purpose." *Abramski v. United States*, 573 U.S. 169, 179 (2014) (cleaned up).

Title III lays out a simple framework. A valid Title III demand must include a "statement of the basis *and* the purpose." 52 U.S.C. § 20703 (emphasis added). The two "requirements are connected by the conjunctive 'and,' meaning [the Government] must meet" both. *United States v. Palomar-Santiago*, 593 U.S. 321, 326 (2021). This language "imposes a mandatory command." *Bufkin v. Collins*, 604 U.S. 369, 379 (2025). "Basis" refers to the factual reason the Government requests the records; "purpose" requires the Government to show its request is connected to investigating violations of voting rights. Title III allows the Attorney General to request "records and papers … relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. As with all administrative production requests, the Government's ability to demand information under Title III "is not without limits." *EEOC v. Lockheed Martin Corp., Aero & Naval Sys.*, 116 F.3d 110, 113 (4th Cir. 1997).

The demand here lacks a valid basis and a proper purpose. What's more, the voter lists the Government seeks aren't "records and papers which come into the Secretary's possession" within the meaning of the statute. The Government's demand lacks statutory authority three times over.

### A. The demand lacks a valid basis.

The Government failed to provide a proper basis for its request. Instead, the agency claims that the exclusive "basis of [its] demand [is] the CRA" itself. *See* Compl. ¶ 21. No court has ever interpreted the term "basis" to simply mean a circular reference back to the statute. This Court

shouldn't break new ground: without a factual basis, the demand fails to meet Title III's requirements.

A basis is "an underlying fact or condition." *Basis*, BLACK'S LAW DICTIONARY (12th ed. 2024); *see also Galvin*, 2026 WL 972129, at *3. Title III's text thus requires the Attorney General to show "specific, articulable facts pointing to the violation of federal law," or at least some "evidence behind its investigation." *Weber*, 2026 WL 118807, at *9; *see also Oregon*, 2026 WL 318402, at *9. It might suffice to simply "point[] to … purported anomalies" in voting data. *Benson*, 2026 WL 362789, at *8. But "the statement must be 'the' factual basis, not just a conceivable or possible basis." *Galvin*, 2026 WL 972129, at *3. After all, administrative demands must "reflect[] on the good faith of the particular investigation." *United States v. Powell*, 379 U.S. 48, 58 (1964). Without a statement of the factual basis, the Court "cannot accurately determine whether the inquiry is within the authority of [the Attorney General] and whether the information sought is reasonably relevant." *CFPB v. Accrediting Council for Indep. Colls. & Secondary Schs.*, 854 F.3d 683, 691 (D.C. Cir. 2017). "Put simply, [Title III] requires a statement of *why* [the Attorney General] demands production of the requested records." *Galvin*, 2026 WL 972129, at *3.

This understanding of the statute has long prevailed. Indeed, the Department of Justice itself has always treated "basis" to mean the facts underlying a demand. For instance, in *Kennedy v. Bruce*, 298 F.2d 860, 861 (5th Cir. 1962), the Government's "demand [was] based upon information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction." DOJ relied on the same factual basis in other cases as well. *See*, *e.g.*, *Kennedy v. Lynd*, 306 F.2d 222, 229 n.6 (5th Cir. 1962); *In re Coleman*, 208 F. Supp. 199, 199 (S.D. Miss. 1962). And courts

permitted past requests because the DOJ provided "reasonable grounds for belief that certain voters [were] being discriminatorily denied their voting rights." *United States v. Lynd*, 301 F.2d 818, 822 (5th Cir. 1962).

The Government's now-contrary reading of "basis" would erase that requirement and "collapse[] its meaning with that of 'purpose.'" *Oregon*, 2026 WL 318402, at *9. Yet "it is generally presumed that statutes do not contain surplusage." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 299 n.1 (2006). And the statute permits a demand only if it's accompanied by a statement of "the basis *and* the purpose." 52 U.S.C. § 20703 (emphasis added). Title III's statutory text thus "clearly conveys that 'the basis' and 'the purpose' are conceptually distinct." *Galvin*, 2026 WL 972129, at *4. But "[t]o read 'basis' as meaning a legal basis would conflate that requirement with the required statement of the demand's "purpose." *Amore*, 2026 WL 1040637, at *5. "Congress could not have intended Title III to be interpreted in this redundant and circular manner." *Id.* So "the requirement that the Attorney General state 'the basis' for [the] request is mandatory, not a mere formality with which the federal government or this Court is free to dispense." *Galvin*, 2026 WL 972129, at *3.

And the "basis" requirement isn't satisfied by a reference to the statute itself, as the Complaint suggests. *See* Compl. ¶ 21. "This argument confuses the legal authority under which the Attorney General made the demand—the CRA—and the statute's requirement to state 'the basis'—the foundation in fact or evidence for the demand." *Galvin*, 2026 WL 972129, at *5. This reading, too, would render "basis" effectively meaningless. The Court should thus adhere to the plain text of Title III differentiating between the two terms, thereby "giv[ing] effect to every clause and word of [the] statute." *Marx v. Gen. Rev. Corp.*, 568 U.S. 371, 385 (2013) (cleaned up).

9

Reading "basis" the way the Government suggests would also give the agency "virtually limitless access to records required to be maintained under" the statute. *Oregon*, 2026 WL 318402, at *8. The Government might want more than the statute provides, but its "interpretation is not better just because it would go further than" the plain text. *Pulsifer v. United States*, 601 U.S. 124, 152 (2024). And this claim of previously "unheralded power" warrants "a measure of skepticism." *Util. Air. Reg. Grp. v. EPA*, 573 U.S. 302, 324 (2014).

The Court should "enforce [Title III] according to its terms." *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (cleaned up). The Attorney General must provide "a factual basis for investigating a violation of a federal statute," not just "identify[] any federal statute." *Oregon*, 2026 WL 318402, at *8-9. "Here, [the Government] offered no basis— none—and the demand [is] therefore facially inadequate." *Galvin*, 2026 WL 972129, at *4.

### B. The demand lacks a proper purpose.

The Government's alleged purpose also falls short. It says that the demand's purpose "is to ascertain compliance with the list maintenance requirements of the NVRA and HAVA." Compl. ¶ 22. But that purpose is divorced from Title III's original purpose. Under Title III, the Attorney General is only "entitle[d] to inspect and copy all of the voter papers and records as defined" if doing so is "in fulfillment of the duties imposed upon [it] by the Civil Rights Act of 1957 and 1960." *Lynd*, 306 F.2d at 228. Title III doesn't allow records demands "based on a statement of *any* purpose." *Amore*, 2026 WL 1040637, at *6. The purpose must come from the statute.

Title III doesn't expressly define what qualifies as a valid purpose under the statute, but the term is "clarified by the remainder of the statutory scheme." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988). "The purpose of Title III is to detect voting-related racial discrimination." *Weber*, 2026 WL 118807, at *8; *see State of Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 852 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Att'y*

10

*Gen. of U.S.*, 285 F.2d 430 (5th Cir. 1961).  Specifically, the law was meant to supplement the existing voting-rights enforcement scheme which, at the time, "lack[ed] a suitable provision for access to voting records during the course of an investigation and prior to the institution of a suit." H.R. REP. NO. 86-956, at 1944 (1959).

"[W]ithin its larger statutory and historical context," "the 'purpose' required" by "Title III's text … must relate to a purpose of investigating violations of individuals' voting rights." *Oregon*, 2026 WL 318402, at *10.  So Title III "enable[s] the Attorney General to determine whether [Civil Rights Act suits] or similar actions should be instituted."  *Lynd*, 306 F.2d at 228; *see also United States v. Ass'n of Citizens Councils of La.*, 187 F. Supp. 846, 847 (W.D. La. 1960) ("The chief purpose of the provisions of Title III, dealing with the preservation and production of records, is to facilitate the investigation of the records before suit is filed."); *Gallion*, 187 F. Supp. at 852.  Ultimately, reading Title III's purpose as limited to the Act's purpose is the only reading that "produces a substantive effect that is compatible with the rest of the law."  *King v. Burwell*, 576 U.S. 473, 492 (2015) (cleaned up).

As the Fifth Circuit long ago explained, voter roll issues like the issues the Government alludes to here are "matter[s] which do[] not bear any particular importance to [an] inquiry" under the Civil Rights Act.  *Bruce*, 298 F.2d at 863 n.2.  "Uniform, centralized statewide voter registration lists—like the one [the Government] is seeking from [West Virginia], were not even required" until decades after the Civil Rights Act of 1960's passage.  *Weber*, 2026 WL 118807, at *9.  Nor was Title III conceived to provide access to "confidential, private papers and effects" like the unredacted information Government now demands.  *Lynd*, 306 F.2d at 231.

As with the basis arguments, the Government's interpretation of purpose would also "render … [the word] meaningless."  *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 128

(2018).  Title III granted "the Attorney General an opportunity to inspect the records as to those who may have been illegally denied the right to qualify" to vote.  *Kennedy v. Lewis*, 325 F.2d 210, 212 (5th Cir. 1963).  It didn't create "an unlimited discovery device which may be employed and used without restraint."  *In re Gordon*, 218 F. Supp. 826, 827 (S.D. Miss. 1963).  The Government's demand thus falls beyond its Title III authority.

The Government's "purpose" argument presents another problem: circumstances surrounding the request cast doubt that the purpose described in the Complaint is the true purpose for the request.  And judicial review is not "an empty ritual."  *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).  So the Court isn't obligated to accept the Government's offered rationale if the Court believes it to be "contrived."  *Id.* at 756.

Though DOJ initially claimed the list-maintenance-review purpose, it seems the Government now wants to use the voter list for immigration enforcement reasons.  February 11, 2026 Letter, at 2.  That purpose matches the purpose outlined in a recent executive order.  *See* 90 Fed. Reg. 14005.  Demanding unredacted voter lists for this use would be outside the Civil Rights Act's purview.

The scope of the Government's efforts further undermines their supposed purpose.  Instead of making targeted requests connected to Title III's purpose, the United States has "requested the same statewide voter registration lists in states across the country."  *Oregon*, 2026 WL 318402, at *11.  The Government has not pointed to any potential voting irregularities.  And former DOJ officials even stated that "the goal was for all fifty states to receive similar requests for voter rolls so that the government could get the last four digits of every voter's Social Security number."  *Weber*, 2026 WL 118807, at *10.

Other courts have pointed out that "significant concerns [exist] about the true purpose of [the Government's] voter data requests." *Oregon*, 2026 WL 318402, at *11. These concerns were substantial enough that the "presumption of regularity that" the Government "could be taken at its word … no longer [held]." *Id.* This Court, too, should "not take lightly [the Government's] obfuscation of its true motives." *Weber*, 2026 WL 118807, at *12. Rather than investigate voting rights violations, the Government appears to be "laying the groundwork to amass the personal information of millions of Americans in a centralized database," *id.* at 11, "for the purposes of immigration enforcement," *Oregon*, 2026 WL 318402, at *11.

Given "the disconnect between the decision made and the explanation given," the Court should decline to "exhibit a naiveté from which ordinary citizens are free" and instead ensure that the United States has provided a "genuine justification." *New York*, 588 U.S. at 756, 785 (cleaned up). Title III "protect[s] voting rights." *Weber*, 2026 WL 118807, at *12. It's not an immigration enforcement mechanism, and the Government can't use it as one "under the guise of a pretextual investigative purpose." *Id.* If it has done so here, the Court must dismiss the complaint.

### C. Unredacted voter lists are not discoverable under the Civil Rights Act.

The registration list demanded is also not a "record" or "paper" under Title III. The statute permits the Attorney General to request only "records and papers which come into [the election official's] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. Voter registration lists fall outside that definition, so they are not subject to Title III's production requirements.

The Act applies to "records and papers which come into [the Secretary's] possession." 52 U.S.C. § 20701. That phrase refers to "a process by which someone *acquires* an item from an external source." *Benson*, 2026 WL 362789, at *9 (citing *Honeycutt v. United States*, 581 U.S. 443, 449 (2017)). This choice of wording isn't unusual, either. "Congress frequently uses the

13

phrase 'come into possession' to refer to items that a person *obtains* rather than *creates*." *Id.* (collecting examples). So the Court shouldn't presume that "the legislature was ignorant of the meaning of the language it employed." *Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883).

The voter registration list doesn't "come into [the Secretary's] possession" because his office creates it. 52 U.S.C. § 20701. He does not "acquire" it in any way. *Huddleston v. United States*, 415 U.S. 814, 820 (1974) (defining "acquire" as "to come into possession, control, or power of disposal of"). What's more, the voter registration list isn't even "assembled purely from information in voter registration applications." *Benson*, 2026 WL 362789, at *10. Instead, the list consists of information compiled from a variety of sources, including individual voters, motor vehicle officers, and other state agencies. *See* 52 U.S.C. §§ 20504, 20506 (NVRA provisions requiring States to accept information from these sources).

Expanding that qualification to include documents the Secretary creates would "nullify Congress's purposeful choice of language." *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 773 (2025). That's especially true here where Congress "did not adopt obvious alternative language." *Advoc. Health Care Network v. Stapleton*, 581 U.S. 468, 477 (2017) (cleaned up). For instance, Congress could easily have chosen to require production of "all papers and records in the possession" of an election official. *See, e.g.*, 30 U.S.C. § 1732(b); 6 U.S.C. § 1502(a). Congress could've also "referred simply to … 'records' without any qualifier" as it did in the NVRA. *Benson*, 2026 WL 362789, at *9 (citing 52 U.S.C. § 20507(i)(1)). It didn't. Thus, "the natural implication" is "that [Congress] did not intend the alternative." *Stapleton*, 581 U.S. at 477 (cleaned up).

"The statutory context of [Title III's text] further confirms its ordinary meaning." *BedRoc Ltd. v. United States*, 541 U.S. 176, 185 (2004). When referring to what must be preserved, the

14

text lists "records and papers … relating to any application, registration, payment of poll tax, or other act requisite to voting." 52 U.S.C. § 20701. "Each of these terms refers to something that the voter submits or does as part of the registration process." *Benson*, 2026 WL 362789, at *9; *see also Fontes*, slip op. at 12 (explaining that there are "salient differences between" the documents listed in Title III and voter registration lists). Thus, "the provision requires officials to preserve voters' submissions to the State so that the federal government can determine whether the State is improperly rejecting voter registration applications." *Id.* This interpretation likewise aligns with the Civil Rights Act's purpose of "protect[ing] the voting rights of Black citizens" which "had been frustrated by state officials' destruction of voter registration applications." *Id.*

Finally, the Government's reading of Title III would create conflict between the Civil Rights Act and HAVA. HAVA requires election officials to update voter lists regularly. 52 U.S.C. § 21083(a)(1)-(2). But the Civil Rights Act prohibits—indeed, imposes criminal sanctions for— altering documents subject to its "retention and preservation" requirement. 52 U.S.C. §§ 20701-02. So if Title III covered internally created voter lists, then HAVA would *mandate* that the Secretary frequently update those lists, while Title III would *impose criminal penalties* on him for doing so. *See Fontes*, slip op. at 7. The Court should interpret Title III in a way that avoids that unnecessary conflict.

Voter registration databases created by the Secretary are not "records or papers" that he "comes into possession" of. The demand lacks statutory support for that reason, too.

> **D.** **The Court should reject the Government's reading of Title III to avoid any constitutional concern.**

Should this Court find some ambiguity in Title III's provisions, it should still be reluctant to embrace the Government's broad reading of the statute. "Courts should indeed construe statutes to avoid not only the conclusion that they are unconstitutional, but also grave doubts upon that

15

score." *Palomar-Santiago*, 593 U.S. at 328-29 (cleaned up). "Even where there are two reasonable constructions of a statute's language, [courts] are to avoid adopting the unconstitutional reading." *McKiver v. Murphy-Brown, LLC*, 980 F.3d 937, 958 (4th Cir. 2020).

If the Government's present demands were deemed permissible under Title III, then serious constitutional concerns would arise. "[T]he accumulation of vast amounts of personal information in computerized data banks or other massive government files" comes with an inherent "threat to privacy." *Whalen v. Roe*, 429 U.S. 589, 605 (1977). Thus, the Fourth Circuit has held that the "fundamental right to vote is substantially burdened" by laws that require disclosure of private information such as Social Security numbers. *Greidinger v. Davis*, 988 F.2d 1344, 1354 (4th Cir. 1993); *see also Benson*, 2026 WL 362789, at *4. Mandating the release of unredacted voter information like Social Security numbers "sweeps broader than necessary to advance electoral order." *Norman v. Reed*, 502 U.S. 279, 290 (1992). The Government's "interest in preventing voter fraud and [promoting] voter participation could easily be met without the disclosure of the [Social Security number] and the attendant possibility of a serious invasion of privacy that would result from that disclosure." *Greidinger*, 988 F.2d at 1354.

Thus, Title III—as understood by the United States—could "create[] an intolerable burden on that right as protected by the First and Fourteenth Amendments." *Greidinger*, 988 F.2d at 1355; *see also Benson*, 2026 WL 362789, at *4 (Requiring "public disclosure of all private information submitted for voter registration purposes would potentially cause [Title III] to impose an unconstitutional burden on the right to vote guaranteed by the First Amendment.") This Court should "avoid rendering [Title III] unconstitutional," *United States v. Davis*, 588 U.S. 445, 463 n.6 (2019), and instead hold that redacted information would satisfy a demand under the statute.

II.    **The demand violates federal privacy laws.**

The Government's demand violates other federal laws, too. In particular, the demand ignores the requirements of the Privacy Act of 1974, 5 U.S.C. § 552a et seq., the E-Government Act, Pub. L. No. 107-347, 116 Stat. 2899 (2002), and the Driver's Privacy Protection Act, 18 U.S.C. § 2721 et seq. Unless their text says otherwise, these later-enacted laws impose additional standards on all government actions falling within their ambit, including Title III requests seeking protected information. *See Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601, 611 (2019) ("It is a commonplace of statutory interpretation that Congress legislates against the backdrop of existing law." (cleaned up)). Thus, "all federal officials … are bound by" them. *Big Ridge, Inc. v. Fed. Mine Safety and Health Rev. Comm'n*, 715 F.3d 631, 650 (7th Cir. 2013); *see also EPIC v. Presidential Advisory Comm'n on Election Integrity*, 266 F.Supp.3d 297, 310-11 (D.D.C. 2017); *Reno v. Condon*, 528 U.S. 141, 143-44 (2000). Because the request here runs afoul of those statutes, the Court should dismiss the Complaint.

*First*, the Privacy Act's safeguards prevent the unredacted disclosure demanded here. The "Privacy Act exists to protect individuals from disclosure of government-collected information." *Ritter v. United States*, 177 Fed. Cl. 84, 87 (2025); *see also Weber*, 2026 WL 118807, at \*17 ("The Act was passed in 1974 amidst concerns over the Executive accumulating and centralizing Americans' personal information."). It creates safeguards requiring agencies "to follow specific procedures prior to maintaining, collecting, using or disseminating records." *Weber*, 2026 WL 118807, at \*17 (citing 5 U.S.C. §§ 552a(a)(3), (a)(5), (e)(4), (e)(7), (f)). And it defines a "system of records" as a "group of any records under the control of any agency, from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." 5 U.S.C. § 552a(a)(5). The information in West Virginia's voter registration list falls under this definition because it includes and can be sorted by, among

other things, the "name … of the registrant." W. VA. CODE § 3-2-30(b)(1). Thus, before "establish[ing]" or "revis[ing]" its own "system of records" using the information, DOJ first needed to publish a notice in the federal register about its "existence and character." 5 U.S.C. § 552a(e)(4). DOJ failed to give such notice here, thus invalidating the demand. *See Weber*, 2026 WL 118807, at *18.

*Second*, the demand fails to satisfy the E-Government Act's strictures. That law requires agencies to perform a "privacy impact assessment" before "initiating a new collection of information" covering "10 or more persons" that "includes any information in an identifiable form permitting the physical or online contacting a specific individual." Pub. L. No. 107-347, § 208(b), 116 Stat. 2899, 2921-22 (2002). This assessment must be done "*before* the agency initiates a new collection of information." *EPIC*, 266 F.Supp.3d at 311. DOJ shirked this assessment and declined to perform any privacy impact assessment at all. So the request violates its responsibilities under the E-Government Act. *See Weber*, 2026 WL 118807, at *19.

*Third*, the Driver's Privacy Protection Act erects yet another privacy-law roadblock to the demand. That statute "regulates the disclosure of personal information contained in the records of state motor vehicle departments." *Reno*, 528 U.S. at 143. It achieves this regulation by preventing disclosure of "personal information" obtained by the West Virginia Department of Motor Vehicles in connection with a "motor vehicle record." 18 U.S.C. §§ 2721(a), 2725(1), (3), (4). West Virginia's voter registration list receives information from the State's DMV. *See* W. VA. CODE § 3-2-11; *see also* 52 U.S.C. § 20504. The Government's demand thus includes that information. The Driver's Privacy Protection Act shields this data, blocking the demand. *See Weber*, 2026 WL 118807, at *19.

**III.  West Virginia law prohibits the Secretary from releasing the State's voter list.**

State law poses a last barrier to fulfilling the Government's demand.  West Virginia law bars disclosure of sensitive voter information.  West Virginia Code § 3-2-30(a) permits "[a]ny person" to "examine the active, inactive, rejected and canceled voter registration records."  But the disclosure "may not include the registrant's telephone number, email address, Social Security number or driver's license number or nonoperator's identification number issued by the Division of Motor Vehicles."  *Id.*

For the Secretary to ignore this state-law mandate, some federal law would need to preempt West Virginia's redaction requirement.  The Government only makes a halfhearted pass at a preemption argument.  *See* Mem. Supporting Mot. to Compel at 18-19.  In fact, its frontline position is that the state and federal laws are *harmonious*.  *Id.* at 19.  But, if they conflict, then "the state law must yield."  *Id.*  True, but that's not the preemption analysis.  Instead, the Government would have to argue that a federal law either "occup[ies] [the federal election] field exclusively" or is "in actual conflict" with West Virginia's law.  *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995).  It can't do either.

Start with first principles.  As the Government acknowledges, the Constitution's Election Clause "is a default provision" that "invests the States with responsibility for the mechanics" of federal elections.  *Foster*, 522 U.S. at 69 (citing U.S. CONST. art. I., § 4, cl. 1).  "Unless Congress" chooses to do so, States are in charge.  *Roudebush v. Hartke*, 405 U.S. 15, 24 (1972).  And by and large, Congress has long "le[ft] the conduct of the [federal elections] to state laws, administered by state officers."  *Gradwell*, 243 U.S. at 485.  When Congress displaces state election laws, it does so by "positive and clear statutes."  *Id.*

As the United States itself recognizes, federal law operates harmoniously with West Virginia law.

Title III of the Civil Rights Act of 1960 doesn't address voter lists at all, so no preemption issues arise there. Also, Title III concerns only "public records which ought ordinarily to be open," not "confidential, private papers and effects" like are protected under West Virginia law. *Lynd*, 306 F.2d at 231.

Nor do the NVRA and HAVA preempt West Virginia law. To the contrary, the state law helps accomplish the same goals as those federal laws. The NVRA bars the release of "uniquely sensitive information" like Social Security numbers. *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 339 (4th Cir. 2012). It provides access only "with the voters' [Social Security numbers] redacted." *Id.* (cleaned up). West Virginia's law strikes precisely the same balance. *Cf. Weber*, 2026 WL 118807, at *14. And HAVA sets only a broad directive to create a "computerized statewide voter registration list." 52 U.S.C. § 21083(a)(1). It leaves the States to "define[], maintain[], and administer" the list "at the State level." *Id.* § 21083(a)(1)(A). HAVA thus assumes the States are best positioned to determine how best "to improve voting systems and voter access" in their State. *RNC v. N.C. State Bd. of Elections*, 120 F.4th 390, 394 (4th Cir. 2024). And HAVA doesn't even include a disclosure provision in the first place, so no preemption issues exist there either. *See*, *e.g.*, *Weber*, 2026 WL 118807, at *15.

Federally enacted election laws operate only "so far as [Congress's power] is exercised, and no farther." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013). Here, none of the federal statutes displace States from the field of election law, nor do they conflict with West Virginia's redaction requirements. So West Virginia's law remains, and the Secretary can also refuse to disclose unredacted lists on that basis.

## CONCLUSION

For these reasons, the Court should dismiss the Complaint.

Respectfully submitted,

20

/s/ *Michael R. Williams*
Michael R. Williams (WV Bar # 14148)
 *Solicitor General*
Caleb A. Seckman (WV Bar # 13964)
 *Assistant Solicitor General*
West Virginia Attorney General's Office
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25305
Michael.R.Williams@wvago.gov
Caleb.A.Seckman@wvago.gov
Telephone: (304) 558-2021
Fax: (304) 558-0140

*Counsel for Defendant Kris Warner*

DATE: April 29, 2026