UNITED STATES OF AMERICA,

        Plaintiff,

        v.

KRIS WARNER, in his official capacity as
West Virginia Secretary of State

        Defendant.

Case No. 2:26-cv-00156-TEJ

**UNITED STATES' MEMORANDUM IN RESPONSE TO DEFENDANT'S MOTION TO DISMISS DKT. 24 AND IN REPLY TO DEFENDANT'S OPPOSITION TO MOTION TO COMPEL FEDERAL ELECTION RECORDS UNDER THE CIVIL RIGHTS ACT OF 1960 DKT. 26**

Plaintiff United States of America respectfully submits this Consolidated Response in Opposition to the Motion to Dismiss by the Defendant Secretary of State Warner ("Defendant") and in reply to his Opposition to the Motion to Compel Production Federal Election Records.

## I.    INTRODUCTION

Title III of the Civil Rights Act of 1960 ("CRA") empowers the United States to obtain federal election records upon written demand. *See* 52 U.S.C. §§ 20701, 20703. When a State refuses to comply with the demand, Title III provides that the United States may seek "appropriate process to compel the production" of those federal election records. 52 U.S.C. § 20705. The United States made a written demand to Secretary of State Warner for West Virginia's statewide voter registration list ("SVRL")— i.e., federal election records. Secretary Warner refused to comply with that demand, necessitating this action. Compl., Dkt. 1.

Title III is a unique provision of federal law because it is purely an investigative tool. The "chief purpose" of Title III "is to facilitate the investigation of the records *before suit is filed*."

1

*United States v. Ass'n of Citizens Councils of La.*, 187 F. Supp. 846, 847 (W.D. La. 1960) (per curiam) (emphasis added). "[T]he function sought to be exercised by the Attorney General is … purely investigative," *Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 854 (M.D. Ala. 1960) *affirmed sub nom. Dinkens v. Attorney General*, 285 F.2d 430 (5th Cir. 1961), to evaluate "possible violations of a Federal statute," *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam) ("*Coleman II*"). Title III authorizes the Attorney General to determine whether a federal lawsuit "should be instituted" and "to obtain evidence for use in such cases if and when filed." *Kenndey v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962).

The Court's inquiry here is a limited one: (1) did the Attorney General make a written demand for federal election records stating the basis and purpose; (2) was that demand made to one or more "officer[s] of election" responsible for performing any act requisite to voting in federal elections including voter registration; (3) did the "officer[s] of election" fail or refuse to make the demanded federal election records "available for inspection, reproduction, and copying"; and (4) did the Attorney General make "a simple statement" to the Court that he satisfied the first three elements. *Lynd*, at 225-26.

Defendant seeks to complicate that narrow inquiry by arguing that the United States' demand exceeds its statutory authority in several unfounded respects and violates federal and state privacy laws. First, Defendant argues that the United States lacks a valid basis and purpose and instead has ulterior nefarious motives. *See* Dkt. 25 at 12-13. Second, Defendant argues that certain voting records do not constitute "papers" under the CRA that came into Defendant's possession.

Finally, Defendant also prematurely asserts affirmative defenses including the Privacy Act, E-Government Act, and Driver's Privacy Protection Act. None of Defendant's assertions have merit.[1]

## II.  BACKGROUND

On September 8, 2025 the Attorney General sent a letter to Secretary Warner requesting the State's SVRL.  The letter cited Section 303 of the Civil Rights Act of 1960 as the basis of the request and the stated purpose was to ascertain West Virginia's compliance with the list maintenance requirements of the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. § 20501, *et seq.* and the Help America Vote Act of 2002 ("HAVA") 52 U.S.C. § 20901, *et seq.* On September 22, 2025, Secretary Warner sent an email attaching a letter refusing to provide the list citing state law. On December 10, 2026, the Attorney General contacted Secretary Warner again requesting the State's SVRL.  Secretary Warner again refused this second request.  The United States then commenced this summary proceeding.  Compl., Dkt. 1.

## III.  ARGUMENT

### A.  The Civil Rights Act calls for a summary proceeding to compel federal election records.

The Attorney General's filing of an application for an order under Title III of the CRA "is not the commencement of an ordinary, traditional civil action with all of its trappings." *Lynd*, 306 F.2d at 225. Rather, a CRA Title III proceeding is "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Id.* In structuring the statute in this way, Congress indicated that the Federal Rules of Civil Procedure are inapplicable. "Since it is a special statutory proceeding, it does not require pleadings which satisfy usual notions under the Federal Rules of

---

[1] The Attorney General advises the Court of an opinion from the Department of Justice Office of Legal Counsel published on May 12, 2026. That opinion concludes that the CRA authorizes the Attorney General to compel States to produce unredacted SVRLs. https://www.justice.gov/olc/media/1440346/dl. *Authority to Obtain and Share Voter Roll Data* Op. O.L.C. (2026).

Civil Procedure." *Id.* at 225-26; *see also Gallion*, 187 F. Supp. at 854 (comparing applications to compel to actions by the Securities and Exchange Commission in which procedural rules "are made specifically inapplicable to investigations"). The CRA differs from ordinary civil actions because its "chief purpose" is to facilitate *pre-suit* investigation. *Citizens Councils*, 187 F. Supp. at 847. In stark contrast, "[t]he chief purpose of Rule 34 … is to give a party litigant the right to have records produced *after* suit has been filed." *Id.* (emphasis added). To summarize, "[t]here is no place for any other procedural device or maneuver," including Defendant's motion to dismiss, in response to a CRA claim. *Lynd*, 306 F.2d at 226; *see also* Fed. R. Civ. P. 81 (summarizing other federal claims to which the Federal Rules of Civil Procedure do not apply).

In other words, Title III invests the Attorney General with a power akin to a grand jury which "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950). The Supreme Court has recognized that statutes that vested investigative powers in Executive Branch agencies provide such agencies with grand jury-like powers and latitude. *See, e.g.*, *United States v. Powell*, 379 U.S. 48, 57 (1964) (recognizing that the IRS Commissioner has grand jury-like powers); *Morton Salt Co.*, 338 U.S. 632, 642-43 (1950) (same with respect to the Federal Trade Commission). The investigative powers that the Attorney General derives from Title III fall comfortably within this paradigm.

West Virginia asserts that the Federal Rules of Civil Procedure must govern these proceedings, because FRCP 81(a)(5) specifically makes the rules applicable to subpoenas. Dkt. 26 at 9. A recent decision issued by a district court in the Sixth Circuit agreed with *Lynd* and rejected the arguments raised by Defendants. *See United States v. Benson*, No. 1:25-cv-01148-HYJ-PJG, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026), *appeal docketed*, No. 26-1225 (6th Cir. Feb. 27,

2026).  Consistent with the Supreme Court's treatment of similar statutes, *Benson* construed "a request for records under the CRA as a form of administrative subpoena." *Benson* at *7 (citing *Lynd*, 306 F.2d at 225 and *In re Gordon*, 218 F. Supp. 826, 826-27 (S.D. Miss. 1963)).  Therefore, "'[m]ost of the Federal Rules of Civil Procedure are simply inapplicable…'" *Benson* at *7 (quoting *United States v. Markwood*, 48 F.3d 969, 982 (6th Cir. 1995)).  Consequently, *Benson* acknowledged that "'a district court's role in the enforcement of an administrative subpoena is a limited one.'" *Id.* (quoting *Markwood*, 48 F.3d at 976).  This is because the United States has not issued a subpoena, it has made a "*demand*" under the CRA. 52 U.S.C. §20703. While a demand is similar and akin to a subpoena, it is a term of art with a specific meaning differing from a subpoena.

Defendant relies heavily on two district court decisions out of the Ninth Circuit to reach a contrary conclusion. In those decisions, the district courts misread the Supreme Court's decision in *United States v. Powell*, 379 U.S. 48 (1964), to reject the Fifth Circuit's determination in *Lynd* that Title III of the CRA is a special statutory proceeding. *See United States v. Oregon*, No. 6:25-cv-01666-MTK, 2026 WL 318402 at **7-8 (D. Or. Feb. 5, 2026), *appeal docketed*, No. 26-1231 (9th Cir. Mar. 3, 2026); *United States v. Weber*, No. 2:25-cv-09149-DOC-ADS, 2026 WL 118807 at *8 & n.15 (C.D. Cal. Jan. 15, 2026), *appeal docketed*, No. 26-1232 (9th Cir. Mar. 3, 2026). However, *Powell* applied certain Federal Rules of Civil Procedure to an IRS administrative summons against a citizen.  The Supreme Court explained that because section 7604(b) of the Internal Revenue Code ("IRC") "contains no provision specifying the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply…[.]" 379 U.S. at 58 n.18. However, the *Oregon* court applied a much broader construction of *Powell* than the Supreme Court intended.

The *Oregon* court found that *Powell* involved interpretation of "a similar statute" to Title III of the CRA, and the decision's admonition that "the court may 'inquire into the underlying reasons for the examination [of records]'" therefore applied to the CRA. *Oregon*, 2026 WL 318402 at *8 (quoting *Powell*, 379 U.S. at 58 & n.18). The *Oregon* court omitted any explanation that the quoted language from *Powell* referred to a process expressly provided in the IRC that is missing from the CRA. The Supreme Court explained that judicial inquiry was appropriate where asked to enforce an administrative summons under the IRC to determine "if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *Powell*, 379 U.S. at 58. That inquiry was permitted because it was specifically authorized by section 7605(b) of the IRC, which prohibited the Government from subjecting a taxpayer "to unnecessary examination or investigations." *Powell* at 52-53 (quoting 26 U.S.C. § 7605(b)). However, no similar language limits the Attorney General's authority to compel records under the CRA and the CRA is not directed at a private citizen but rather state election officers acting in their official capacity. *See* 52 U.S.C. §§ 20701-20706. Nor does the CRA provide any process for election officers to object to CRA proceedings being initiated against them. *See id.*

The *Weber* court, in addition to *Powell*, referred to what it indicated was a decision of the United States Supreme Court also supporting this argument. *See Weber*, 2026 WL 118807 at *8 (citing "*Becker v. United States*, 451 U.S. 1306 (1981)"). That is incorrect. *Becker* was an order issued by the Circuit Justice on an application for a temporary stay. *See* 451 U.S. 1306 (1981) (Rehnquist, J., in chambers) (continuing temporary stay pending review by the Court). The subsequent history indicates that the stay was continued, 452 U.S. 912 (1981), and later vacated and denied, 452 U.S. 935 (1981), leaving it without any precedential authority. Moreover, because

6

*Becker* involved an administrative summons under the IRC, then-Justice Rehnquist specifically recognized that *Powell*'s reference to the Federal Rules of Civil Procedure applying to records demanded under the IRC was "'not intended to impair a summary enforcement proceeding so long as the rights of the party summoned are protected and an adversary hearing, if requested, is made available.'" *Becker*, 451 U.S. at 1308 (Rehnquist, J., in chambers) (citation omitted). Far from supporting Defendant's argument that the summary proceeding does not apply to production of federal records under the CRA, Justice Rehnquist's opinion in *Becker* undercuts it. As the Supreme Court later clarified, "post-*Powell* cases, too, are clearly and consistently to the effect that the footnote in *Powell* was not intended to impair a summary enforcement proceeding so long as the rights of the party summoned are protected and an adversary hearing, if requested, is made available." *Donaldson v. United States*, 400 U.S. 517, 529 (1971).

That is exactly what has happened here. Defendant was notified of and is responding to the Motion to Compel. Even if this court decides to apply the Federal Rules of Civil Procedure, the rules must be applied on a limited basis – that is, no discovery is permitted – consistent with the investigative, pre-suit, summary nature of a CRA proceeding.

Moreover, with respect to Defendant's motion to dismiss, this court must draw all reasonable inferences in favor of the United States, *Hall v. DirectTV,* 846 F.3d 757,765 (4th Cir 2017), within the constraints imposed by the CRA. *Lynd*, 306 F.2d at 225-30. Taking as true the allegations in the United States' Complaint, the United States has satisfied each of the four elements of its CRA action. Therefore, the motion to dismiss must be denied.

**B. The Attorney General has a basis and purpose to investigate West Virginia's compliance with federal election laws.**

The CRA establishes a straightforward requirement for the Attorney General to make a written demand to officers of election for federal election records that articulates "the basis and

7

purpose therefor." 52 U.S.C. § 20703. The United States has done that. On September 8, 2025, the United States sent Defendant a written demand for a copy of West Virginia's SVRL. Dkt. 14, attachment 1, Eric Neff Declaration ("First Neff Decl.") at ¶¶ 7, 9 and Ex. 1. As stated in that demand, the basis for the demand was Title III of the CRA, the NVRA and HAVA, and the purpose was to "assess West Virginia's compliance with the SVRL maintenance provisions of the National Voter Registration Act ("NVRA")." *Id.* at 2. ****

Nevertheless, Defendant argues that the United States failed to provide a sufficient statement of basis and purpose for its demand for federal election records or, in the alternative, that it has not provided the true reason for the demand. Dkt. 25 at 4, 7-13.

To begin, recent enforcement efforts by the Attorney General demonstrate the need for federal scrutiny. First Neff Decl. ¶¶ 12-14. In 2025, North Carolina election officials admitted that the state "maintained and used a HAVA List that includes records that do not comply with the requirements for Federal elections under Section 303(a)(5)." *United States v. N. Carolina Bd. of Elections*, Consent J. & Order at 4 (E.D.N.C. Sept. 8, 2025) (attached as First Neff Decl. ¶ 13, Ex. 3). One of the problems was that even though some of the registration applications had HAVA identifiers, counties failed to input those identifiers into the SVRL. As a result of the Attorney General's enforcement action, North Carolina has reduced the number of voter records missing an identification number under HAVA from 103,329 to 70,709. *See N. Carolina Bd. of Elections*, Defs.' 2d Status R. at 2 (E.D.N.C. Jan. 30, 2026) (attached as Eric Neff's second declaration submitted with this response and reply ("Second Neff Decl.") at ¶9, Ex. 7).

Defendant further argues the Attorney General's concern with Defendant's list maintenance is not the true purpose of the Attorney General's request. Dkt. 25 at 13. Rather, Defendant argues, based entirely on unreliable hearsay, that the Department of Justice is amassing a nationwide voter

database. Defendant's argument is absurd and false – as the United States District Court for the Eastern District of North Carolina recently found in rejecting such arguments as "speculative and premature." *United States v. North Carolina Board of Elections*, Case No. 5:25-cv-00283 (E.D.N.C. Sept. 8, 2025), Dkt. 87, Order Denying Motion for Reconsideration of Motions to Intervene at 7. (attached to the Second Neff Decl. at ¶10, Ex. 8).

Obtaining an SVRL to assess and enforce HAVA and the NVRA is not new. As mentioned in its Motion to Compel, the United States used the CRA to obtain statewide voter lists to assess compliance with list maintenance requirements in Georgia and Texas. Dkt. 15 at 17-18. Similarly, in 2007, the United States entered a Consent Decree with the State of Maine regarding HAVA compliance and list maintenance. *See United States v. Maine*, No. 1:06-cv-00086, 2007 WL 1059565 (D. Me. Apr. 4, 2007). (attached to the Second Neff Decl. at ¶11, Ex. 9). Paragraph 9(e) of the consent decree required Maine to "provide to the United States in July 2007 and again in January 2009 an electronic copy of voter information from the CVR (computerized statewide voter registration system) that includes the voter's full name, *unique identifier*, date of birth, address, voter jurisdiction, active or inactive status, and (in January 2009 only) whether the voter participated in the 2008 federal election." *Id.* at *5(emphasis added).[2] The United States entered into similar agreements with the States of New Jersey and Indiana to enforce voter registration list maintenance compliance.[3] Likewise, Indiana was required by consent decree to "retain voter registration and list maintenance records related to the terms of this agreement for the time periods

---

[2] Paragraph 11 of the consent decree explicitly invokes the CRA, referring to 42 U.S.C. § 1974, which was later transferred to 52 U.S.C. § 20701. 2007 WL 1059565, *5.

[3] *See United States v. New Jersey*, No. 2:06-cv-04889 (D. NJ. Oct. 12, 2006). In New Jersey, paragraph 5 of the stipulated order required the HAVA identifiers to be provided and paragraph 14 required Defendant to retain voter registration and list maintenance records. Dkt. 2 in 2:06-cv-04889. (attached as 2d Neff Decl. as Ex. 10).

provided by… [Section 20701].” Dkt. 5 at 6 in *United States v. Indiana*, 1:06-cv-01000 (S.D. Ind. July 5, 2006). (attached to the Second Neff Decl. at ¶12, Ex. 11).

In *Indiana,* the United States later moved to amend the consent decree to obtain the full, unredacted SVRL, including driver license numbers and social security numbers. Dkt. 16 in *Indiana*, 1:06-cv-01000. (attached to the Second 2d Neff Decl. at ¶12, Ex. 12). As discussed in the Motion, the United States was entitled to the unredacted SVRL pursuant to Title III, notwithstanding any conflicting state laws. *Id*. at 2. The consent decree acknowledged that the State is “required to provide the requested information under the relevant statutes and pursuant to the Supremacy Clause of the Constitution.” *Id*. at 4. The parties further recognized that “compliance with this request [was] a release of public information to a member of the public.” *Id*. Importantly, the United States agreed to “use the voter registration list information to assess the State’s compliance with federal voting laws, including, but not limited to, the NVRA.” *Id*. The Order granting the Motion to Amend the Consent Decree required Indiana, within 21 days of the order, to immediately make available to the United States the full statewide voter registration list including, where available, the following information: each registered voter’s full name, address, full date of birth, voter identification number as defined in IC 3-5-2-50.1, driver license number, race, voter status and voting history. Moreover, the amended order required Indiana to produce such data in electronic format on a CD ROM or DVD. Dkt. 18 in *Indiana*, 1:06-cv-01000. (attached to the Second Neff Decl. at ¶13, Ex. 13).

The United States’ use of Title III of the CRA is not limited to investigating compliance with HAVA and the NVRA. It also has used the law in the enforcement of the Uniformed and Overseas Citizen Absentee Voting Act (“UOCAVA”), 52 U.S.C. §§ 20301, *et seq*. The United

States sued Alabama for the State's noncompliance with 42 U.S.C. § 1973ff-1(c),[4] which required Alabama to report to the Election Assistance Commission, not later than ninety days after a regularly scheduled general election for Federal office, certain data regarding ballots from absent uniformed services voters and overseas voters. *See* Dkt. 1, *United States of America v. Alabama*, Case No. 2:08-cv-00920 (M.D. Ala. March 28, 2009). (attached to the Second Neff Decl. at ¶14, Ex. 14). The United States sought data in 21 Alabama counties under the CRA, and the Court issued an Order approving that request, and indicated that it would send demand letters to each of those counties for those election records. *Id*. at Dkt. 24. A copy of a letter sent to Shelby County in 2009 requesting election records pursuant to Title III is attached to (attached to the Second Neff Decl. at ¶14, Ex. 18). The United States filed a similar lawsuit in Vermont to obtain records for enforcement of the UOCAVA reporting requirement and the parties agreed that election officials are required to retain election records under the CRA. *See, e.g.*, Dkt. 1, *United States of America v. Vermont*, Case No. 2:08-cv-00217 (D. Vt. Feb. 26, 2009). (attached to the Second Neff Decl. at ¶15, Ex. 15).

The United States has also used the CRA in enforcement of the Voting Rights Act. The United States sought election records from counties gathering evidence for a lawsuit brought under Section 2 of the Voting Rights Act in *United States v. Georgia*, No. 1:21-cv-02575 (N.D. Ga. June 25, 2021), Dkt. 1. The Civil Rights Division sought election information from 159 counties in Georgia, and demand letters under Title III were sent to some of those counties. A copy of a letter sent to Newton County, Georgia is attached to the Second Neff Decl. at ¶16, Ex. 16. The Federal Prosecution of Election Offenses explains under the heading "Retention of Federal Records: 52 U.S.C. § 20701" that "[t]he detection, investigation, and proof of election crimes – in many

---

[4] UOCAVA was transferred to 52 U.S.C. §§ 20301, *et seq*.

instances Voting Rights Act violations – often depend[s] on documentation generated during the voter registration, voting, tabulation, and election certification processes." U.S. Dep't of Just., *Federal Prosecution of Election Offenses* 75 (8th ed. 2017). That document further provides that "under Section 20701, all documents and records that may be relevant to the detection or prosecution of federal civil rights or election crimes must be maintained if the documents or records were generated in connection with an election that included one or more federal candidates."[5] *Id*. at 78. Accordingly, the United States has provided a sufficient statement of basis and purpose for its demand for federal election records.

### C. Title III of the CRA does not require allegations that the federal election records demanded are needed to investigate race-based denial of voting rights.

Title III of the Civil Rights Act of 1960 is entitled "Federal Election Records." CRA § 301, Pub. L. No. 86-449, 74 Stat. 86 (1960). This "sweeping" obligation requires officers of election to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd*, 306 F.2d at 226. Section 301 provides, in pertinent part, "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of [a federal election] all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election…." 52 U.S.C. § 20701. Section 303 authorizes the Attorney General of the United States to compel any person "having custody, possession, or control of such record or paper" to make "available for inspection, reproduction, and copying … by the Attorney General or [his] representative" such records. 52 U.S.C. § 20703.

---

[5] In April 2024, the Department of Justice also issued guidance that explains Title III of the CRA requires election officials to retain election records. "The Act protects the right to vote by ensuring that federal elections records remain available in a form that allows the Department to investigate and prosecute both civil and criminal election matters under federal law." U.S. Dep't of Justice, *Federal Law Constraints on Post-Election 'Audits'* 2 (April 2024), https://www.justice.gov/crt/media/1348586/dl?inline (accessed April 10, 2026)

Notwithstanding the CRA's plain language, Defendant suggests that the only permissible basis for a Title III request is to investigate racial discrimination in voting and not to assess a state's compliance with HAVA and the NVRA. Dkt.25 at 10-12. Defendant is mistaken. Congress made clear in the CRA where it intended a remedy to be limited to racial discrimination. *See* Section 601 of the CRA, P.L. No. 86-449, 74 Stat. 90 (applying Title VI of the CRA to violations of rights "on account of race or color") (codified as amended at 52 U.S.C. § 10101). That is consistent with express limitations Congress made to remedies in other civil rights statutes. *See, e.g.*, 42 U.S.C. § 2000e-2 (prohibiting employment practices "because of such individual's race, color…" in Title VII of the CRA of 1964); 52 U.S.C. §§ 10301-10306, 10309 (prohibiting discrimination "on account of race, color," or language minority status in the Voting Rights Act of 1965); 42 U.S.C. §§ 3604-3606, 3617 (prohibiting discrimination in housing or rentals "because of "race, color, … or national origin" in the Fair Housing Act of 1968). No such language limiting Title III of the CRA to voting rights violations based upon racial discrimination appears anywhere in the statutory text. *See* 52 U.S.C. §§ 20701-20706.

Moreover, in *Gallion,* the court concluded "that the prescribed standard of Section 301 is *clear and unambiguous*." *Gallion*, 187 F. Supp. at 848 (emphasis added). Specifically, Title III functions as "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Lynd*, 306 F.2d at 225. The only language that is required in the Attorney General's demand is that it "was made for the purpose of investigating possible violations of a Federal statute." *Coleman II*, 313 F.2d at 868 (quoting "Senator Keating, one of the principal spokesmen for the bill in the Senate," at 106 Cong. Rec. 7767); *see also Coleman v. Campbell*, 208 F. Supp. 199, 200 (S.D. Miss. 1962) ("*Coleman I*") (a sufficient purpose to examine federal election records is "to see if any Federal laws were violated").

Defendant also suggests that enforcing list maintenance by examining compliance with HAVA's identification requirements is incompatible with securing an individual's right to vote. *See* Dkt. 25 at 11-12. Actually, the opposite is true – examining compliance with HAVA is essential to securing an individual's right to vote. In 2001, the bipartisan National Commission on Federal Election Reform, with former Presidents Gerald R. Ford (Rep.) and Jimmy Carter (Dem.) serving as Honorary Co-Chairs, explained why adding driver's license information and the last four digits of the Social Security numbers for federal elections protected individual voters:

> Any state adopting a statewide voter registration system will confront the problem of uniquely identifying voters, figuring which Joseph Smith is the same as that Joe Smith. That is why, following the Michigan example, we recommend obtaining residential addresses, with the DMV and voter registration address required in identical form. An added identifier is desirable, given the various spellings and the clerical errors that frustrate reliance only on a given name and address. For this purpose some numeric identifier can be useful. Given the danger from overuse of entire Social Security Numbers as an individual identifier we suggest that states obtain the last 4 digits of this number as an added identifier [SSN4s]. The Federal Election Commission has made the same recommendation.

Nat'l Comm'n on Fed. Election Reform, To Assure Pride and Confidence in the Electoral Process 32-33 (Aug. 2021). (excerpts attached to the Second Neff Decl. at ¶17, Ex. 17). Furthermore, the Commission noted that it was "estimated that 92% of all registered voters also have a driver's license," *Id.* at 30, which strongly supported use of a driver's license number as a unique identifier for each voter who possessed one. The Commission recognized that "accuracy" of a statewide voter registration database "can mean access." *Id.* The Commission explained, "[u]sed cumulatively, this information could improve the accurate exchange of information affecting voter eligibility and help avoid mistaken voter removals like those that occurred in Florida." *Id.* at 33. Congress heeded the Commission's finding that inaccurate voter databases can disenfranchise individual voters when Congress enacted HAVA in 2002. Congress explained how list maintenance and compliance with HAVA's identifying numbers helps protect an individual's right to vote: to

14

"reduce the incidence of voters appearing at a polling place only to discover that no record of their registration can be found."[6] H.R. Rep. 107-329, pt. 1, at 36 (2001).

Engrafting a requirement of racial discrimination that does not exist in Title III of the CRA would violate the statute's express congressional mandate as well as undermine the Attorney General's enforcement of requirements in HAVA and the NVRA that help protect voting rights. Where, like here, the language of an enactment is unambiguous, "the words employed are to be taken as the final expression of the meaning intended." *United States v. Mo. Pac. R.R. Co.*, 278 U.S. 269, 278 (1929). Well-established principles of statutory construction foreclose federal courts from rewriting a statute in a manner that better suits a litigant. As the Supreme Court explained, "[t]he judicial function to be exercised in construing a statute is limited to ascertaining the intention of the Legislature therein expressed. A *casus omissus* does not justify judicial legislation." *Ebert v. Poston*, 266 U.S. 548, 554-55 (1925). "[W]here the language of an enactment is clear, and construction according to its terms does not lead to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended. And in such cases legislative history may not be used to support a construction that adds to or takes from the significance of the words employed." *Mo. Pac.*, 278 U.S. at 278 (citations omitted). In that manner, the "judicial function [is] to apply statutes on the basis of what Congress has written, not what Congress might have written." *United States v. Great N. Ry. Co.,* 343 U.S. 562, 575 (1952). "After

---

[6] Recent enforcement efforts by the Attorney General demonstrate the need for federal scrutiny. First Neff Decl. ¶¶ 12-14. In 2025, North Carolina election officials admitted that the state "maintained and used a HAVA List that includes records that do not comply with the requirements for Federal elections under Section 303(a)(5)." *United States v. N. Carolina Bd. of Elections*, Consent J. & Order at 4 (E.D.N.C. Sept. 8, 2025) (attached to the First Neff Decl. at ¶13,, Ex. 3). As a result of the Attorney General's enforcement action, North Carolina has reduced the number of voter records missing an identification number under HAVA from 103,329 to 70,709. *See N. Carolina Bd. of Elections*, Defs.' 2d Status R. at 2 (E.D.N.C. Jan. 30, 2026) (attached to the Second Neff Decl. at ¶9,, Ex. 7).

all, only the words on the page constitute the law adopted by Congress and approved by the President. If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process…." *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 654-55 (2020).

The *Benson* court rejected arguments that parallel those of Defendant in this case, concluding that the CRA cannot be rewritten to restrict the statute's scope. *Benson* first rejected *Weber*'s imposition of a temporal limitation on the CRA to only those statutes in effect when the Act became law. *Benson* explained, "[t]here is no rule of statutory interpretation that prevents a statute from interacting with, or being used in conjunction with, subsequently enacted statutes," *Benson*, 2026 WL 362789 at *8, such as the NVRA and HAVA. Turning to the argument that Title III of the CRA only could be used to investigate racial discrimination, *Benson* observed that "the CRA's text includes no such limitation…" *Id.* Investigating list maintenance efforts under the NVRA fits neatly within the scope of Title III: "The CRA aides the Attorney General in assessing states' compliance with federal election law and protecting voting rights; the NVRA is a federal election law that protects voting rights." *Id.*

As a result, the United States respectfully submits that the Court must decline Defendant's invitation to rewrite the CRA to add a requirement of racial discrimination that simply does not exist in Title III. *See id.*

> **D. West Virginia's SVRL falls within Section 301's broad definition of "all records and papers" relating to registration to vote in a federal election.**

Congress broadly established the scope of federal election records covered by Title III. Section 301 of the Act provides that the retention and production requirements apply to "*all records and papers*" which "come into … possession" of an officer of election "relating to any application, registration, payment of poll tax, or other act requisite to voting" in a federal election "for a period

16

of twenty-two months" from the date of any federal election. 52 U.S.C. § 20701 (emphasis added); *see also Lynd*, 306 F.2d at 226.

Contrary to what Defendant argues, the *Benson* decision does not substantially change the application of "all records" to the SVRL, as required by the plain language of Section 301 of the CRA, 52 U.S.C. § 20701. Dkt. 25 at 13-15. Regardless of who created the SVRL, Secretary Warner has "custody, possession, or control of such record or paper" and must make it "available for inspection, reproduction, and copying." 52 U.S.C. § 20703.

West Virginia's SVRL is merely a composite of individual records relating to voter registration for federal elections. When a term goes undefined in a statute, the Court must "give the term its ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd*., 566 U.S. 560, 566 (2012). The ordinary meaning of the term "relating to," the Supreme Court has explained, "is a broad one." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992). This term means "'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with.'" *Id.* (quoting *Black's Law Dictionary* 1158 (5th ed. 1979)); *see also Milner v. Dep't of Navy*, 562 U.S. 562, 566 n.1 (2011) (the term "related" is "expansive"). As required by Section 303 of HAVA, 52 U.S.C. §21803, the SVRL is the method by which West Virginia accumulates the records of who has registered to vote, and one cannot seriously dispute that such a list "has 'a connection with, or reference to,' the topics the statute enumerates," *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 96 (2017) (quoting *Morales*, 504 U.S. at 384) – namely, voter "registrations." 52 U.S.C. § 20701; *cf.* Ky. Rev. Stat. § 116.025(1) (requiring a voter to appear on the registration list to vote); Ky. Rev. Stat. § 116.013 (defining a voter as "any name contained in any registration list").

Indeed, federal courts that have applied 52 U.S.C. § 20701 have concluded that Congress

meant what it said in the statute. It does not exclude any voting record that Defendant maintains, despite his argument that the SVRL is excluded because his office "created" it. *See* Dkt. 25 at 15. One court explained in detail why a similar effort to impede the Attorney General's enforcement of federal election laws failed:

> There is nothing uncertain about that part of the Act requiring preservation and production of all records and papers which are in the possession of an election official … if those records and papers relate to the acts requisite to voting…. Regardless of when these records came into the possession of the election official, under Section 301 they must be retained and preserved for a period of twenty-two months 'from the date of any general, special, or primary election.'

*Gallion*, 187 F. Supp. at 855 (quoting 52 U.S.C. § 20701).

The United States substantially briefed the Court on *Benson* in its Motion to Compel. *See* Dkt. 26 at 16-19. Notwithstanding Defendants' arguments, *Benson* does not preclude the United States from obtaining the West Virginia's SVRL. *See* Dkt. 25 at 13-15. *Benson* agreed with the United States regarding the summary nature of a Title III proceeding, but in doing so it reached a few atextual conclusions. In particular, *Benson* read Section 301 of the CRA more narrowly than Congress intended in the statute's reference to "all records." *See* 2026 WL 362789 at *9-10. The United States respectfully disagrees. Such a reading carves out vast numbers of federal election records, which was plainly not Congress's intent when passing Title III. *Lynd*, 306 F.2d at 226.

Nothing in Section 301 restricts "all records and papers" to only those records and papers submitted by voters. Even assuming that the examples of documents cited in the statute "refers to something that the voter submits or does," *Benson*, 2026 WL 362789 at *9, that does not mean that every record or paper "relating to" those examples, 52 U.S.C. § 20701, likewise comes from a voter. *See United States v. Mississippi*, 380 U.S. 128, 134 (1965) (stating broadly that "records of voting registration [must] be kept" under Title III); *McIntyre v. Morgan*, 624 F. Supp. 658, 664 (S.D. Ind. 1985) (Section 301 "encompasses, among other things, voting registration records, poll

lists, applications for absentee ballots, ballot envelopes, tally sheets, computer programs used to tabulate votes, as well as the ballots themselves.").

Limiting Section 301 to materials that a state election official has acquired from a third party would undermine the statute's purpose. Interpreting Section 301 to exclude materials that state election officers have created themselves – including statewide voter registration lists – would subvert that purpose by frustrating the United States's ability to acquire evidence that could shed light on whether a violation of the law has occurred. And courts "have rejected rules that would 'thwart and defeat [an agency's] appropriate investigatory powers." *United States v. Clarke*, 573 U.S. 248, 254 (2014) (quoting *Donaldson*, 400 U.S. at 533); *accord N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 419–20 (1973) ("We cannot interpret federal statutes to negate their own stated purposes.").

Moreover, there is no reason to attribute such a "pedantic distinction" to Congress. *Benson*, 2026 WL 362789 at *10. The Attorney General is entitled, after an appropriate written demand, to "all records and papers which come into [the] possession" of an "officer of election" and which "relat[e] to any application, registration, payment of poll tax, or other act requisite to voting in [certain specified] election[s]" for a period of 22 months from the date of election. 52 U.S.C. §§ 230701, 20703. According to *Benson*, "'come into [their] possession' naturally refers to a process by which someone *acquires* an item from an external source" as opposed to the phrase "records in the possession of," which would include documents or records that were self-generated. 2026 WL 362789 at *9. That, however, is not what the plain terms of the statute dictate: an officer "come[s] into … possession" of any record or document the moment that he "get[s]" or "acquire[s]" it and retains it within his control. *Webster's New World Dictionary of the American Language* 291, (8th coll. ed. 1960); *see id.* at 1140 (defining "possess" and "possession"). Secretary Warner acquired

19

the relevant records carrying out his duties as his responsibility for administering federal elections in West Virginia.

Contrary to *Benson*, "distinction[s] between possessing something and having something come into one's possession," 2026 WL 362789, at *9, are temporal distinctions – not distinctions between obtaining records from an outside source and those through self-generation – as shown by the very example that court cites. Section 1454(a) of Title 8 imposes dual obligations: If a certificate of naturalization or declaration of intention is lost, "the applicant or any other person who shall have" the certificate or declaration at that time "is required to surrender it to the Attorney General," but so too "the applicant or any other person who … may come into possession of it" at a later time must likewise surrender the document. Reading that distinction as one between documents that a person obtains from an outside source and documents that a person generates for himself, in contrast, would make little sense because no applicant or private person can create a certificate of naturalization nor can any "other person" create a declaration of intention for a separate declarant. *See* 8 U.S.C. §§ 1445(f), 1449.

Federal courts addressing similar provisions of federal election law interpret election records expansively. The District of Maryland, for example, when asked by a private, nongovernment party, found that the "focus on the information sought" was significant "rather than the particular language used to characterize that information" when interpreting the NVRA. *Judicial Watch v. Lamone*, 399 F. Supp. 3d 425, 440 (D. Md. 2019) (citing *Project Vote v. Kemp*, 208 F.Supp.3d 1320, 1329 (N.D. Ga. 2016) (court rejected defendant's argument that plaintiff could not obtain voter list)). Focusing on the information sought rather than how it was acquired or generated, the state's voter registration list qualified as election records. *Id*. at 441-43; *see also Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 337 (4th Cir. 2012) (holding that "all

records" under Section 8(i)(1) for request by private, third party included voter registration records). As a result, the SVRL is encompassed by Section 301 of the CRA and must be produced to the United States.

**E.**     **The United States is entitled to unredacted "reproduction" and "copying" of West Virginia's SVRL.**

Section 303's language provides that "[a]ny record or paper required by [Section 301] to be retained and preserved shall" upon written demand by the Attorney General or his representative stating the basis and purpose, "be made available for inspection, reproduction, and copying…." 52 U.S.C. § 20703. "The incorporated standard of [Section 301] is sweeping." *Lynd*, 306 F.2d at 226. The question is only "open for determination" by the Court if "a genuine dispute… arises as to whether or not any specified particular paper or record comes within this broad statutory classification of 'all records and papers … relating to any … act requisite to voting'…." *Id.*

Nevertheless, Defendant asks the Court to legislate limitations conspicuously absent from Title III by limiting the United States to only the redacted, publicly available SVRL. Dkt. 25 at 13-15, 20. The statutory text of Title III itself makes clear that the records that must be produced under the CRA are not limited to only those that are public. Furthermore, Section 304 of the CRA explicitly requires the nondisclosure of records produced to the Attorney General under the Act:

> Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

52 U.S.C. § 20704.

Section 304's privacy protection only has meaning if the records covered by the CRA include non-public information. Despite this, Defendant ignores the plain language of Section 304 and asks the Court to do the same by rewriting the CRA to exclude all non-public records and

information. Congress rejected the position Defendant advances by the statute's broad reference to "all records and papers…" 52 U.S.C. § 20701. In sharp contrast, where Congress intended to require a smaller class of records to be produced in a statute, it has said so. *See* 52 U.S.C. § 20507(i) (providing in the NVRA that voter records to be produced to the public for assessment of list maintenance "shall include lists of the names and addresses" of voters sent confirmation notices and any responses). To put it succinctly: Section 301 means what it says in requiring production of "all records and papers" relating to registration to vote in a federal election, including West Virginia's SVRL. 52 U.S.C. § 20701. As *Lynd* made clear, "All means all." 306 F.2d at 230. Defendant's argument that non-public records are excluded fails as a matter of law.

The United States will strictly abide by the statutory limitations in Section 304 and other federal privacy laws. The unredacted SVRL and other responsive federal election records can certainly be produced to the United States consistent with these federal protections through a protective order.[7] *Lynd*, 306 F.2d at 230.

Finally, this court's adoption of Defendant's position would eviscerate Title III. Because Defendant's voting list will contain numerous individuals with the same name, the Attorney General can only meaningfully investigate and enforce list maintenance requirements under HAVA and the NVRA by having access to the voter identification numbers required by federal law. For each voter in West Virginia, that requires their social security number or other HAVA identifier. *See* 52 U.S.C. § 21083 (a)(5)(D). As explained above, that information is necessary to identify

---

[7] Consistent with this approach to address any reasonable privacy concerns without impeding the Attorney General's authority to enforce federal law, the United States offered several states a memorandum of understanding, or MOU, memorializing these requirements. *See* Second Neff Decl. ¶ 18. As of May 11, 2026, fourteen states have provided their SVRLs without any MOU. *Id.* Three states have agreed to provide their SVRL under the terms of the MOU. *Id.* One other state agreed to provide its SVRL to settle a CRA lawsuit. *Id.*

duplicate registration records, registrants who have moved, and registrants who have died, or who are otherwise no longer eligible to vote in federal elections.[8] The only way for the United States to determine whether West Virginia has an identifier for each person registered to vote for federal elections is by reviewing its complete SVRL. There is no question that enforcement of the list maintenance requirements of HAVA and the NVRA and to ensure that West Virginia is in compliance with HAVA's identification requirements are for "the purpose of investigating possible violations of a Federal statute." *See Coleman II*, 313 F.2d at 868; *cf. Morton Salt*, 338 U.S. at 642-43 (confirming compliance with federal law is a legitimate purpose).

The data the United States has requested under the CRA is the same data twenty-six states and the District of Columbia routinely share with a third party, the Electronic Registration Information Center, ("ERIC"), to facilitate their compliance with federal list-maintenance requirements.[9] Similarly, states have released to private parties even more detailed voter data than what the United States has requested where necessary to bring actions to enforce federal rights. *See Coal. for Open Democracy v. Scanlan*, No. 24-CV-312-SE, 2025 WL 1503937, at *2 (D.N.H. May 27, 2025) (ACLU compelled production of "[a] copy of the New Hampshire statewide voter database and all documents concerning the use of the statewide voter database, including instruction manuals or other guides concerning the data fields contained in the database and their correct interpretation."), *appeal dismissed*, No. 25-1585 (1st Cir. July 2, 2025).

---

[8] *See generally* 52 U.S.C. § 20507 (a)(4) ("In the administration of voter registration for elections for Federal office, each State shall – (4) conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of – (A) the death of the registrant; or (B) a change in the residence of the registrant…"); 52 U.S.C. § 21083 (a)(4) ("The State election system shall include provisions to ensure that voter registration records in the State are accurate and are updated regularly, including… (A) A system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters….").

[9] *See* ERIC, ERIC Overview, *available at* https://ericstates.org/ (last visited May 11, 2026).

Accordingly, the United States is entitled to reproduction and copying of West Virginia's unredacted electronic SVRL under the unambiguous language of Section 303 of the CRA. *See* 52 U.S.C. § 20703; *see also Gallion*, 187 F. Supp. at 855-56 (granting the Attorney General "an order to require the production of records for inspection, reproduction and copying…"); *Lynd*, 306 F.2d at 226 (same).

**F.      The CRA respects federalism by trusting states to comply with federal election law and empowering the Attorney General to verify that States do so.**

Defendant argues that the United States is foreclosed from using the CRA to obtain West Virginia's SVRL by principles of federalism. Defendant suggests that the Attorney General plays no role in the conduct of federal elections and that the federal laws at issue must yield to West Virginia's state privacy laws. Dkt. 25 at 15-16. Defendant is mistaken on both counts.

The Attorney General's use of the CRA to investigate compliance with HAVA and the NVRA and, if appropriate, to bring an enforcement action, fully respects the federal structure. Without question, the United States Constitution invests states with the primary responsibility for the conduct of federal elections. But at the same time, the Constitution explicitly authorizes Congress to override those state choices. The Elections Clause provides, "The Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1. The Supreme Court has explained that the Elections Clause "is a default provision; it invests the States with responsibility for the mechanics of congressional elections … but only so far as Congress declines to preempt state legislative choices …. Thus, it is well settled that the Elections Clause grants Congress 'the power to override state regulations' by establishing uniform rules for federal elections, binding on the States." *Foster v. Love*, 522 U.S. 67, 69 (1997) (citations omitted). "[T]he regulations made by Congress are

24

paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Id.*; *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 7-9 & n.1 (2013) (discussing the breadth of the Elections Clause).

Congress enacted broad regulations over the conduct of federal elections in the CRA, HAVA, and the NVRA, adopting a "trust, but verify" approach. State election officials including Defendant are given the primary responsibility for administering federal elections. Specifically, Title III of the CRA imposes a "sweeping" obligation on election officials to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd*, 306 F.2d at 226. HAVA requires states to implement a computerized SVRL and establish "[m]inimum standard[s] for accuracy of State voter registration records." 52 U.S.C. § 21083(a)(4). Section 303 of HAVA mandates that every state "ensure that voter registration records in the State are accurate and are updated regularly," including by use of a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters" and "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." *Id.*

Each of these provisions regulate the conduct of federal elections and make state officials responsible for implementing them. But contrary to what Defendant argues, that does not mean that the Attorney General, as the Nation's chief law enforcement officer, plays no role at all. Far from it. At the same time state election officials were trusted to conduct federal elections, Congress empowered the Attorney General to verify that Defendant is doing so in compliance with federal law. Only the United States, through the Attorney General, is authorized to compel records under Title III of the CRA and to enforce Section 303 of HAVA. *See* 52 U.S.C. §§ 20703, 20705 (CRA); 52 U.S.C. § 21111 (HAVA). The Attorney General likewise enforces the NVRA's requirement that

25

all states maintain "accurate and current voter rolls" and remove ineligible voters in the conduct of federal elections. *See* 52 U.S.C. §§ 20510 (b), 20507 (a)(4). Adopting this approach of trust but verify thereby respects the federal structure and the primacy of state officials in conducting federal elections.

Title III of the CRA further promotes the transparency of the state's conduct of federal elections by giving the Attorney General pre-suit investigative tools to evaluate a state's records pertaining to those elections, including its SVRL. As *Lynd* explained, "the right of the Attorney General to inspect and copy such records is not dependent upon an existing demonstrable right" to maintain a lawsuit. 306 F.2d at 227. "His right to records does not require that he show he could win without them." *Id.* In other words, the CRA's purpose "is to enable the Attorney General to determine" if an enforcement action "should be instituted. And it is to enable him to obtain evidence for use in such cases if and when filed." *Id.* at 228. To afford the Attorney General the ability to verify compliance with federal law, the CRA "has equipped him with the machinery thought suitable for the effective fulfillment of that obligation." *Id.* at 230. "Wide scope must be accorded the Attorney General" in his ability to review federal election records like the SVRL and "extends as far as the sovereign State itself." *Id.* at 228. If the Attorney General's review reveals that state election officials are not in compliance with federal law, then the United States can bring an appropriate enforcement action. In other words, trust, but verify.

The United States believes that state law can be read in harmony with federal law. However, if there is a direct conflict between state and federal laws, then state law must yield under the Supremacy Clause. *See* U.S. Const. art. VI, cl. 2; *see also Inter Tribal Council*, 570 U.S. at 15 ("States' role in regulating congressional elections – while weighty and worthy of respect – has always existed subject to the express qualification that it 'terminates according to federal law.'")

26

(quoting *Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341, 347 (2001)). In any event, the United States has complied and will continue to comply fully with all federal privacy laws applicable to the SVRL and other federal election records that are produced. Through its Motion to Compel, the United States asks the Court to respect the federal structure, acknowledging that while Defendant is trusted to conduct federal elections, the Attorney General has been empowered by the CRA to verify that Defendant is doing so in compliance with HAVA and the NVRA.

### G. The United States is complying with Federal privacy laws and State privacy laws do not prevent disclosure of the requested data.

Defendant next makes a variety of arguments that various privacy laws – the Privacy Act, E-Government Act, Driver's Privacy Protection Act, and state privacy law – require dismissal of the United States' efforts to compel production of West Virginia's federal election records. *See* Dkt. 25 at 16-20. Defendant's arguments are misguided at best. First, these arguments are affirmative defenses and therefore cannot form the basis for dismissing the Complaint. Federal law does not require the United States plead its compliance with the Privacy Act in every complaint it brings in which it may obtain records that contain personally identifiable information. The Privacy Act and Section 304 of the CRA simply require that when protected information is obtained, it must be securely stored and not be subject to unauthorized dissemination or use.[10] Defendant's remaining privacy arguments lack merit. The Complaint, incorporating the demand, is in full compliance.

### 1. The United States is complying with the Privacy Act.

Bottom line, the Privacy Act does not bar the disclosure of West Virginia's SVRL to the United States, as Defendant asserts. Dkt. 25 at 17. The Privacy Act regulates federal agencies'

---

[10] As *Lynd* recognized under similar circumstances, any legitimate privacy concerns can be addressed through an appropriate protective order governing the production of the demanded federal election records, including compliance with Section 304 of the CRA and the Privacy Act.

collection, maintenance, and disclosure of information with federal agencies. The statute's plain language confirms that it applies only to federal "agencies" as defined in 5 U.S.C. §§ 552a(a)(1), meaning "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government." State and local entities fall outside that definition. The Privacy Act "erects certain safeguards for an individual against an invasion of personal privacy," Pub. L. No. 93-579, § 2(b), 88 Stat. 1896 (1974), only within the scope of the federal agency record systems. There is no basis for Defendant to fail or refuse to disclose information to a federal agency for law enforcement purposes, particularly here, where the United States in complying with the provisions of the Privacy Act.

To that extent, the voter information that the United States is collecting is maintained according to the Privacy Act protections explained in the Department of Justice, Civil Rights Division's Privacy Policy, which it has published online. The full list of routine uses for this collection of information, which include investigations and enforcement actions, can be found in the Department of Justice's systems of records notices ("SORN"), most of which are identified with their citations in U.S. Dep't of Just., Privacy Act of 1974; System of Records, 82 Fed. Reg. 24147-01 (May 25, 2017), listed in a table at pages 24,148 to 24,151. The list of routine uses for this collection of information includes JUSTICE/CRT – 001, "Central Civil Rights Division Index File and Associated Records," 68 Fed. Reg. 47610-01, 611 (Aug. 11, 2003); 70 Fed. Reg. 43904-01 (July 29, 2005); and 82 Fed. Reg. 24147-01 (May 25, 2017). As referenced in SORN CRT-001 in the categories of records in the system: "The delegated legal duties and responsibilities of each section are described in detail at the Civil Rights Division Web page: *http://www.usdoj.gov/crt/crt-home.html*." 68 CFR 47611. Similarly, it is noted that the purposes of the SORN are broad:

> The purposes of this system are to assist all the sections within the
> Division in maintaining names of Division employees and their case

> investigation assignments, names of defendants or investigation targets, victims, witnesses or potential witnesses, or other persons or organizations as they relate to potential or actual cases, investigations, and matters of concern to CRT.

*Id*. The statutes cited for routine use in the Department of Justice SORNs include enforcement of HAVA, the NVRA, and the Civil Rights Act of 1960, as described in note 16 of the Department of Justice's Privacy Policy.[11] The United States made its requests and filed the above captioned matter pursuant to those statutes. *See* Dkt., 1, ¶¶ 10-19. The records in the system of records are kept under authority of 44 U.S.C. § 3101 and in the ordinary course of fulfilling the responsibility assigned to the Civil Rights Division under the provisions of 28 C.F.R. §§ 0.50, 0.51.

To the extent that Defendant is concerned about the transport of such data to the United States, the Department of Justice uses a secure file-sharing system, Justice Enterprise File Sharing ("JEFS"). That system implements strict access controls to ensure that each user can only access their own files and is also covered by SORNs. Regardless, there is simply no requirement in federal law which requires the United States to plead its compliance with the Privacy Act in a complaint it brings that involves obtaining records that contain personally identifiable information. Rather, the Privacy Act in conjunction with Section 204 of the CRA simply requires that when protected information is obtained, it must be securely stored and not be subject to unauthorized dissemination or use. As outlined above, the United States will do that.

---

[11] States have frequently been the subject of voting investigations and enforcement as JUSTICE/CRT – 001 SORN advises. The United States has been involved in statewide redistricting cases where it has used statewide voter registration lists (https://www.justice.gov/crt/cases-raising-claims-under-section-2-voting-rights-act-0#tx2021) (last visited May 11, 2026).

### 2. *The E-Government Act does not prevent the United States from obtaining data supporting its HAVA and NVRA claims.*

Defendant next argues that the demand for production of West Virginia's SVRL and other federal election records violates the E-Government Act. According to Defendant, the United States is required to conduct a "privacy impact assessment," or "PIA," before initiating investigations of each state's compliance with HAVA and the NVRA. *See* Dkt. 25 at 18. Again, neither the E-Government Act nor case law supports this assertion.

The E-Government Act neither authorizes dismissal of this case nor limits the United States' ability to bring suit. The E-Government Act is not applicable to the United States' enforcement of HAVA and the NVRA. The United States is not initiating a new process whereby it is contacting individuals for information as contemplated by Pub. L. No. 107-347, § 208(b)(l)(A)(ii)(II), which "includes any information in an identifiable form permitting the physical or online contacting of a specific individual, if identical questions have been posed to, or identical reporting requirements imposed on, 10 or more persons, other than agencies, instrumentalities, or employees of the Federal Government." The Attorney General requested Defendant to provide a voter registration list already maintained pursuant to federal law to analyze West Virginia's federally required list maintenance. The SVRL would be kept on a system for which a Privacy Impact Assessment has been done. Only when a new system is established – not when each new data request is made – is a Privacy Impact Assessment required.[12]

---

[12] When the Civil Rights Division began using ServiceNow (SNOW), a FedRAMP High-compliant Software as a Service (SaaS) cloud-hosting provider offering a suite of natively integrated applications designed to support Information Technology Service Management (ITSM), resource management, and shared support services, it prepared a Privacy Act Assessment ("PIA") as required by the E-Government Act. *See* Office of Privacy & Civ. Liberties, DOJ Privacy Impact Assessments, *available at* https://www.justice.gov/opcl/doj-privacy-impact-assessments (last visited May 11, 2026)."

Even if the Court found the E-Government Act applied here – and it should not – Defendant has misplaced his reliance on *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Elec. Integrity,* 266 F. Supp. 3d 297 (D.D.C. 2017) ("*EPIC I*"). *See* Dkt. 25 at 18. *EPIC I* does not support dismissal of a complaint based on an alleged failure to conduct a PIA. In *EPIC I,* the plaintiff sought to enjoin a federal commission's collection of state voter information, claiming the commission had failed to prepare a PIA under § 208 of the E-Government Act. The D.C. Circuit affirmed dismissal of the claim on standing grounds. *See Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Elec. Integrity,* 878 F.3d 371 (D.C. Cir. 2017) ("*EPIC II*"). In doing so, *EPIC II* explained that the Act "is intended to protect individuals – in the present context, voter – by requiring an agency to fully consider their privacy before collecting their personal information. EPIC is not a voter and is therefore not the type of plaintiff the Congress had in mind. *Id.* at 378 (emphasis in original).

### 3. *The Driver's Privacy Protection Act does not allow Defendant to deny the United States list maintenance data.*

Finally, Defendant incorrectly maintains that dismissal is warranted because he claims that the United States' demand violates the Driver's Privacy Protection Act ("DPPA"). Dkt. 25 at 18. The DPPA generally prohibits the disclosure of "personal information" obtained by a state Department of Motor Vehicles in connection with a motor vehicle record. *See* 18 U.S.C. §§ 272l(a), 2725(1), (3), (4). Nonetheless, the statute explicitly contains exceptions that permit certain governmental uses. Under 18 U.S.C. § 2721(b)(l), disclosure is allowed "for use by any government agency ... in carrying out its functions," including law enforcement or other regulatory enforcement purposes. This statutory language demonstrates that the DPPA was not intended to block all government access to DMV records – particularly when requested for purposes of law enforcement or regulatory enforcement.

The DPPA's prohibition is clearly not implicated in the present case. The Department of Justice is a government agency performing a statutorily mandated function-verifying voter registration records and associated list maintenance activities by state and local entities. Under the governmental-function exemption in § 272l(b)(l), the United States' use of DMV-provided information is permissible, even though the information originates from a motor vehicle record. Transfers of DMV data to government agencies for official functions, including voter registration administration, are therefore consistent with the DPPA and fall squarely within the statute's exceptions.

**H.      The First Amendment does not prohibit the United States' access to data maintained under HAVA or the NVRA.**

Defendant also contends that voter registration data the United States seeks is a form of political expression protected by the First Amendment – the disclosure of which risks imposing "an unconstitutional burden on the right to vote." *See* Dkt. 25 at 16.  This argument misses the mark. Without question, voting and registration implicate speech and actions protected under the First Amendment.  But that does not foreclose the United States from enforcing federal election laws such as HAVA and the NVRA. Enforcing HAVA and the NVRA are within the scope of an authorized law enforcement activity—necessarily implying that the United States can obtain the materials consistent with the Privacy Act. 5 U.S.C. § 552a(e)(7).  Moreover, Defendant's argument would effectively prevent the Voting Section of the Civil Rights Division from engaging in any investigations or enforcement actions at all.  That plainly is not what Congress intended.

**I.       West Virginia's Public Inspection Laws do not prevent the United States from obtaining data maintained under HAVA or the NVRA.**

Finally, Defendant asks the Court to legislate limitations conspicuously absent from Title III. Defendant cites to West Virginia Public Inspection laws to support the argument that only a

32

redacted version of the West Virginian's SVRL is required. *See* Dkt. 25 at 19-20. On its face, though, West Virginia law does not prohibit the disclosure of the state's SVRL as the Defendant claims. In fact, the statute "may not be interpreted to prevent the Secretary of State from sharing data … across state lines with any state or local official for the purpose of voter registration and election administration in accordance with … applicable federal law." W. Va. Code § 3-2-30(g).

Furthermore, when viewed alongside W. Va. Code § 5A-8-22(a)-(b) which governs the release of Social Security numbers maintained by West Virginia executive branch agencies – a statute conveniently ignored by Defendant here – there can be no doubt the United States can obtain the information sought from Defendant. By its express terms, W. Va. Code § 5A-8-22(b) permits Social Security numbers otherwise "exempted from public disclosure as an unreasonable invasion of privacy" to be released to the United States "for such purposes as are authorized by federal law or regulation …." Title III which defines election records at 52 U.S.C. § 20701 and requires the West Virginia to produce them upon demand, 52 U.S.C. § 20703, is that law.

Put another way, West Virginia law makes certain information confidential from *public* disclosure. W. Va. Code § 3-2-30(a) (requiring redaction of a social security number before it is furnished to a member of the public to examine); W. Va. Code § 5A-8-22(a)(1) (exempting Social Security numbers from disclosure to "non-governmental entities"). But the United States is not asking for *public* disclosure of West Virginia's SVRL. It is requesting an intergovernmental transfer of the data authorized by federal laws and regulations – which West Virginia's statute already accounts for – to assess the West Virginia's compliance with federal election law. Pursuant to the CRA's privacy provisions and the Privacy Act, none of the information obtained will be publicly disclosed.

Section 304 of the CRA makes clear that the records that must be produced are not limited

33

to only those that redact personal identifying information (PII). Section 304 of the CRA explicitly requires the nondisclosure of records produced to the Attorney General under the Act:

> Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

52 U.S.C. § 20704. Section 304's privacy protection only has meaning if the records covered by the CRA include non-public information. Defendant ignores the plain language of Section 304 and asks the Court to rewrite the CRA to exclude all non-public records and information.

The United States will strictly abide by the statutory limitations in Section 304 and other federal privacy laws. The unredacted VRL and other responsive federal election records can certainly be produced to the United States consistent with these federal protections through a protective order. *Lynd*, 306 F.2d at 230.

## IV.   CONCLUSION

For the foregoing reasons, the United States respectfully submits that the Motion to Dismiss (Dkts. 24-25) be denied and that the United States' Motion to Compel Production of federal election records under Section 305 of the CRA (Dkt. 15) be granted.

Dated this 13th day of May, 2026,

Respectfully submitted

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

JESUS A. OSETE
Principal Deputy Assistant Attorney General
Civil Rights Division

ERIC V. NEFF
Acting Chief, Voting Section
Civil Rights Division

/s/*Christopher Gardner*___
Christopher Gardner
James Catania
Trial Attorneys
Voting Section, Civil Rights Division
4 Constitution Square
150 M. Street NE, 8th Floor
Washington, D.C. 20002
Christopher.Gardner@usdoj.gov
James.Catania@usdoj.gov
202-812-2631