# To Assure Pride and Confidence

## *in the Electoral Process*

August 2001



# *The* National Commission
# *on* Federal Election Reform

*Organized by*
Miller Center of Public Affairs,
   University of Virginia
The Century Foundation

*Supported by*
The David and Lucile Packard Foundation
The William and Flora Hewlett Foundation
The John S. and James L. Knight Foundation

## Miller Center of Public Affairs

University of Virginia
P.O. Box 400406
2201 Old Ivy Road
Charlottesville VA 22904-4406

*tel*   804-924-7236
*fax*   804-982-2739
*web*   http://millercenter.virginia.edu

## The Century Foundation

41 East 70th Street
New York NY 10021

*tel*   212-535-4441
*fax*   212-879-9190
*web*   http://www.tcf.org

www.reformelections.org

## The Commission

### Honorary Co-Chairs
President Gerald R. Ford
President Jimmy Carter

### Co-Chairs
Robert H. Michel
Lloyd N. Cutler

### Vice-Chairs
Slade Gorton
Kathleen M. Sullivan

### Commissioners
Griffin Bell
Rudy Boschwitz
John C. Danforth
Christopher F. Edley, Jr.
Hanna Holborn Gray
Colleen C. McAndrews
Daniel Patrick Moynihan
Leon Panetta
Deval L. Patrick
Diane Ravitch
Bill Richardson
John Seigenthaler
Michael Steele

### Executive Director
Philip D. Zelikow

## Public Hearings

### March 26, 2001
*Citizen Participation*
The Carter Center
Atlanta, Georgia

### April 12, 2001
*Election Administration*
The Ronald Reagan Presidential Library
Simi Valley, California

### May 24, 2001
*What Does the Law Require?*
Lyndon B. Johnson Library and Museum
Austin, Texas

### June 5, 2001
*The American and International Experience*
Gerald R. Ford Library
Ann Arbor, Michigan

# To Assure Pride and Confidence
## in the Electoral Process

August 2001

## *The* National Commission
## *on* Federal Election Reform

*Organized by*
Miller Center of Public Affairs,
   University of Virginia
The Century Foundation

*Supported by*
The David and Lucile Packard Foundation
The William and Flora Hewlett Foundation
The John S. and James L. Knight Foundation

# Letter
## to the American People

In 2000 the American electoral system was tested by a political ordeal unlike any in living memory. From November 7 until December 12 the outcome of the presidential election was fought out in bitter political and legal struggles that ranged throughout the state of Florida and ultimately extended to the Supreme Court of the United States. The American political system proved its resilience. But we must think about the future.

The ordinary institutions of election administration in the United States, and specifically Florida, just could not readily cope with an extremely close election. Many aspects of the election process were put under a microscope and viewed by an anxious nation. With dismay and growing anger we saw controversial ballot design; antiquated and error-prone voting machines; subjective and capricious processes for counting votes; voter rolls that let unqualified voters vote in some counties and turned away qualified voters in others; confusion in the treatment of overseas military ballots; and a political process subjected to protracted litigation.

Stepping back from Florida, the picture is no more encouraging. The chief election official of Georgia, Cathy Cox, testified to our Commission that: "As the presidential election drama unfolded in Florida last November, one thought was foremost in my mind: there but for the grace of God go I. Because the truth is, if the presidential margin had been razor thin in Georgia and if our election systems had undergone the same microscopic scrutiny that Florida endured, we would have fared no better. In many respects, we might have fared even worse." Across America, we have heard from official after official who feels the same way.

There is good news, though. In the last few years, and now spurred by the events last year, election reform has returned to the legislative agenda in many states. In much of the country cadres of able and dedicated election administrators are in place who can show what is possible and carry reforms into practice. In a world of problems that often defy any solution, the weaknesses in election administration are, to a very great degree, problems that government actually can solve.

In this report we and our colleagues offer very specific recommendations on what should be done. In other words, Americans can and should expect their electoral system to be a source of national pride and a model to all the world.

Gerald R. Ford

Jimmy Carter

Robert H. Michel

Lloyd N. Cutler

*Co-chairs of the National Commission on Federal Election Reform*

Eleven states and the District of Columbia have already implemented statewide registration systems that cover all their jurisdictions. Seven more states have adopted them and are in the process of implementing them; three more are close to adoption. A statewide registration system was part of the reform program adopted earlier this year in Florida. These 21 states and D.C. include 39.2% of the voting-age population in the United States. In its June 2001 report to Congress, the bipartisan Federal Election Commission, after consulting with state and local election officials, recommended that states "1) develop and implement a statewide computerized voter registration database; 2) insure that all local registration offices are computerized; and 3) link their statewide computerized system, where feasible, with the computerized systems of the collateral public agencies relevant to the NVRA (motor vehicle offices, public assistance offices, etc.)"[19]

With a sense of how voter registration has evolved over the past century, we believe four factors weigh heavily in favor of placing the core responsibilities for voter registration in the hands of state governments.

**The constitutional allocation of responsibilities.** Under the U.S. Constitution, voter qualifications are defined primarily by state governments. So it makes sense to center registration responsibility at this same level of government. Local issues and ballots may vary, but a resident of a given state, voting in a state or presidential election, will find the same voter eligibility rules and the same candidates at the top of the ballot anywhere within the state.

**The nature of the data.** The most important source of applications for new voter registration has become the application for a driver's license. This is already a statewide database, and it is estimated that 92% of all registered voters also have a driver's license. The most effective systems have made DMV (Department of Motor Vehicles) information congruent, and thus interoperable, with the voter information called for by the state's election code. When people move within a state, they are still in the database even if they are slow to get a new license. When they move from one state to another, one of the first—and perhaps the only—civic act they must accomplish is to get a driver's license valid for that state. DMV change-of-address information is thus considered even more comprehensive and reliable than the useful National Change of Address database maintained by the U.S. Postal Service.[20]

**Accuracy can mean access.** People are mobile, but more than three-quarters of all moves are within the same state. An effective statewide database can therefore be quite useful, including its capacity to address such common issues as the registration of in-state college students and people with second homes within a state. But perhaps the most important beneficiaries of statewide registration systems will be members of lower-income groups, who are more likely to move than higher-income groups

and, when they do move, are much more likely to move from one place to another within the same state. They are thus more likely to fall off local voter rolls and bear the burden of re-registration.

**Accountability.** A clear statewide registration system will be more transparent and accountable to outside scrutiny. Some advocates for disadvantaged groups are



Georgia Secretary of State Cathy Cox

uneasy about statewide registration proposals, fearing that these will turn into still more powerful tools for "purging." Yet one of the clearest findings from the U.S. Civil Rights Commission's investigation in Florida is that, with purely local administration of list maintenance, local variations on statewide guidelines can be critical yet difficult to track.

Beyond the general recommendation in favor of statewide registration systems, several specific policy issues deserve mention. One is the question of whether to require voters to display some proof of identification at the polls.

All states hope that precinct officials and poll watchers will have at least some familiarity with the residents of their precincts. Seven states, all but one of them rural, do nothing more. In the rest, the most common practice now is to require voters to sign their names in an official registry or on a ballot application. About a third of the states require poll workers to check signatures against those provided at registration. Fourteen states insist that voters produce some form of identification.[21]

Most states that have histories of strong party rivalry or election fraud require signature verification or voter identification at the polls. Signature verification puts an extra burden upon administrators, and especially on often ill-trained poll workers practicing a very subjective, often impossible, task while voter lines lengthen. Also, many polling places lack the means to provide poll workers with accurate copies of the voter's actual signature (the one the voter used in order to register) and a signature may change over time.

One alternative, favored by several Commissioners, is to require those who are registering to vote and those who are casting their ballot to provide some form of official identification, such as a photo ID issued by a government agency (e.g., a driver's license). A photo ID is already required in many other transactions, such as check-cashing and using airline tickets. These Commissioners point out that those who register and vote should expect to identify themselves. If they do not have photo identification then they should be issued such cards from the government or have available alternative forms of official ID. They believe this burden is reasonable, that voters will understand it, and that most democratic nations recognize this act as a valid means of protecting the sanctity of the franchise.

A small percentage of adults, perhaps about 5 to 7%, do not possess a driver's license or other photo identification. They are disproportionately poor and urban (since they may use public transit rather than drive a car). Some Commissioners also object to requiring voters to produce a photo ID or some alternative form to verify their identity because some members of minority groups believe such a process can be used to intimidate voters or turn them away in a racially discriminatory fashion.



Election Day, Gloucester, MA, November 7, 2000

We believe that an assessment of how to strike the right balance between administrative burden and voter responsibility turns too much on the assessment of local conditions to be amenable to any categorical recommendation by this Commission. We do believe, however, that states should be able to verify a voter's identity.

In recommending the adoption of statewide voter registration systems, we looked at the experience of those states that have adopted them. The outstanding models appear to be Michigan and Kentucky. Michigan deserves particular scrutiny because it is the most populous state to have fully implemented such a system and it is also a state with a larger number of separate election jurisdictions, more than 1600, than any other. The Michigan system is new, having been put in place just in the last few years, and it passed the test of the 2000 election with flying colors. The software solution developed in Michigan has been inexpensive and is not exclusive to a particular vendor. Any state can copy it. A more complete description of the Michigan voter registration system is attached in Appendix B to this report.[22]

Any state adopting a statewide voter registration system will confront the problem of uniquely identifying voters, figuring which Joseph Smith is the same as that Joe Smith. That is why, following the Michigan example, we recommend obtaining residential addresses, with the DMV and voter registration address required in identical form.

An added identifier is desirable, given the various spellings and the clerical errors that frustrate reliance only on a given name and address. For this purpose some numeric identifier can be useful. Given the danger from overuse of entire Social Security Numbers as an individual identifier we suggest that states obtain the last 4 digits of this number as an added identifier.[23] The Federal Election Commission has made the same recommendation.



Commissioner John Seigenthaler

Some states also seek added identifiers, such as information on the place of birth and prior residential address. We take no position on the value of having this added information, but we do believe that federal law and regulations should be amended over time where state experience provides evidence that a change is needed. Used cumulatively, this information could improve the accurate exchange of information affecting voter eligibility and help avoid mistaken voter removals like those that occurred in Florida.

Our policy recommendation need not require any immediate amendment of the NVRA. The NVRA specifies how voters can be registered. In general, those provisions will benefit from and work much more effectively with a statewide registration system. The NVRA also specifies how voter lists should be maintained. We believe those provisions do not take adequate account of the kind of statewide voter registration system we recommend. But we see no need to amend the list of maintenance provisions of the NVRA either to add more safeguards or pare them back until more and wider experience with new systems can give us more evidence about just what is needed.

All states require voters to declare, by their signature, that they are U.S. citizens and meet other criteria for eligibility to vote. Twelve states require applicants at least to check a box specifically affirming they are a citizen, though most of these accept the national mail-in and NVRA forms that do not have such a box. Inability to verify citizenship is a weakness in every state's voter registration system. The problem is not hypothetical. Non-citizens do vote, albeit illegally.[24] We therefore recommend that a specific enforceable affirmation of citizenship be included in all voter registration applications. Combined with enforcement of the relevant state and federal vote fraud laws, this should be sufficient to contain this potential problem.