

# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*25-CV-639-MSM
                                        \*
UNITED STATES OF AMERICA,                \*
                                        \*
                Plaintiff,               \*
                                        \*
            vs.                          \*MARCH 26, 2026
                                        \*
GREGG M. AMORE, in his official          \*
capacity as Secretary of State           \*
for the State of Rhode Island,           \*
                                        \*
                Defendant.               \*Courtroom 2
                                         \*PROVIDENCE, RI
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*




BEFORE THE HONORABLE MARY S. McELROY

DISTRICT JUDGE


(Motion to Compel)
(Motions to Dismiss)


**APPEARANCES**:

FOR THE PLAINTIFF:          ERIC NEFF
                            DOJ-Crt
                            Civil Rights Division
                            150 M St. NE, Ste 8-1807
                            Washington, DC  20002

FOR THE DEFENDANT:          JAMES J. ARGUIN
Gregg Amore                 RI Department of Attorney
                            General
                            150 South Main Street
                            Providence, RI  02903

MR. NEFF: What we are saying is that we don't need to allege that. We -- as the *Lynd* court said, the Attorney General's, quote, right to records does not require that the A.G. show that the A.G. could win without them. We do not need to allege a violation of a specific statute.

I was only raising the lack of a particular audit and, again, this was self-reported by Rhode Island as a concern that the Voting Section had.

There are also certain numbers that raise concerns with the Voting Section, as Rhode Island self-reported having 60,000 inactive registrations. They reported having 60,000 duplicate registrations. This is out of about 800,000 registered voters. That's also a 90 percent registration rate of the adult age voting population.

THE COURT: I believe it's 700-and something thousand voters; but your point is taken.

But I guess what's the DOJ's, what horse do you have in this race? Is it that you're trying to double-check the work of all of the states, or is it that you're trying to assert an outsized role for the federal government in the running of elections?

MR. NEFF: Certainly not outsized role, your Honor.

THE COURT: It seems that way from your filings in all of these states. So what's your purpose?

MR. NEFF: The United States is in a trust but verify mode as it relates to voter list maintenance countrywide. It is --

THE COURT: So let me ask a question then because I think 11 -- well, originally three jurisdictions just provided the list to DOJ: Texas; I don't know, North or South Carolina; somebody else. What did you do with those lists?

MR. NEFF: So we kept all the lists that we received -- at this point it's been 17 states have been kept in separate compartmentalized files that only very limited people have any access to.

THE COURT: And what did you do to verify those lists?

MR. NEFF: We've not done anything yet because we've not --

THE COURT: Why not? If you need to verify those lists, if you have an oversight role why haven't you taken -- some states have said here, here's all our data. And you've gotten it, and by my understanding you got some of it back in the summer of last year. Why haven't you done anything with those states' data?

MR. NEFF: Well, we're talking as to the

non-public lists; correct?

THE COURT: Right.

MR. NEFF: Okay. The United States is taking extra concern to make sure that we're complying with the Privacy Act in every conceivable way, and there are still a couple steps we have to go through before the United States is comfortable proceeding and comfortable representing to this Court that we're in full compliance with the Privacy Act.

THE COURT: What steps have you taken and what steps need to be taken with those states that have complied? Because to me, the states that have complied are traditionally more conservative states. Texas just gave you their list, let's say. Why not go through Texas's list to make sure that only eligible voters are on their list?

MR. NEFF: I can only go into the United States delivery of process so much, you Honor, but what I can say is that the United States is evaluating, for one, an opinion out of the D.C. Circuit that analyzed DHS's SORN, and also the United States is -- we are certainly going to be proceeding with running this, our intention is to run this against DHS's SAVE database.

THE COURT: Which database?

MR. NEFF: The SAVE database that runs, that

essentially is a, it's called like a fetching system that seeks information from other databases to cross-check whether the data set on a roll is either a deceased person or a noncitizen.

THE COURT: And what's the accuracy rate of data that you've run against that system?

MR. NEFF: The accuracy rate we've been told --

THE COURT: By whom?

MR. NEFF: -- by DHS, and it's particularly the SAVE personnel that run the system is that it is in effect 100 percent accurate.

THE COURT: That's not the reporting; right? I mean isn't the reporting that people have been run through that SAVE Act and not for voting but for other things have been kicked out as noncitizens when they were, in fact, citizens?

MR. NEFF: There's an important note that the SAVE database has been around, the SAVE Act, essentially states have been able to submit their information to SAVE for about 30 years. But SAVE has also changed drastically in the last few months. It's been I would call upgraded and the process they go through, we can go into that if your Honor wants to, but essentially when any flagged voter comes back, it's then run through a very comprehensive confirmation

process to make sure that the, quote, like problematic registration is, in fact, not just --

THE COURT: What's the process?

MR. NEFF: DHS has about 200-odd employees who are trained for a minimum of six months each and know various databases that are accessible to the federal government through use and shared agreements to be able to essentially access important naturalization files and other data that can establish whether the person is a citizen, because there are holes in the process.

THE COURT: What are the holes?

MR. NEFF: The holes, the most common hole would be when someone is -- someone who came to the United States is a parent and has children who are U.S. citizens and then naturalized; like the most common hole of that is that it's actually rather expensive to go through the full, quote, documentation process. A common, cheaper shortcut that people will just do is just go get a passport.

THE COURT: By "people," do you mean the children or the parent?

MR. NEFF: The parents, your Honor.

THE COURT: Because the children are derivative citizens under that scenario, so even if the children are born outside of the United States; correct?