# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### CHARLESTON DIVISION

UNITED STATES OF AMERICA,

*Plaintiff*,

v.

Case No. 2:26-cv-00156

KRIS WARNER, in his Official Capacity as WEST VIRGINIA SECRETARY OF STATE,

*Defendant*.

## <u>MEMORANDUM OF LAW IN SUPPORT OF WEST VIRGINIA CITIZEN ACTION GROUP'S MOTION TO DISMISS</u>

**INTRODUCTION**

Plaintiff's Complaint, like its flawed Motion to Compel, ECF No. 14, alleges that West Virginia violated the Civil Rights Act (CRA) when it declined to produce its unredacted voter-registration list—containing sensitive information about every voter in West Virginia—to the United States Department of Justice (DOJ). West Virginia is one of 30 states, plus the District of Columbia, that Plaintiff has sued over their refusals to produce unredacted voter rolls. Because Plaintiff did not state the basis and the purpose of its demand for West Virginia's unredacted voter rolls, which are basic requirements of the CRA, it fails to state a claim under Rule 12(b)(6).

To date, all courts to rule on the merits of these parallel cases have agreed that Plaintiff's claims are deficient and have dismissed Plaintiff's complaints. *See United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026); *United States v. Oregon*, No. 6:25-cv-01666-MTK, 2026 WL 318402 (D. Or. Feb. 5, 2026); *United States v. Benson*, No. 1:25-cv-01148-HYJ-PJG, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026); *United States v. Galvin*, No. 1:25-cv-13816-LTS, 2026 WL 972129 (D. Mass. Apr. 9, 2026); *United States v. Amore*, No. 1:25-cv-00639-MSM-PAS, 2026 WL 1040637 (D.R.I. Apr. 17, 2026); *United States v. Fontes*, No. CV-26-00066-PHX-SMB, 2026 WL 1177244 (D. Ariz. Apr. 28, 2026). Most often, courts have found that Plaintiff's demand did not provide a sufficient basis or purpose under the CRA. Because Plaintiff's allegations in West Virginia suffer from the same legal flaws, Intervenor-Defendant West Virginia Citizen Action Group (CAG) requests that this Court similarly dismiss the Complaint.

**BACKGROUND AND PROCEDURAL HISTORY**

**I.      Factual Background and Procedural Posture**

In the summer of 2025, Plaintiff sent letters to election officials in dozens of states, including West Virginia, demanding production of their statewide voter registration lists, including

sensitive information that is not part of the public voter file. DOJ wrote to Secretary of State Warner on September 8, 2025, demanding an electronic copy of West Virginia's statewide voter-registration list containing "all fields, which . . . must include the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number[.]" ECF No. 14-2, Sep. 8, 2025 Letter; *see also* ECF No. 1, Compl. ¶¶ 21-24. On September 22, 2025, Secretary Warner wrote back to DOJ explaining that "thorough review of" the sources that DOJ cited "reveals no authority compelling compliance with such a broad request." *See* ECF No. 14-3, Sep. 22, 2025 Letter. Secretary Warner also explained West Virginia's list-maintenance practices. *Id.*

On December 10 and 19, 2025, and on January 13, 2026, DOJ "sent follow-up emails renewing the request for a copy of West Virginia's" voter-registration list with "all fields." ECF No. 1, Compl. ¶ 25. On February 11, 2026, Secretary Warner sent DOJ "a letter explaining that [his office] would not provide West Virginia's" voter-registration list "with all fields." *Id.* ¶ 26; *see also* ECF No. 11-6, Feb. 11, 2026 Letter. Secretary Warner stated that "the alleged purpose of the DOJ's request is to run West Virginia's entire voter list through the Systematic Alien Verification for Entitlements ('SAVE') database," but "as we discussed, the WVSOS is a registered and recently approved user of the SAVE database." ECF No. 11-6, Feb. 11, 2026 Letter. Secretary Warner also explained that "West Virginia law protects the sensitive personally identifiable information of its voters, and the Secretary of State takes seriously his responsibility to safeguard such information from unauthorized disclosure." *Id.* Secretary Warner offered to work with DOJ to "reach an amicable resolution within the limits of state and federal law" and "to provide a detailed narrative of [West Virginia's] voter list maintenance procedures upon request." *Id.* Secretary Warner provided additional details about West Virginia's list-maintenance

procedures. *Id.*

Plaintiff filed suit on February 26, 2026, alleging only one claim: that Defendant has violated the CRA. ECF No. 1, Compl. Weeks later, Plaintiff moved to compel West Virginia to provide its full statewide voter-registration list pursuant to the same statute. *See* ECF Nos. 14-15. Plaintiff served the Summons and Complaint on April 23 and, on April 29, Secretary Warner filed his Motion to Dismiss and response to Plaintiff's Motion to Compel. ECF Nos. 25-26, 28.

**II.      Statutory Background**

Although Plaintiff's lawsuit asserts only one count under the CRA, the lawsuit invokes three statutes—the CRA, NVRA, and HAVA. *See* ECF No. 1, Compl. ¶ 10. Congress's intent in passing all three of the statutes "was clear—ensuring that all Americans, regardless of race, are able to vote without fear or distress." *Weber*, 816 F. Supp. 3d at 1175.

**A.      CRA**

The Civil Rights Act of 1960 was "designed to protect access to the ballot in jurisdictions with patterns or practices of denying [voting] access based on race." *Allen v. Milligan*, 599 U.S. 1, 47 (2023) (Thomas, J., dissenting). "Title III of the Civil Rights Act of 1960 was passed during the Jim Crow era, when persistent voter suppression was preventing Black Americans from voting." *Weber*, 816 F. Supp. 3d at 1175. "States were utilizing literacy tests, arbitrary registration tactics, voter ID laws, and poll taxes to keep minorities away from the ballot. Black Americans risked intimidation and violence every time they tried to access the polls." *Id.* "One of the many techniques used to keep Black voters from the polls was to reject would-be registrants for insignificant, hyper-technical errors in filling out application forms." *Pa. State Conf. of NAACP Branches v. Sec'y Commonwealth of Pa.*, 97 F.4th 120, 126 (3d Cir. 2024). These efforts included rejecting "applicants for failing to calculate their age to the day" and "underlining Mr. when it

should have been circled." *Id.* (citation modified). During this time, "[t]o hide their complicity in voter suppression, state officials destroyed the records of Black Americans who had registered to vote, as well as those denied the opportunity to register." *Weber*, 816 F. Supp. 3d at 1175.

Congress enacted the CRA "directly in response to these concerns, requiring states to retain and preserve all records pertaining to voter registration, voting applications, and payments of poll taxes." *Weber*, 816 F. Supp. 3d at 1175. Section 301 of the CRA requires state and local officials to retain and preserve records related to voter registration and other acts requisite to voting for any federal office for a period of twenty-two months after any federal general, special, or primary election. 52 U.S.C. § 20701. Section 303 requires that a state make any of these retained records available for inspection, reproduction, and copying "upon [a] demand in writing by the Attorney General" that contains "a statement of the basis and the purpose therefor." 52 U.S.C. § 20703.

### B. NVRA

Congress passed the NVRA in 1993 to establish "procedures that will increase the number of eligible citizens who register to vote in elections for Federal office," making "it possible for Federal, State, and local governments to implement this [Act] in a manner that enhances the participation of eligible citizens as voters in elections for Federal office," protecting "the integrity of the electoral process," and ensuring "that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b). Similar to the CRA, the NVRA was enacted "to combat the effects of discriminatory and unfair registration laws that cheapened the right to vote." *Weber*, 816 F. Supp. 3d at 1175 (citing *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 334 (4th Cir. 2012)).

Each section of the NVRA works to balance these objectives. Section 8 of the NVRA regulates the way that states update and maintain their voter-registration lists—often referred to as

list maintenance—and provides a disclosure mechanism by which any party may seek certain information regarding those lists. 52 U.S.C. § 20507(b). Section 8 requires states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of . . . the death of the registrant . . . or a change in the residence of the registrant," but does not require states to conduct programs to remove voters for other reasons. 52 U.S.C. § 20507(a)(4).

### C. HAVA

Against the backdrop of the NVRA, and following the 2000 general election, Congress enacted HAVA. Pub. L. No. 107-252, 116 Stat. 1666 (2002) (52 U.S.C. §§ 20901-21145). HAVA requires that each state maintain "a single, uniform, official, centralized, interactive computerized statewide voter registration list," which "shall serve as the single system for storing and managing the official list of registered voters throughout the State." 52 U.S.C. § 21083(a)(1)(A), (a)(1)(A)(i). HAVA charges states with "conducting a general program of list maintenance that makes a reasonable effort to remove voters who become ineligible because of a change of address [or death]." *Bellitto v. Snipes*, 935 F.3d 1192, 1203 (11th Cir. 2019); *see also* 52 U.S.C. § 21083(a)(2)(A)(ii). Although the statute repeatedly refers to other provisions of the NVRA, *see, e.g.*, 52 U.S.C. § 21083(a)(2)(A)(i), it neither contains nor incorporates a disclosure provision of any kind.

### LEGAL STANDARD

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted" under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), the complaint must present "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547, 570

(2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Johnson v. Baltimore City*, 163 F.4th 808, 814 (4th Cir. 2026) (citation omitted). Although factual allegations contained in the complaint are assumed to be true, this rule does not extend to legal conclusions. "'Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice' to survive a motion to dismiss." *MSP Recovery Claims, Series LLC v. Lundbeck LLC*, 130 F.4th 91, 112 (4th Cir. 2025) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). When a complaint fails to meet this standard, it "must be dismissed." *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).[1]

## ARGUMENT

### I. The CRA requires Plaintiff to provide a statement of the basis and the purpose for a request for records.

The CRA requires that a demand from the Attorney General "shall contain a statement of the basis and the purpose therefor." 52 U.S.C. § 20703; *see also Weber*, 816 F. Supp. 3d at 1182 ("The DOJ is required to offer a written statement of *both* the purpose and basis for its demands[.]") (emphasis in original). The basis and purpose requirements of the CRA are essential procedural safeguards that Plaintiff has failed to satisfy. The *Weber*, *Oregon*, *Galvin*, and *Amore* courts have uniformly agreed that failing to satisfy one or both safeguards is fatal to Plaintiff's case.[2]

---

[1] Plaintiff argues in other briefing that this Court should dispense with the Federal Rules of Civil Procedure. ECF No. 39 at 3-7. For the reasons explained in CAG's response to Plaintiff's Motion to Compel, that is incorrect—"appropriate process" under the CRA requires application of the normal rules. *See* ECF No. 22 at 4-9. Plaintiff's position is also inconsistent—even as it seeks to avoid the Rules, it also relies on the applicable standard under Rule 12(b)(6). *See* ECF No. 39 at 7 (citing *Hall v. DirectTV*, 846 F.3d 757, 765 (4th Cir. 2017)).

[2] The *Benson* Court dismissed Plaintiff's complaint on the grounds that the CRA allows the Attorney General to inspect or copy records relating to acts requisite to voting only if those records "come into [the] possession" of election officials in the course of carrying out those acts, and voter-registration lists are not among such records. 2026 WL 362789, at *9. The *Fontes* Court adopted

"The basis is the reasoning provided by the DOJ regarding the evidence behind its investigation of a particular state and specific, articulable facts pointing to the violation of federal law," and "purpose" is "the rationale for the request[.]" *Weber*, 816 F. Supp. 3d at 1184; *see also Basis*, Black's Law Dictionary 161 (8th ed. 2004) ("an underlying condition"); *Purpose*, Black's Law Dictionary 161 (8th ed. 2004) ("an objective, goal, or end"); *Espinal-Andrades v. Holder*, 777 F.3d 163, 168 (4th Cir. 2015) ("[W]e must try to give every word in the statute meaning to avoid rendering its terms superfluous.") (citation omitted). At a minimum, the "basis" requirement compels DOJ to describe factual information in its possession that tends to show the law has been violated. *See Kennedy v. Bruce*, 298 F.2d 860, 861 (5th Cir. 1962); *Amore*, 2026 WL 1040637, at *5.

These CRA requirements are meaningful safeguards that Plaintiff may not flout. *See Weber*, 816 F. Supp. 3d at 1196; *Oregon*, 2026 WL 318402, at *8. The requirements ensure that the federal government uses the CRA as a tool to conduct properly predicated investigations rather than as a blank check to get wide swaths of documents about voters beyond its statutory authority. *See In re Gordon*, 218 F. Supp. 826, 827 (S.D. Miss. 1963) ("[T]his Act merely provides for a limited exploration and discovery as to the validity of the election processes employed and pursued in such Federal elections after May 6, 1960."); *see also United States v. Markwood*, 48 F.3d 969, 979 (6th Cir. 1995) "[A] district court is not a 'rubber stamp' for agency demands for the production of information." *Weber*, 816 F. Supp. 3d at 1182 (holding that "appropriate process" requires application of FRCP, which allows the Court to determine whether Plaintiff has met the CRA's statutory requirements).

---

that reasoning. 2026 WL 1177244, at *3. The Court need not reach this issue if it finds that Plaintiff failed to follow the CRA's requirement to state the basis and the legitimate purpose for its demand.

7

The CRA's safeguards accord with those that courts apply in analogous situations. In the administrative subpoena context, the Fourth Circuit has found that the test for judicial enforcement of an administrative subpoena requires evaluating whether the investigation is "authorized for a legitimate governmental purpose," "limited in scope to reasonably relate to and further its purpose," "sufficiently specific so that a lack of specificity does not render compliance unreasonably burdensome," and "not overly broad for the purposes of the inquiry as to be oppressive[.]" *In re Subpoena Duces Tecum*, 228 F.3d 341, 349 (4th Cir. 2000); *see also In re 2025 Subpoena to Children's Nat'l Hosp.*, No. 1:25-cv-3780-JRR, 2026 WL 160792, at *8 (D. Md. Jan. 21, 2026) (quashing DOJ subpoena concluding "the Subpoena was not issued for a legitimate governmental purpose, is not limited in scope to any legitimate purpose, and is oppressive in its breadth"). In analyzing such demands, courts should inquire into an agency's attempt to enforce a subpoena that "lacks a legitimate purpose." 2026 WL 160792, at *9 (denying subpoena to hospital because "[t]he Subpoena bears no credible connection to an investigation of any statutory violation by the Hospital.").

II. **Plaintiff failed to meet the CRA's requirement to state the basis and the purpose of its request.**

Although the plain text of the CRA requires DOJ to include a statement of "the basis" and "the purpose" for any demand under Title III, the demand issued to West Viriginia contained neither. The Complaint should therefore be dismissed.

A. **Plaintiff failed to state the basis for its demand.**

Plaintiff's September 8, 2025, demand for West Virginia's state voter list contained no statement of the factual basis for its request, merely a bare citation to the CRA. ECF No. 1, Compl. ¶ 21 ("The September 8 Letter said the basis of the demand was the CRA."); *see also* ECF No. 14-2, Sep. 8, 2025 Letter. This fails to state a basis under the statute. *See Weber*, 816 F. Supp. 3d at

1184 (holding that statement of basis must include "specific, articulable facts pointing to the violation of federal law").

The CRA requires that the Attorney General provide both the basis *and* the purpose alongside any CRA demand, but Plaintiff's assertion that merely citing the CRA satisfies the statutory requirements collapses these two distinct elements, thereby eliminating a substantive requirement imposed by Congress. *See Oregon*, 2026 WL 318402, at \*9 ("If the purpose is to investigate violations of a statute, the basis must be something else; the statute underlying the investigation is nothing more than a component of the purpose."); *Galvin*, 2026 WL 972129, at \*3 ("the requirement that the Attorney General state 'the basis' for her request is mandatory, not a mere formality with which the federal government or this Court is free to dispense"); *Amore*, 2026 WL 1040637, at \*5 (rejecting Plaintiff's argument and finding "Congress could not have intended Title III to be interpreted in this redundant and circular manner"); *Weber*, 816 F. Supp. 3d at 1184 ("The requirement that the Attorney General state their purpose and basis is not merely perfunctory—it is a critical safeguard that ensures the request is legitimately related to the purpose of the statute."). In order to give meaning to both terms, "the basis" must "mean a factual basis for investigating a violation of a federal statute." *Oregon*, 2026 WL 318402, at \*9; *see also Galvin*, 2026 WL 972129, at \*6; *Amore*, 2026 WL 1040637, at \*5. Even in *Kennedy v. Lynd*, 306 F.2d 222, 225 (5th Cir. 1962)—a case which Plaintiff relies upon in its motion to compel, *see* ECF No. 15 at 1-8—the Attorney General's letter made a "statement of the basis" when explaining that the demand was "based upon information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction." 306 F.2d at 229 n.6.

In contrast, Plaintiff's September 8 letter demanded West Virginia's sensitive voter data "[p]ursuant to the foregoing authorities [of the NVRA and HAVA], including the CRA." ECF No. 14-2, at 2. Plaintiff cites nothing to support this proposition, because it cannot possibly be accurate. Because Plaintiff provided no factual predicate for its September 2025 demand, it has not complied with the requirements of the CRA, and the Complaint must be dismissed. *Galvin*, 2026 WL 972129, at *6 (holding a Title III demand without a factual basis is deficient and dismissing the case).

Nor can Plaintiff cure the problem by supplying a post-hoc justification for its demands as it attempts through the declaration of Eric Neff. *See* ECF No. 14-1. The CRA requires that the written demand itself contains the statement of basis and purpose. *See Galvin*, 2026 WL 972129, at *5. This Court should not consider Plaintiff's post hoc rationales. *See also S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013) ("It is well-established that parties cannot amend their complaints through briefing or oral advocacy."). Even if the Court were to consider Neff's Declaration, Plaintiff would still fail to satisfy the CRA's requirements. The Declaration provides only discussions of prior matters related to the NVRA, HAVA, and the CRA, but no basis to argue that *West Virginia* has recently violated federal voting laws. *See* ECF No. 14-1.

Moreover, the Declaration's examples demonstrate that DOJ does not have any basis for obtaining West Virginia's unredacted voter rolls by invoking HAVA. As the Declaration explains, Plaintiff settled a HAVA enforcement action against North Carolina. ECF No. 14-1 ¶¶ 12-14. Plaintiff settled that lawsuit *without* demanding North Carolina's unredacted voter rolls. *See* Consent Judgment and Order at 10-11, *United States v. N.C. State Bd. of Elections*, No. 5:25-cv-00283-M-RJ (E.D.N.C. Sep. 8, 2025),

https://www.brennancenter.org/media/14474/download/072-09.08.2025-entry-of-stipulated-consent-judgment.pdf?inline=1. And, as Plaintiff touts in its Motion to Dismiss Response, this settlement has been effective. ECF No. 39. In any event, events that occurred in another state, and which are not mentioned in DOJ's letters to Secretary Warner, cannot serve as the "basis" for its demand for information about West Virginia voters. 52 U.S.C. § 20703; *Galvin*, 2026 WL 972129, at \*3 ("the text makes clear that 'the basis' of the demand must be made express—the 'demand in writing' must 'contain a statement of the basis and the purpose.'").

Plaintiff's failure to provide a basis for its request that is specific to West Virginia becomes clearer within the broader context: it has demanded unredacted voter rolls from almost every state and sued 30 states and the District of Columbia without providing individualized reasons showing a good-faith belief that every one of these states is violating federal voting law.

### B. Plaintiff failed to state the purpose for its demand.

Plaintiff has likewise failed to identify a legitimate purpose for its demand, which is fatal to its Complaint. The only purpose described in the September 8 Letter and Complaint is "to ascertain compliance with the list maintenance requirements of the NVRA and HAVA." ECF No. 1, Compl. ¶ 22; ECF No. 14-2, Sep. 8, 2025 Letter. Plaintiff's arguments related to purpose are insufficient because an unredacted voter file is not necessary for the United States to assess West Virginia's compliance with its statutory responsibilities under the NVRA or HAVA. *See Weber*, 816 F. Supp. 3d at 1184. The NVRA requires states to implement "a *general program* that makes a *reasonable effort* to remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(a)(4) (emphasis added); *Condon v. Reno*, 913 F. Supp. 946, 953 (D.S.C. 1995) ("the NVRA requires *each state* to conduct certain general programs.") (emphasis added). The Supreme Court has recognized that "States take a variety of approaches" in complying with the NVRA's requirements, and states are able to take a variety of approaches because the

term "reasonable effort" gives states room to delineate the program they wish to implement. *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 762 (2018).

Here, Plaintiff failed to state the purpose for its request because Plaintiff failed to explain why it needs access to driver's license numbers and social security numbers to evaluate whether West Virginia's general list-maintenance programs meet the standard of "reasonable effort." Independently checking or performing list maintenance does not fall under the federal government's duty to evaluate a state's general list-maintenance procedures. In addition, a static, unredacted copy of West Virginia's voter-registration list is not necessary to determine whether West Virginia is complying with HAVA's and the NVRA's list-maintenance requirements because a static list does not explain the procedures by which West Virginia maintains the list. Therefore, Plaintiff's stated purpose—to conduct its own list maintenance under the NVRA and HAVA—is not sufficient under the CRA.

In its Response in Opposition to Defendant's Motion to Dismiss, ECF No. 39, Plaintiff argues that obtaining a voter-registration list to enforce HAVA and the NVRA is a typical practice, but only cites decades-old consent decrees that courts issued in cases alleging a particular state violated HAVA and the NVRA. *See* ECF No. 39-4 at 1; ECF No. 39-5 at 1; ECF No. 39-6 at 2. Moreover, the consent decrees "embod[y] an agreement of the parties[.]" *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) (citation omitted). Although the decrees demonstrate an expectation that the agreement "will be reflected in, and be enforceable as, a judicial decree," *id.*, the courts that issued that decrees did not make any express finding as to Plaintiff's power under the CRA or the processes DOJ must follow to obtain documents.

Documents that have recently come to light through Freedom of Information Act requests reveal that Plaintiff has used HAVA, the NVRA, and the CRA to intentionally hide the purpose

for its requests for the voter files. From at least November 2025, Mr. Neff, acting as Voting Section Chief, instructed that DOJ should not provide information about its intended purpose for the data to the states, stating that neither the HAVA, NVRA, or CRA "require [us] to give the states information about what we are going to do with the data." Exhibit A. Plaintiff could not possibly have satisfied the requirement to provide *the* purpose of the demand when it was obscuring that purpose.

Moreover, the Constitution and relevant statutes invoked by Plaintiff, establish that the states, not the federal government, are in charge of the maintenance of voter rolls and the process of removing and adding individual voters. *See* U.S. Const. art. I, § 4, cl. 1; 52 U.S.C. § 20507(a)(4); 52 U.S.C. § 21083(a)(1)(A); 52 U.S.C. § 21085 (delegating expressly to the states the methods of complying with HAVA's substantive list-maintenance provisions); *see also Amore*, 2026 WL 1040637, at *2. West Virginia has its own state list-maintenance procedures, as contemplated by HAVA and the NVRA. *See, e.g.*, W. Va. Code § 3-2-1 *et seq.* Secretary Warner explained in his September 22, 2025, letter how list maintenance works in the state, including how the state addresses registrants who have moved out of state, moved within the state, died, have been convicted of a felony and remain under a conviction, and are otherwise ineligible. ECF No. 14-3 at 1, Sep. 22, 2025 Letter; *see also* W. Va. Code § 3-2-4a. Plaintiff's purported purpose would supplant West Virginia's role in list maintenance by substituting its own judgment and process, and thereby violate the constitutional and statutory assignments of election administration duties. *See infra* Section II(B)(2). Usurping the State's duties cannot serve as a legitimate purpose for Plaintiff's demands. *See Weber*, 816 F. Supp. 3d at 1175 ("The DOJ cannot go beyond the boundaries provided by Congress and use these legislative tools in a manner that wholly disregards the separation of powers provided for in the Constitution.").

**1. Plaintiff's apparent goals for compiling nationwide voter data do not appear connected to list-maintenance analysis.**

The widespread lack of justification demonstrates again that DOJ seeks to misuse the CRA as an unlimited tool to compile and consolidate voter data, and to interfere with the states' rights to administer their own elections, rather than to protect the right to vote. *See Weber*, 816 F. Supp. 3d at 1186 ("If the DOJ wants to instead use these statutes for more than their stated purpose, circumventing the authority granted to them by Congress, it cannot do so under the guise of a pretextual investigative purpose."); *In re Gordon*, 218 F. Supp. at 826-27 ("[T]his Act merely provides for a limited exploration and discovery as to the validity of the election processes employed and pursued in such Federal elections after May 6, 1960.").

Plaintiff's plans for this sensitive data appear nowhere in the Complaint, but have emerged from other sources, including President Trump's most recent Executive Order on elections, the Memorandum of Understanding (MOU) that DOJ has signed with at least two states, and other DOJ statements and documents.[3] On March 31, 2026, President Trump issued Executive Order 14399, titled "Ensuring Citizenship Verification and Integrity in Federal Elections." The Order purports to enforce federal laws "prohibit[ing] non-citizens from registering to vote or voting in Federal elections," and to "enhance election integrity via the United States Mail." The Order directs the creation of a "State Citizenship List," which would require using Social Security

---

[3] *See* "Confidential Memorandum of Understanding" executed with Texas, https://www.brennancenter.org/media/15082/download/texas_12.09.2025_executed-mou.pdf?inline=1; "Confidential Memorandum of Understanding" executed with Alaska, https://www.brennancenter.org/media/15064/download/alaska_12.22.2025_executed-mou.pdf?inline=1. DOJ has apparently asked other states to sign the same MOU. *See* Proposed "Confidential Memorandum of Understanding" sent to Colorado, https://www.documentcloud.org/documents/26330926-vrldata-sharing-agreement-doj-co/; *see also* Jonathan Shorman, *Trumps's DOJ Offers States Confidential Deal to Remove Voters Flagged by Feds*, Stateline (Dec. 18, 2025), https://stateline.org/2025/12/18/trumps-doj-offers-states-confidential-deal-to-wipe-voters-flagged-by-feds-as-ineligible/.

records and other sensitive voter data—*i.e.*, the data that DOJ seeks through its unprecedented data-collection effort in West Virginia. Exec. Order No. 14399, 91 Fed. Reg. 17125 (Mar. 31, 2026). In addition, the MOU circulated by DOJ describes DOJ's attempted takeover of states' exclusive authority to maintain their voter rolls and determine who should be removed from the rolls due to ineligibility. It provides that DOJ will conduct an "analysis and assessment" of the state's voter rolls and instruct the state to remove voters DOJ identifies.[4]

DOJ's public statements and documents obtained from the agency through Freedom of Information Act requests confirm its goal was not to review list-maintenance procedures, but to expand federal control over elections and target voters for removal. *See* Exhibit B at 1220; (ordering that DOJ "mass produce" letters to states). DOJ leadership recently stated "[a]t this Department of Justice, we will not permit states to jeopardize the integrity and effectiveness of elections by refusing to abide by our federal elections laws. If states will not fulfill their duty to protect the integrity of the ballot, we will."[5] In one email, one DOJ official responded to Privacy Act concerns by stating that DOJ wanted to "conduct searches that assess the List maintenance of voter registrations lists." Exhibit C at 724.

DOJ is following through with these plans—the Civil Rights Division executed a separate MOU with the Department of Homeland Security and USCIS to permit it to run state voter lists through SAVE, including that DOJ will contact voters to obtain additional information. Exhibit D at 34. But this federal takeover of list maintenance would run contrary to the constitutional and the

---

[4] The MOU DOJ is providing to states provides that removals must take place within 45 days of notification from DOJ, which—for any voters flagged for removal based on changed residence—would violate Section 8(d) of the NVRA. 52 U.S.C. § 20507(d).

[5] Press Release, U.S. Dep't of Just., Just. Dep't Sues Four Additional States and One Locality for Failure to Comply with Fed. Elections Laws (Dec. 12, 2025), https://www.justice.gov/opa/pr/justice-department-sues-four-additional-states-and-one-locality-failure-comply-federal.

statutory frameworks for elections, which provide that Congress and the states make the law, and state and local governments run elections, including registering voters and maintaining voter rolls. 52 U.S.C. § 20507(a)(4); 52 U.S.C. § 21083(a)(1)(A); 52 U.S.C. § 21085.[6] And although DOJ has apparently been planning to run the lists through SAVE since at least 2025, and executed the MOU with DHS and USCIS on January 20, 2026, it told a court hearing a parallel case as recently as March 23 that "there has been no directive or instruction that the data, the non-publicly available data, is going to be transmitted to any other agency." Exhibit E at 44:8-15. However, at a hearing held by the federal district court in Rhode Island in yet another parallel case, Plaintiff replied that it "intend[ed] to" send the voter rolls to the Department of Homeland Security. Exhibit F at 65:1-11.

Given that statements and documents from public officials demonstrate that Plaintiff's true purpose is not reviewing list maintenance procedures, for which a static copy of the voter registration list is not helpful, Plaintiff's contention that this is based on "unreliable hearsay," ECF No. 39 at 8, is unavailing. Plaintiff's purpose is apparent from what federal officials are telling each other and saying publicly—and has been scrutinized by courts in reviewing Plaintiff's demands for sensitive voter information. *See Weber*, 816 F. Supp. 3d at 1186; *see also Oregon*, 2026 WL 318402, at *11.

**2. West Virginia law prevents the disclosure of this sensitive voter data.**

Even if Plaintiff sufficiently stated a basis and purpose for seeking the unredacted voter file under the CRA for potential violations of the NVRA's or HAVA's list-maintenance requirements, West Virginia voter protection laws prevent disclosure of the personally identifying information at issue, and nothing in federal law preempts those protections. W. Va. Code § 3-2-

---

[6] Further, the proposed MOU with states does not limit DOJ's ability to use states' data and expressly permits DOJ to provide the data to contractors. MOU at 6-7; *but see* 52 U.S.C. § 20704.

30(a). West Virginia law provides that a limited set of voter information is available for public inspection, and that information "may not include" driver's license number or social security number. *Id.*

Secretary Warner specifically invoked West Virginia law protecting voter information in his response to Plaintiff's September 8 letter, explaining that W. Va. Code § 3-2-30(a) "expressly prohibits disclosure of a registrant's . . . Social Security number, driver's license number, or nonoperator's identification number." ECF No. 14-3 at 2. Moreover, West Virginia is one of a minority of states with a constitutionally recognized right to privacy. *See Cantrell v. Forest City Pub. Co.*, 419 U.S. 245, 248 (1974); Syl. Pt. 2, *Cordle v. Gen. Hugh Mercer Corp.*, 174 W. Va. 321, 322, 325 S.E.2d 111, 112 (1984). Therefore, as Secretary Warner explained "[i]n accordance with West Virginia law, the Secretary of State's Office makes registration lists available subject to . . . limitations." ECF No. 14-3 at 2. Though the Secretary of State's office detailed how to access the voter-registration list with the required redactions, Plaintiff did not respond and instead filed this lawsuit.

Plaintiff does not argue that HAVA preempts state privacy protections, nor could it: HAVA lacks a public-disclosure provision. And courts have recognized that the NVRA and state privacy laws operate together where such state privacy laws require minimal redaction of sensitive personal identifiers, while still requiring disclosure of the underlying records. *See Weber*, 816 F. Supp. 3d at 1185-86. The NVRA's coexistence with state privacy laws is another way that the law balances its objectives of encouraging participation and protecting the integrity of the electoral system. The Fourth Circuit has recognized that redacting voters' social security numbers is consistent with the NVRA's public disclosure provision. *See Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 339 (4th Cir. 2012). West Virginia has made clear that the publicly available

voter-registration list would be available to Plaintiff.

West Virginia laws preventing disclosure of sensitive information do not frustrate the NVRA's purpose. Instead, those privacy laws reinforce the boundaries of public inspection articulated by the courts and the Attorney General. *See id.*; Brief for the United States as Amicus Curiae, *Pub. Int. Legal Found. v. Bellows*, No. 23-1361, 2023 WL 4882397, at *28 (1st Cir. July 25, 2023) (arguing that state law limits on voter information are not preempted when they affect uses that "would not further the NVRA's purposes," including "bans on disseminating personal data"). Thus, West Virginia's privacy laws are not preempted by the NVRA, and because Plaintiff's purported need for the unredacted voter file is to assess NVRA compliance, West Virginia law prevents Plaintiff from accessing the sensitive voter information it seeks through this litigation. *See Weber*, 816 F. Supp. 3d at 1189 ("The NVRA and California's privacy protections can coexist because the latter does not obstruct the former. Nothing in the NVRA prevents redaction of sensitive voter information as California law requires."). In short, neither statute Plaintiff purports to be assessing overcomes the protections of West Virginia law, another indication that its "purpose" fails.

## CONCLUSION

For the foregoing reasons, Plaintiff's Complaint should be dismissed.


May 14th, 2026                                        Respectfully submitted,

                                                     */s/ Aubrey Sparks*

Aubrey Sparks (WV Bar No. 13469)
American Civil Liberties Union of
West Virginia Foundation
P. O. Box 3952
Charleston, WV 25339-3952
asparks@acluwv.org

Adriel I. Cepeda Derieux*
American Civil Liberties Union Foundation
915 15th Street NW
Washington, DC 20005
(202) 457-0800
acepedaderieux@aclu.org

Theresa J. Lee*
Sophia Lin Lakin
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
tlee@aclu.org
slakin@aclu.org

Brent Ferguson
Daniel S. Lenz*
Sejal Jhaveri
Renata O'Donnell*
Kate Hamilton
Alexis Grady
Campaign Legal Center
1101 14th St. NW, Suite 400
Washington, DC 20005
Tel: (202) 736-2200
Fax: (202) 736-2222
bferguson@campaignlegalcenter.org
dlenz@campaignlegalcenter.org
sjhaveri@campaignlegalcenter.org
rodonnell@campaignlegalcenter.org
khamilton@campaignlegalcenter.org
agrady@campaignlegalcenter.org

Maura Eileen O'Connor *
Justin Lam*
Brennan Center for Justice
at NYU School of Law
777 6th St. NW, Ste. 1100
Washington, DC 20001
Tel: (202) 249-7190
oconnore@brennan.law.nyu.edu
lamju@brennan.law.nyu.edu

*Admitted pro hac vice

Counsel for Proposed Intervenor-Defendant
West Virginia Citizen Action Group

19

**CERTIFICATE OF SERVICE**

I, Aubrey Sparks, do hereby certify that on this 14th day of May, 2026, I caused a true and correct copy of the foregoing document to be served upon all counsel of record registered with the Court's ECF system, by electronic service via the Court's ECF transmission facilities.

/s/ *Aubrey Sparks*
Aubrey Sparks