## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## AT CHARLESTON

**THE UNITED STATES OF AMERICA,**

    *Plaintiff*,

    **v.**

    **Civil Action No. 2:26-cv-00156**
    **Hon. Thomas E. Johnston**

**KRIS WARNER, in his Official Capacity
as WEST VIRGINIA SECRETARY OF
STATE,**

    *Defendant*.

### DEFENDANT KRIS WARNER'S REPLY MEMORANDUM
### <u>IN SUPPORT OF MOTION TO DISMISS</u>

Michael R. Williams (WV Bar # 14148)
 *Solicitor General*
Caleb A. Seckman (WV Bar # 13964)
 *Assistant Solicitor General*
West Virginia Attorney General's Office
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25305
Michael.R.Williams@wvago.gov
Caleb.A.Seckman@wvago.gov
Telephone:  (304) 558-2021
Fax:  (304) 558-0140

*Counsel for Defendant Kris Warner*

**INTRODUCTION**

Half a dozen courts stand against the Government.[*] In his motion to dismiss, Secretary Warner explained why those courts are correct. The Government's "Title III demand" (1) seeks documents the statute doesn't cover (2) for a purpose the statute doesn't permit (3) without any factual basis. Each of these reasons is enough to block the demand. Yet the Government hardly acknowledges its demand's shortcomings; nor does it counter the concerns that the Secretary— and multiple federal courts—have raised. Because the Government leaves so many grounds unaddressed, the Court can take its pick to resolve this case.

The Government has more than just Title III problems. Its demand also violates at least three federal privacy statutes—obligations that good intentions and protective orders cannot satisfy. And because Congress has not displaced West Virginia law's redaction requirement, that state law independently bars the disclosure the Government seeks.

Against this backdrop, six courts have considered the Government's demands—and six have found those demands wanting. The Government offers no compelling explanation for why this case should go differently. Instead, it focuses on its view of what Title III *should* do and how much it thinks it needs these documents to carry out the mission it envisions for itself. But Congress granted the Attorney General specific powers for a specific purpose. The demand exceeds both. The Court should thus dismiss this effort to enforce the unjustified demand.

---

[*] *United States v. Weber*, 816 F. Supp. 3d 1168 (2026), *appeal docketed*, No. 26-1232 (9th Cir. Mar. 3, 2026); *United States v. Oregon*, No. 25-cv-1666, 2026 WL 318402 (D. Or. Feb. 5, 2026), *appeal docketed* No. 26-1231 (9th Cir. Mar. 3, 2026); *United States v. Benson*, No. 25-cv-1148, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026), *appeal docketed*, No. 26-1225 (6th Cir. Feb. 27, 2026); *United States v. Galvin*, No. 25-13816, 2026 WL 972129 (D. Mass. Apr. 9, 2026); *United States v. Amore*, No. 25-CV-639, 2026 WL 1040637 (D.R.I. Apr. 17, 2026); *United States v. Fontes*, No. 26-66, 2026 WL 1177244 (D. Ariz. Apr. 28, 2026)

## ARGUMENT

### I.      Title III does not cover West Virginia's voter registration list.

The demand has a threshold problem: Title III does not cover West Virginia's voter registration list.  The list is not a "record[] [or] paper[] which come[s] into [the Secretary's] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election."  52 U.S.C. § 20701.  The Government disagrees, but its reading of Title III ignores the statute's plain text in favor of its view about what the statute should cover.  As written, Title III "refers only to documents that people submit to the State as part of the voter registration process, not a document like the voter registration list that is created by state officials." *Benson*, 2026 WL 362789, at *9.  This Court should not "superimpose [the Government's] expansive definition where Title III, by its plain text, does not tolerate such a definition." *Fontes*, 2026 WL 1177244, at *6.

**A.** Start with the phrase "all records and papers … relating to any application, registration, payment of poll tax, or other act requisite to voting in such election."  52 U.S.C. § 20701.  The Government argues that because the voter registration list is a "record," Title III must cover it. United States' Memo. in Response to Defendant's Motion to Dismiss and in Reply to Defendant's Opposition to Motion to Compel (Consol. Resp.), ECF No. 39, at 17.  This argument ignores that Title III covers *only* those records "relating to" its enumerated "act[s]."  52 U.S.C. § 20701.

The use of the word "act" is critical.  An "act" is "[s]omething done or performed." *Act*, BLACK'S LAW DICTIONARY (12th ed. 2024).  And the catch-all phrase "other act" should be read to "embrace only objects similar in nature to those objects enumerated by the preceding specific words," *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001).  Here, the listed "terms refer[] to something that the voter submits or does as part of the registration process." *Benson*, 2026 WL 362789, at *9.  Thus, Title III covers its specific examples and "other acts" like them:

2

things voters do to register to vote. *Id.*; *see also Fontes*, 2026 WL 1177244, at *5-6. The Government's cited cases say the same. *See* Consol. Resp. at 18-19 (citing *United States v. Mississippi*, 380 U.S. 128, 134 (1965) (responding to a state law which made it so "registrars no longer need[ed] to keep any record made *in connection with the application* of anyone to register to vote" that Title III requires retention of "records of voting registration" (emphasis added)); and *McIntyre v. Morgan*, 624 F. Supp. 658, 662-64 (S.D. Ind. 1985) (listing materials related to voter action and observing that Title III covers "election materials," which are things "used in elections for federal offices" that will be "destr[oyed] or dispos[ed] of" following the election in which they are used)).

And while the Government doesn't contest the voter-submitted nature of the specifically enumerated acts, it argues that even if *all* the enumerated items are acts done by voters, that doesn't mean that "every record or paper relating to those examples likewise" must "come[] from a voter." Consol. Resp. at 18 (cleaned up). This reading not only disregards the specific examples, though; it also removes the "other act" qualifier of the statute. The Government's reading would effectively transform Title III's carefully limited phrase—"records and papers … relating to any application, registration, payment of poll tax, or other act requisite to voting"—into an open-ended demand power over any "records and papers relating to elections." But Congress didn't write that statute. The modifier "relating to" might broaden the types of records about those acts, but it doesn't broaden the category of acts themselves. So the Court should decline to "read into [Title III] words that aren't there." *Romag Fasteners, Inc. v. Fossil, Inc.*, 590 U.S. 212, 215 (2020).

Lacking textual support, the Government entreats the Court to go beyond Title III's text in fear that a literal reading "would subvert [the statute's] purpose by frustrating the United States's ability" to make demands. Consol. Resp. at 19. But even assuming the Government is right that

its demand serves Title III's purpose (which it doesn't), "what Congress (possibly) expected matters much less than what it (certainly) enacted." *Stanley v. City of Sanford*, 606 U.S. 46, 58 (2025). "[N]o statute yet known pursues its stated purpose at all costs." *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017) (cleaned up). And "[t]here is no canon of statutory construction which requires this Court to construe Title III broadly merely because it pertains to election records." *Fontes*, 2026 WL 1177244, at \*6. So the Court should take the statute as it is, not as the Government wishes it to be.

**B.** Next, turn to "come into his possession." 52 U.S.C. § 20701. The Government agrees that this phrase means Title III applies only to records and documents the Secretary "gets or acquires." Consol. Resp. at 19 (cleaned up). Despite this concession, the Government goes on to claim that "Secretary Warner acquired the relevant records" here. *Id.* at 19-20. But the Secretary already explained that he didn't "acquire" the records here, he created them. *See* Memo. in Support of Mot. to Dismiss (Mot. to Dismiss), ECF No. 25, at 14. And the Government doesn't explain why it believes "acquires" actually means "creates."

The only support the Government offers for equating create and acquire is that it believes "distinctions between possessing something and having something come into one's possession are temporal distinctions." Consol. Resp. at 20 (cleaned up). But the statute doesn't say anything of the sort. Ordinary usage runs against this "temporal" idea, too. If a person paints a portrait, they wouldn't say they "came into possession" of a portrait. Nevertheless, the person "possesses" a portrait. Conversely, a person who buys a portrait does "come into possession" and thereby "possess" the portrait. So too here: the Secretary did not receive the voter registration list from some outside source. His office compiled it from individual applications, generating a new document that no one delivered to him.

4

In short, creation is not acquisition.  If the Government thinks this is a "pedantic distinction," Consol. Resp. at 19 (cleaned up), it is a "pedantic distinction made by Congress." *Benson*, 2026 WL 362789, at \*10; *see also Fontes*, 2026 WL 1177244, at \*6 (noting that it's "disingenuous" to claim *Benson* actually held that the distinction is pedantic).  That distinction dooms the Government's demand.  *See Benson*, 2026 WL 362789, at \*9; *Fontes*, 2026 WL 1177244, at \*7.

Faced once more with a lack of textual support, the Government asks the Court to read Title III "expansively" by "[f]ocusing on the information sought rather than how it was acquired or generated."  Consol. Resp. at 20.  Indeed, based only on references to cases "interpreting the NVRA," the Government says the Court can put aside "the particular language used to characterize that information" in Title III.  *Id.* (cleaned up).  That form of interpretation, the Government contends, would've allowed the *Benson* court to fully grasp what "Congress intended."  *Id.* at 18 (citing *Benson*, 2026 WL 362789, at \*9-10).  But the *Benson* court instead focused on "the touchstone of statutory interpretation: the text itself."  *Benson*, 2026 WL 362789, at \*10.  This Court should do the same.

**C.** So the Court shouldn't use purpose to stretch Title III's text to reach West Virginia's voter registration list.  If it does, the result would not only be atextual: it would also subject the Secretary to a catch-22 between the Government's vision of Title III and HAVA.  If the Secretary complies with HAVA by regularly updating the voting lists, *see* 52 U.S.C. § 21083(a)(1)-(2), Title III would levy criminal penalties on him for "willfully … alter[ing]" the now-covered voter registration list, *id.* § 20702.  And if he preserves the list as Title III would require, he couldn't fulfill his duties under HAVA.  The Government doesn't address the problem at all.  Because only

5

the Government's reading creates this otherwise artificial conflict, this Court should "avoid such an interpretation of Title III." *Fontes*, 2026 WL 1177244, at *7.

**D.** Finally, the Government claims the Secretary "asks the Court to legislate limitations conspicuously absent from Title III by limiting the United States to only the redacted, publicly available [voter registration list]." Consol. Resp. at 21. The Secretary asks no such thing. Indeed, Title III doesn't cover even the *redacted* list for the reasons discussed. Thus, the Secretary only offered a redacted list due to his willingness to work with the federal government to the extent allowed by West Virginia law.

If Title III did cover voter registration lists, demands could hypothetically include non-public information. But Title III doesn't preempt state (or federal) privacy laws regarding voter rolls and the sensitive information they contain. *See* Mot. to Dismiss at 20. Here, West Virginia law prohibits the release of the information. So—like the Secretary said—it's that unpreempted state law, not Title III, that would limit the Government to a redacted list. *See id.* at 5-6 ("[N]o federal law … preempts [West Virginia's] redaction requirement. So even if the demand was otherwise proper, the Government would still only be entitled to a redacted list.").

## II.    The Government provides no basis for its demand.

In his motion to dismiss, the Secretary argued that Title III requires a *factual* basis for a demand. At least four courts have said the same. *See Weber*, 2026 WL 118807, at *9; *Oregon*, 2026 WL 318402, at *8-9; *Galvin*, 2026 WL 972129, at *4; *Amore*, 2026 WL 1040637, at *5-6; *see also Benson*, 2026 WL 362789, at *8 (referring to "several purported anomalies within Michigan's voter registration data" as the "asserted bases" for the Government's demand). The Government doesn't dispute this understanding of basis. Yet instead of any factual support, the Government explains that the "basis" for its request is twofold. First, "recent enforcement efforts by the Attorney General demonstrate the need for federal scrutiny." Consol. Resp. at 8. And

6

second, using voter registration lists "to assess and enforce HAVA and the NVRA is not new." *Id.* at 9. Neither explanation supplies a factual basis for the current demand.

The Government starts by explaining at length how enforcement actions in North Carolina revealed that the State's officials failed to input certain information as required by HAVA. *See* Consol. Resp. at 8. But that action wasn't a Title III case. The Government brought suit based on its HAVA enforcement powers. *See* Complaint, *United States v. N.C. Bd. of Elections*, No. 25-cv-283 (E.D.N.C. May 27, 2025), ECF No. 1. So if anything, this action demonstrates that the Government is fully capable of investigating and enforcing voter list requirements without expanding Title III. What's more, the United States doesn't explain why problems in other States are relevant to whether the Secretary has complied with *his* federal obligations. Nothing in the Complaint or the Response points to anything in that regard.

Next, the Government discusses a handful of past instances in which it has supposedly "used [Title III] to obtain statewide voter lists to assess compliance with list maintenance requirements." Consol. Resp. at 9. But each instance is a voluntary agreement between the State at issue and the federal government. Voluntary compliance under negotiated terms is categorically different from compelled production over a state's legal objection. And where the Government points to court orders, those orders merely interpret and enforce the consent decrees the Government entered into with the States in question. *See id.* at 10-11. Again, these are instances of voluntary production where "the parties agreed" what to do. *Id.* at 11. None of the Government's examples tested the legality of the request generally, let alone in the face of unpreempted state law barring disclosure. And again, the Government fails to clarify why other States' voluntary actions mean that the Secretary is legally obligated to violate state law and produce West Virginia's list.

7

Ultimately, a single instance of HAVA noncompliance in another State (discovered by means besides Title III) and voluntary agreements with other States do not supply "a factual basis for believing [West Virginia] violated" federal law. *Oregon*, 2026 WL 318402, at *9. Thus, the demand doesn't satisfy Title III.

### III.    The Government's purpose must be related to Title III.

The Secretary previously explained that a Title III demand's "purpose must come from the statute." Mot. to Dismiss at 10. The Government seems to agree, as it doesn't argue that literally any purpose will suffice. But Title III doesn't define "purpose." So the question is, what purposes does Title III permit?

For his part, the Secretary used the "remainder of the statutory scheme" to determine that a valid purpose "must relate to a purpose of investigating violations of individuals' voting rights." Mot. to Dismiss at 10-11 (quoting *Oregon*, 2026 WL 318402, at *10). Three courts looking at the statute have come to the same conclusion. *See Oregon*, 2026 WL 318402, at *10; *Weber*, 816 F. Supp. 3d at 1182 ("alleged civil rights violations"); *Amore*, 2026 WL 1040637, at *6 ("individual voting rights"). That view of purpose also aligns with the contemporary understanding that "one of the clearest purposes of the Title III proceeding is to enable the Attorney General" to investigate "a question concerning infringement or denial of [a person's] constitutional voting rights." *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962); *see also Kennedy v. Lewis*, 325 F.2d 210, 212 (5th Cir. 1963) (describing Title III as providing "an opportunity to inspect the records as to those who may have been illegally denied the right to qualify" to vote). At the time, courts required a "simple assertion … that there are reasonable grounds for belief that certain voters are being discriminatorily denied their voting rights." *United States v. Lynd*, 301 F.2d 818, 822 (5th Cir. 1962).

The Government derides this analysis for supposedly "[e]ngrafting a requirement of racial discrimination" onto Title III.  Consol. Resp. at 15.  In doing so, the Government doesn't engage with the courts or the statutory context aligned with the Secretary's view.  Instead, the Government claims that Title III's "plain language" is all it needs.  *Id.* at 13.  But unless the Government believes Title III can be used for *any* purpose imaginable, the word must have some statute-specific meaning.  Indeed, the Government engrafts its own, saying that purpose means "for the purpose *of investigating possible violations of a Federal statute*."  *Id.* (emphasis added) (quoting *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam)).  To the Government's credit, the *Benson* court reached the same conclusion.  *See Benson*, 2026 WL 362789, at *8.  But that court, too, mistakenly observed that Title III "includes no such limitation" (despite what other courts have found), while adding its own view that purpose is somehow limited to "assessing states' compliance with federal election law and protecting voting rights."  *Id.*

Title III doesn't go so far as the Government supposes.  Violations of federal laws are only relevant to Title III to the extent those violations might warrant a suit to vindicate an individual's "constitutional voting rights."  *Kennedy*, 306 F.2d at 228.  For instance, a Title III demand couldn't be used to investigate and prosecute an individual whom the Government believed committed voter fraud.  *See In re Gordon*, 218 F. Supp. 826, 827 (S.D. Miss. 1963) (Title III isn't "an unlimited discovery device which may be employed and used without restraint.").  For the same reasons they don't alter the meaning of "basis," *see* Section II, *supra*, past instances of *voluntary* productions and consent agreements don't change the statute's legal scope with regard to "purpose," either.  *Contra* Consol. Resp. at 9-11.

Title III-relevant federal laws include "§ 1971 suits" (now 52 U.S.C. § 10101) and "similar actions."  *Kennedy*, 306 F.2d at 228.  Title III permits the United States to obtain "evidence for use

in such cases." *Id.* And it's those laws that expressly prohibit denial of the right to vote based on "[r]ace, color, or previous condition." 52 U.S.C. § 10101(a). Congress thus didn't forget to make clear that Title III protects against individual voter discrimination. *Contra* Consol. Resp. at 13. Purpose under Title III relates to these laws; it doesn't extend to a violation of every other federal law, even if the law does concern elections in general. *See Weber*, 816 F. Supp. 3d at 1182-83; *Oregon*, 2026 WL 318402, at *10; *Amore*, 2026 WL 1040637, at *6. The law resulted because the bipartisan Commission on Civil Rights had found it challenging to investigate voter discrimination without some requirement that States preserve relevant records; the Commission thus asked for the legislation that became the voter-registration record preservation and inspection requirements. *See Report of the United States Commission on Civil Rights* 138 (Sept. 9, 1959), https://tinyurl.com/y253324x.

All said, "the entire history of [Title III] reflects that it was and is designed to provide a means of enforcing the basic federally guaranteed rights of citizenship to vote." *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 852 (M.D. Ala. 1960) (cleaned up), *aff'd sub nom. Dinkens v. Att'y Gen. of U.S.*, 285 F.2d 430, 430 (5th Cir. 1961) (summarily affirming *Gallion* as a "well reasoned opinion"). The term "purpose" must thus be understood in light of that context. *See United States v. Hernandez*, 173 F.4th 94, 98 (4th Cir. 2026) ("Interpreting the plain language of a statute requires looking to both the specific context in which the language is used, and the broader context of the statute as a whole." (cleaned up)); *cf. Turner v. Littleton-Lake Gaston Sch. Dist.*, 442 F.2d 584, 587 (4th Cir. 1971) ("In determining the purpose of legislation, it is appropriate to consider not only the effect of the legislation itself, but also the history and setting out of which the legislation arose."). And the Government's references to the Uniformed Overseas Citizens Absentee Voting Act and the Voting Rights Act—both statutes that vindicate *individual* voters'

10

constitutional rights—fit squarely within that understanding of Title III's purpose.  *See Doe v. Walker*, 746 F. Supp. 2d 667, 670 (D. Md. 2010) (explaining that UOCAVA is intended "to prevent th[e] disenfranchisement of absent uniformed services and overseas voters"); *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 656 (2021) ("Congress enacted the landmark Voting Rights Act of 1965 … in an effort to achieve at long last what the Fifteenth Amendment had sought to bring about 95 years earlier: an end to the denial of the right to vote based on race.").

None of this is to say that voting list maintenance isn't "essential to securing an individual's right to vote."  Consol. Resp. at 14.  The Secretary never objected to this general principle, and the Government is wrong to say otherwise.  The Secretary said only that "voter roll issues *like the issues the Government alludes to here*" aren't essential to securing an individual's right to vote.  Mot. to Dismiss at 11 (emphasis added).  And that's true: even now, the Government (without factual basis in West Virginia) suggests only that too many people might be on the voter rolls.  *See* Consol. Resp. at 8 ("As a result of the Attorney General's enforcement action, North Carolina has reduced the number of voter records missing an identification number under HAVA from 103,329 to 70,709."); *see also id.* at 15 n.6.

But having too many people on voter rolls doesn't violate or threaten to violate any individual's right to vote.  Thus, even apparent "failures to purge voters who have moved away or have died … do[] not bear any particular importance" to whether a Title III demand has a valid purpose.  *Kennedy v. Bruce*, 298 F.2d 860, 863 n.2 (5th Cir. 1962) (disregarding as irrelevant "statistics … show[ing] that there are 2634 white citizens of voting age; 112.4% of these, or 2950 white citizens, are registered to vote" and instead focusing on the "disparity in the percentage of voters to eligible citizens as between the races" because "[o]f the 6085 Negro citizens of voting age not a single one is registered to vote").  The Government's reference to the National

11

Commission on Federal Election Reform tracks this distinction: the Commission wanted to ensure "access" and to "avoid mistaken voter removals," both of which might "disenfranchise individual voters." Consol. Resp. at 14 (quoting Nat'l Comm'n on Fed. Election Reform, *To Assure Pride and Confidence in the Electoral Process* 32-33 (Aug. 2001), *available at* https://tinyurl.com/86jy7ps7). The Commission didn't say that inspection aimed at *removing* records protects an individual's right to vote, and the Government offers no reason why it would. Thus, the Government's reliance on these statements is misplaced.

So the Government's stated purpose falls outside Title III's scope. That's enough to invalidate the demand. Yet if the Court believes the stated purpose suffices, it should still ensure that the purpose isn't "contrived" in the first place to mask an immigration-centered agenda. *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

The Government says the Secretary's contrived-purpose argument is "based entirely on unreliable hearsay" and "absurd and false." Consol. Resp. at 8-9. Put aside the implication that the Secretary can't trust his conversations with DOJ. *See* Mot. to Dismiss at 2. The President's executive order is hardly "unreliable hearsay." *See id.* at 12 (citing *Preserving and Protecting the Integrity of American Elections*, Exec. Order 14,248, 90 Fed. Reg. 14005, 14006-07 (Mar. 25, 2025)). And the Government seems to be doubling down on its ulterior motive, informing the Court that DOJ Office of Legal Counsel recently published an opinion on the matter. *See* Consol. Resp. at 3 n.1 (citing Office of Legal Counsel, *Authority to Obtain and Share Statewide Voter Roll Data*, slip op. (May 12, 2026), https://tinyurl.com/vebkdrwp). That opinion—issued well after these demands were sent and lawsuits initiated—says that DOJ can "seek statewide voter lists, and then … share the lists with … DHS." *See* Office of Legal Counsel, *supra*, at 1. In other words, the OLC opinion confirms the very motive the Government called "absurd" when the Secretary

12

identified it.  *See* Mot. to Dismiss at 12; *but see* Office of Legal Counsel, *supra*, at 5 (explaining that although DOJ "has proposed to share these lists with … DHS," it did so to "enable cross-referencing the lists against existing databases in order to identify illegal aliens who are ineligible to vote" and further explaining that "this activity may have incidental immigration consequences by providing DHS updated information regarding the location of illegal aliens").

And though the Government dismisses the Secretary's concerns as "absurd," that dismissal ignores that other courts agree with the Secretary.  The *Weber* court "d[id] not take lightly DOJ's obfuscation of its true motives" and called the stated purpose "pretextual."  816 F. Supp. 3d at 1186.  And the *Oregon* court said there was "serious doubt as to the true purposes" for the demand such that "[t]he presumption of regularity … no longer holds."  2026 WL 318402, at \*11.  The Government addresses neither these holdings nor the President's past statements.  This Court should take more care in considering the issue.

**IV.    Congress has not displaced the States as the primary regulators of elections, so West Virginia law applies here and forbids unredacted disclosure.**

**A.** On preemption, the Government largely ignores the Secretary's position.  In its place, the Government tells the Court that the Secretary "suggests that the Attorney General plays no role in the conduct of federal elections and that the federal laws at issue must yield to West Virginia's state privacy laws."  Consol. Resp. at 24.  The Government misses the mark.  The Secretary's real position was that "none of the federal statutes" in this case "displace States from the field of election law, nor do they conflict with West Virginia's redaction requirements."  Mot. to Dismiss at 20.  The Government has no real answer for *that* argument.

The Government at least agrees "[w]ithout question" that "the United States Constitution invests states with the primary responsibility for the conduct of federal elections."  Consol. Resp. at 24.  And the Secretary agrees that "the Constitution explicitly authorizes Congress to override

those state choices." *Id.*; *see* Mot. to Dismiss at 19.  So all parties agree (in theory) that States are presumptively in charge until Congress says otherwise.  Thus, the question is whether any federal law preempts West Virginia's redaction law.  *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013).  None does.

The Secretary argued that none of the relevant statutes here—Title III, HAVA, or the NVRA—conflicted with West Virginia's voter-list-redaction law.  *See* Mot. to Dismiss at 20.  In response, the Government doesn't point to any "positive and clear" language like Congress would normally deploy when displacing state election law.  *United States v. Gradwell*, 243 U.S. 476, 485 (1917).  Rather, the United States suggests some form of field preemption wherein the federal government has apparently displaced States entirely and now simply "trust[s]" the States "to conduct federal elections" subject to the Attorney General's oversight.  *See* Consol. Resp. at 25.  But "statutory text accurately communicates the scope of Congress's pre-emptive intent" in the Elections-Clause context.  *Inter Tribal Council of Ariz.*, 570 U.S. at 14.  The texts here reveal nothing like the preemption the Government now asserts.  And the Government doesn't dispute the Secretary's characterizations and interactions of the three laws with West Virginia's redaction requirement.  Thus, the Court should not "strain the intent and meaning of state election laws to find constitutional violations where there are none." *Sharma v. Hirsch*, 121 F.4th 1033, 1039 (4th Cir. 2024).

The Government's formulation of preemption also turns the Elections Clause on its head: the Clause gives Congress the power to "regulate, *in the last resort*, the election of its own members." *Sharma*, 121 F.4th at 1039 (quoting FEDERALIST NO. 59 (Alexander Hamilton) (1788) (C. Rossiter ed. 1961)).  "Executive regulatory authority over federal elections does not appear to have crossed the Framers' minds." *League of United Am. Citizens v. Exec. Off. of the President*,

14

780 F. Supp. 3d 135, 159 (D.D.C. 2025). So the Clause can't support the Government's sweeping view of preemption for all state laws interacting in any way with federal law. *See Gradwell*, 243 U.S. at 485 (Elections-Clause preemption achieved by "positive and clear" laws). Unless Congress overrode state election rules, the Elections Clause doesn't "restrict the way States enact legislation." *Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 815 (2015). Without any textual support, the Government's broad appeals to its view of Title III's purpose fall short. *See Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 778 (2019) (opinion of Gorsuch, J.) (warning courts away from finding preemption through purpose, as courts may "only wind up displacing perfectly legitimate state laws on the strength of 'purposes' that only we can see, that may seem perfectly logical to us, but that lack the democratic provenance the Constitution demands before a federal law may be declared supreme").

At bottom, West Virginia's redaction law isn't preventing the Attorney General from playing his role in federal elections. The demand fails because the Attorney General is acting outside the role Congress assigned to him. Congress did not displace State redaction laws, so the Attorney General cannot demand otherwise.

**B.** Because West Virginia law applies, the Secretary cannot hand over unredacted lists. The Government's contrary interpretation of West Virginia state law is inappropriate and incorrect.

*First*, and most importantly, the United States has no place "instruct[ing] state officials on how to conform their conduct to state law." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). In fact, "it is difficult to think of a greater intrusion on state sovereignty." *Id.* If the Court were to grant relief based on the Government's view of West Virginia's law (in the face of a contrary construction by the State's chief election officer), the result would "conflict[] directly with the principles of federalism that underlie the Eleventh Amendment." *Id.*; *see also Bragg v.*

15

*W. Va. Coal. Ass'n*, 248 F.3d 275, 296 (4th Cir. 2001) (describing a "federal command to a State official to comply with the State's law" as "abhorrent to the values underlying our federal structure").

*Second*, the Government's reading is wrong. West Virginia Code Section 3-2-30(g) applies to "data files containing voter information," and it doesn't say those files can be provided unredacted. That Section also permits only sharing with "any state or local election official for the purpose of voter registration and election administration." W. VA. CODE § 3-2-30(g). It doesn't allow limitless sharing with the federal government or sharing for the purported purpose here.

And West Virginia Code Section 5A-8-22(a)(1) allows release of the private information only if "authorized by federal law or regulation." Even if Title III covered the voter registration list, no federal law here requires the release of private information. The Government points to Title III's nondisclosure requirement and argues that its "privacy protection only has meaning if the records covered by [Title III] include non-public information." Consol. Resp. at 34. But the Government makes this assumption without any basis in the text. It's much more likely that Congress meant what it said and wanted to prohibit the Government from disclosing "*any* record or paper produced pursuant to this chapter." 52 U.S.C. § 20704 (emphasis added). If Congress meant only private records, it would have said as much. *See Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 461-62 (2002) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says." (cleaned up)). And anyway, the statute speaks only to the federal government's obligations, not the State's.

*Third*, West Virginia law doesn't change just because other States "routinely share" the data the Government seeks "with a third party." Consol. Resp. at 23. Nor does that fact enlarge the scope of the Government's authority to demand production. The Government offers no reason

16

that it would, either.  Whatever those other States do, West Virginia has made different judgments, under different laws.

Similarly, the Government's promises to "strictly abide by the statutory limitations in Section 304 and other federal privacy laws" are appreciated.  Consol. Resp. at 34.  As is the offer of a protective order.  *Id.*  But those promises don't amend West Virginia law to permit unredacted disclosure to trustworthy parties.

### V.      The Government promises to protect privacy but has not complied with statutory requirements.

The Government seeks to sidestep compliance with federal privacy laws by claiming that such laws are "affirmative defenses" that "cannot form the basis for dismissing the Complaint." Consol. Resp. at 27.  And remember: the Government says this is a summary proceeding, so if the defenses aren't able to be considered now, the Government's position would mean such defenses are never available.  Fortunately, the Government is wrong, and the privacy-law defenses "clearly appear[] on the face of the complaint."  *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993).  Thus, this Court is free to consider these defenses.  And like the *Weber* court, this Court should find that the "DOJ's request for [West Virginia's] unredacted voter rolls violates" these federal privacy laws.  *Weber*, 816 F. Supp. 3d at 1192.

Where the Government does address these laws, it falls short.  It largely offers assurances about how the data will be handled in practice.  But those assurances—even in the form of a protective order, *see* Consol. Resp. at 34—aren't a substitute for statutory prerequisites.  The Government must follow the law *before* it undertakes a collection like the demand.

*First*, the Government says that it is "complying with the provisions of the Privacy Act." Consol. Resp. at 28.  So the Government agrees that the Privacy Act applies to its request.  If that's true, notice of this specific collection must appear in the federal register.  *See* 5 U.S.C.

17

§ 552a(e)(4).  It doesn't.  Instead, the Government points to a number of *past* notices for different collections and revisions and assures the Court that the data will "be securely stored and not be subject to unauthorized dissemination or use."  *See* Consol. Resp. at 28-29.  But the Privacy Act demands more: a notice is required when a system of records is "establish[ed] or revis[ed]."  5 U.S.C. § 552a(e)(4).  "[N]one of the [notices] identified give sufficient notice to the American public" about *this* collection.  *Weber*, 816 F. Supp. 3d at 1194.  Thus, the demand violates the Privacy Act.

*Second*, the Government takes a similar swing at portraying compliance with the E-Government Act.  This time, it says that because West Virginia already maintained the list, the demand "is not initiating a new process whereby it is contacting individuals for information as contemplated" by the law.  Consol. Resp. at 30.  But it doesn't matter that West Virginia already kept this data; what's relevant is that the United States now seeks it.  And again, the Government's argument is based on the idea that past compliance is enough because the produced list "would be kept on a system for which a Privacy Impact Assessment has been done."  *Id.*  Not true: the E-Government Act requires an assessment before "initiating a new *collection* of information," not the creation of a new storage site.  Pub. L. No. 107-347, § 208(b), 116 Stat. 2899, 2921-22 (2002) (emphasis added).  "Since the DOJ does not cite to an applicable [assessment], it has failed its requirements under the E-Government Act."  *Weber*, 816 F. Supp. 3d at 1194.

*Third*, the Government claims that the Driver's Privacy Protection Act "prohibition is clearly not implicated in the present case" because the law has an exception "for use by any government agency … in carrying out its function."  Consol. Resp. at 31-32 (quoting 18 U.S.C. § 2721(b)(1)).  But this exception doesn't apply here.  The Government "has not identified how the use of" over a million West Virginians' "driver's license numbers would help it understand

whether [West Virginia]" is complying with voter-list-maintenance requirements. *Weber*, 816 F. Supp. 3d at 1195; *see also Senne v. Vill. of Palatine*, 695 F.3d 597, 606 (7th Cir. 2012) (en banc) ("When a particular piece of disclosed information is not *used* to effectuate that purpose in any way, the exception provides no protection for the disclosing party."). Thus, the "request for this information violates the [Driver's Privacy Protection Act]." *Weber*, 816 F. Supp. 3d at 1195.

**VI.    The Government concedes the First Amendment protects the information it seeks, yet it offers no authority for disregarding those protections.**

Finally, if Title III does grant such sweeping authority as the Government imagines, a new problem emerges: the statute itself would "impose an unconstitutional burden on the right to vote guaranteed by the First Amendment." *Benson*, 2026 WL 362789, at *4; *see also Greidinger v. Davis*, 988 F.2d 1344, 1354 (4th Cir. 1993). The Government agrees that "[w]ithout question, voting and registration implicate speech and actions protected under the First Amendment." Consol. Resp. at 32. Yet its response doesn't rebut *Benson*, *Greidinger*, or any other First Amendment authority. The Government simply waves the First Amendment away by saying that it can enforce HAVA and the NVRA, so it's "necessarily impl[ied]" that the Amendment's protections don't get in the way here. *See id.* But beyond allusions to practical concerns and the allegedly "plain[]" intentions of Congress, *see id.*, the Government offers no support for this position. Nor could it. Compelled disclosure of voters' personal information—including Social Security numbers, dates of birth, and driver's license numbers—could chill the willingness of citizens to register and vote. And as for what might be implied in the statutes, statutory mandates could never prevail over constitutional ones.

So even if the Court agrees with the Government on every other argument, the Court should follow *Benson* and "'avoid rendering [Title III] unconstitutional'" by declining "to read [the

statute] as requiring public disclosure of all personal information provided by prospective voters."

*Benson*, 2026 WL 362789, at *4 (quoting *United States v. Davis*, 588 U.S. 445, 463 n.6 (2019)).

**CONCLUSION**

The Court should dismiss the Complaint.

Respectfully submitted,

/s/ *Michael R. Williams*
Michael R. Williams (WV Bar # 14148)
 *Solicitor General*
Caleb A. Seckman (WV Bar # 13964)
 *Assistant Solicitor General*
West Virginia Attorney General's Office
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25305
Michael.R.Williams@wvago.gov
Caleb.A.Seckman@wvago.gov
Telephone: (304) 558-2021
Fax: (304) 558-0140

*Counsel for Defendant Kris Warner*

DATE: May 20, 2026

20
